## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**Pastor Rich Penkoski, Warriors For Christ DC Chapter, Chris Sevier Esq., De Facto Attorneys General DC Division, Tex Christopher, Special Forces Of Liberty DC Chapter,**
**(Plaintiffs)**

Vs.

**Muriel Bowser, In her official capacity as Mayor of the District Of Columbia**
**(Defendant)**

Case: 1:20-cv-01519   JURY DEMAND
Assigned To : McFadden, Trevor N.
Assign. Date : 6/10/2020
Description: PRO SE GEN CIV (F-DECK)

ORIGINAL COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

JURY DEMAND

### ORIGINAL COMPLAINT
### Against The Mayor Of Dc For Excessive Entanglement With The Black Lives Matter Cult In Violation Of The Establishment Clause Of The First Amendment Of The United States Constitution

www.blacklivesmattercult.com

### I. INTRODUCTION:

1.  Now Comes (1) Pastor Rich Penkoski, founder of the DC chapter of Warriors For Christ and DC street preacher, (2) 1LT Chris Sevier Esq, former Judge Advocate General and Founder of De Facto Attorneys General DC Division, Congressional liaison between the House and Senate on Constitutional Legislative Affairs, and outspoken Electronic Dance artist, and (3) Tex Christopher, former bull rider, community organizer, and registered DC lobbyist, against


RECEIVED
Mail Room
JUN 1 0 2020
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Mayor Muriel Bowser in her official capacity as mayor of the District of Columbia pursuant to the First Amendment Establishment Clause of the United States Constitution.[1]

2.   In early June 2020, Defendant Bowser painted a permanent massive "BLACK LIVES MATTER" banner in bold letters that spanned two blocks of 16th street, a central axis that leads southward straight to the White House to show respect for the Black Lives Matter cult orthodoxy.[2]  At the same time, Defendant Bowser also changed a nearby street name to Black Lives Matter Plaza to pay respect to the Black Lives Matter liturgy at the taxpayers expense.[3] Defendant Bowser's paramount objective was to convey to the Plaintiffs and all other taxpayers the Black Lives Matter cult, which is a denominational sect of the religion of Secular Humanism, is the favored religion of the city and the Nation and that another who disagrees with their gospel narrative is a second class citizen.

3.   Under the totality of the circumstances, Defendant Bowser's policy decision to display the Black Lives Matter banner and to change a street name in the manner complained of violates the Establishment Clause of the First Amendment of the United States Constitution by failing all the three prongs of the Lemon test by (a) constituting a non-secular sham that (b) cultivates an indefensible legal weapon against non-observers of the Black Lives Matter religion and (c) serves to excessively entangle the government with the the religion of Secular Humanism.

4.   As taxpayers with a logical nexus to assert standing, the Plaintiffs in this action demand that this Article III Court issue an temporary and permanent injunction requiring that Defendant Bowser immediately remove an Black Lives Matter religious displays on 16th Street

---

[1] For the non-lawyer Plaintiffs in this action, counsel will be appearing pro hac vice in due course.
[2] https://www.cnn.com/2020/06/05/us/black-lives-matter-dc-street-white-house-trnd/index.html
[3] https://www.eonline.com/news/1158968/washington-d-c-mayor-muriel-bowser-changes-street-name-to-black-lives-matter-plaza

and on all other public property throughout the city.  Additionally, for every day that the Black Lives Matter's banner is displayed on 16th Street, the Plaintiffs ask the Court to order the city to replace the banner with three separate banners to be displayed at different intervals for the same duration in the same manner, scale, and magnitude as the original banner and at the city's expense. The first of the three banners should read "Blue Lives Matter" to show respect for law enforcement, which is a secular statement that represents the government's inherent police power and different provisions of Article II of the United States Constitution.  The Second banner, should read "Green Lives Matter" to show respect for the Guard units that responded to the call to defend the city from rioters that the Mayor was non-responsive towards, some of whom are congregational members of the Black Lives Matter church. The third sign should read "All Lives Matter," which is a secular self-evident  all inclusive truth claim that reflects what the Fourteenth Amendment Equal Protection Clause of the United States Constitution requires from government actors and is a self-evident neutral message that is in the Declaration of Independence itself.

5.  Additionally, the Plaintiffs ask that the Court order Defendant Bowser to change the street name from Black Lives Matter Plaza to something secular or to alternatively rename a comparable street to "Jesus is the answer Plaza."

6.  The Plaintiffs bring a second case of action under the Fourteenth Amendment's Equal Protection Clause because the banner Black Lives Matter is under inclusive and does not represent the members of non-obvious suspect classes. The Black Lives Matter banner conveys that black people are the favored race of the city of DC, which is of course a racist contention floated by a racist Democrat who persistently refuses to think logically. Yet, this cause of action will focus primarily on the Establishment Clause of action.

## II.  **NATURE OF THE CASE**

7.  Justice Scalia stated that the most under-developed area of the law is Establishment

Clause jurisprudence. That was an understatement. This action will help develop First

Amendment jurisprudence and inform citizens and government officials that irreligion is a

religion, and that the Free Exercise of religion is not absolute, especially when it comes to some

religious ideologies.  While the evidence shows that the Black Lives Matter cult is a religious

organization that warrants limited speech protection under the Free Exercise Clause of the First

Amendment, just like one of the Democrats prior favored religious organizations the Klu Klux

Klan does, the freedom to exercise religion is not absolute. The dogma promoted by the Black

Lives Matter cult is inconsistent with the peace and safety of the state and amounts to disfavored

speech that is offensive, controversial, and dangerous.   The government has a narrowly tailored

compelling interest to disfavor Black Lives Matter orthodoxy, especially since it calls for

immediate acts of violence or seeks to entice criminal activity to include the destruction of

property.  As a brainwashed Democrat, Defendant Bowser is too truth allergic to see this

otherwise inescapable reality

More importantly, this action will demonstrate that the Establishment Clause ties the

hands of all moral relativists government officials from taking direct or symbolic action to

endorse, favor, respect, or promote the Black Lives Matter religion or any other denominational

sect of the Secular Humanist religion, to include the LGBTQ denominational sect that advocates

a worldview that is licentious and erodes community standards of decency.[4]

---

[4] The government's endorsement of Secular Humanism religion has demonstrated that people who are intolerant of intolerant people are intolerant, people who are judgmental against judgmental people are judgmental, and people who are dogmatic about not being dogmatic are the most dogmatic. This Court is being asked to serve as a check and balance on the Mayor Bowser and likewise the Democrat party writ large. Continued non-responsiveness of the Judiciary regarding the demand that all federal and state actors disentangle the government with the religion of Secular Humanism will more likely than not continue to push society into violence and potential sedition. The stakes

8.   John Adams was correct in stating that "Our Constitution was made only for a moral and religious People. It is wholly inadequate to the government of any other." The ideology advocated by the Black Lives Matter cult is objectively immoral from the reasonable person perspective. Yet, this Honorable Court is not being asked to weigh in on the merits or plausibility of the truth claims floated by the Black Lives Matter cult that Defendant Bowser endorses and favors for self-serving political reasons. Despite whatever acrimonious or pugilistic nature of the cause, this is a very simple case were this Honorable Court is being asked to determine if Defendant's Bowser's display of the Black Lives Matter banner on 16th Street and her renaming a street to Black Lives Matter Plaza violates the Establishment Clause of the First Amendment for failing at least one prong of the Lemon Test.[5] This is also a case where the Court should determine with the display is underinclusive of non-obvious suspect classes of the race category - which it is.

### III.   LEGAL FACTS AND BACKGROUND FACTS

9.   The United States is a Constitutional Republic that the District of Columbia is part of.

10.   The Establishment Clause of the First Amendment of the United States Constitution states that "[The Government] shall make no law respecting an establishment of religion"

---

are real and a demand for strict Constitutional compliance is not a game. The Plaintiffs would respectfully remind this Court of a quote from President Lincoln that seems appropriate: "From whence shall we expect the approach of danger? Shall some trans-Atlantic military giant step the earth and crush us at a blow? Never. All the armies of Europe and Asia...could not by force take a drink from the Ohio River or make a track on the Blue Ridge in the trial of a thousand years. No, if destruction be our lot we must ourselves be its author and finisher. As a nation of free men we will live forever or die by suicide." - Abraham Lincoln's Lyceum address.

[5] The Plaintiffs in this case openly admit that they are far worse than racists or self-identified transvestites. They are Christians, which means that they admit that they are far capable of unimaginable acts of evil and yet, are more loved by the Creator reference in the Declaration of Independence than they could ever dare hope. This is not a case about who is morally superior - the Plaintiffs or Defendant Bowser. The Plaintiffs do not know Defendant Bowser. The meaningful question raised by this cause of action is whether the Defendant's actions violate the Establishment Clause of the First Amendment for failing at least one prong of the Lemon Test. The Plaintiffs have appeared before this Court to demonstrate with convincing clarity that the Defendant's government action violates all three prongs of the Lemon Test by a landslide.

11. The United States Supreme Court held in *Everson v. Bd of Education,* 330 U.S. 1 (1947) that the Establishment Clause of the First Amendment applies to the States and to the District of Columbia through the Fourteenth Amendment.

12. The Establishment Clause applies just as equally to Executive Branch expenditures as it does to legislative exercises of the Taxing and Spending Power, to permit Executive Branch use of appropriated funds to accomplish an unconstitutional end would mean that "Establishment Clause protection would melt away." See *Hein v. Freedom From Religion Foundatio*n , 551 U.S. 587, 640 (2007) (Souter, J., dissenting).

13. All religion amounts to is a set of unproven answers to the greater questions like why are we here, what gives us identity, what should we be doing as humans, and what happens after death.

14. The First Amendment Establishment Clause was not just designed to merely prohibit the government from respecting the edicts of institutionalized religions but from especially respecting the doctrines of non-institutionalized religions as well, to include the religious dogma promoted by the Black Lives Matter cult.

15. The religion of Secular Humanism is also commonly referred to as postmodern individualistic moral relativism or expressive individualism by scholars like Pastor Tim Keller or the religion of wokeness, by political pundits like Michael Knowles of the Daily Wire.[6]

16. The United States Supreme Court found that Secular Humanism is a religion for the purposes of the First Amendment Establishment Clause in *Torcaso v. Watkins,* 367 U.S. 488 (1961), stating "among religions in this country which do not teach what would generally be

---

[6] https://www.facebook.com/watch/?v=621412225395443

considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular

Humanism, and others. See *Oklahoma Ethical Society v. District of Columbia*, 101 U. S. App. D.

C. 371, 249 F. 2d 127; *Fellowship of Humanity v. County of Alameda*, 153 Cal. App. 2d 673, 315

P. 2d 394; II Encyclopaedia of the Social Sciences 293; 4 Encyclopaedia Britannica (1957 ed.)

325-327; 21 id., at 797; Archer, Faiths Men Live By (2d ed. revised by Purinton), 120-138,

254-313; 1961 World Almanac 695, 712; Year Book of American Churches for 1961, at 29, 47."

17.  Most of the Federal Courts of appeals have found that Secular Humanism is a

religion for the purpose of the First Amendment Establishment Clause in cases such as:

(a) *Malnak v. Yogi*, 592 F.2d 197, 200-15 (3d Cir.1979);

(b) *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th Cir. 1977);

(c) *Thomas v. Review Bd.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981);

*Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003);

(d) *Real Alternatives, Inc. v. Se'y Dep 't of Health & Human Ser*, 150 F. Supp. 3d 419,

2017 WL3324690 (3d Cir. Aug. 4, 2017); and

(e) *Wells v. City and County of Denver*, 257 F.3d 1132, 1148 (10th Cir. 2001).[7]

---

[7] While intellectually dishonest Judges on the 9th Circuit and DC Circuit Court of appeals have seemingly failed to recognize that Secular Humanism is a religion, the United States Supreme Court, which outranks both already has. The Plaintiffs are working with just about every single legislative body in the Country to ensure that government treat Secular Humanism not only as a religion but a disfavored religion that attempts to justify practices that are inconsistent with the peace and safety of the state through legislative instruments like the Life Appropriation Act and the Disentanglement Act. (see www.lifeappropriationact.com and www.disentanglementact.com)  Any government actor that fails to see and understand that Secular Humanism is a religion for purposes of the First Amendment Establishment Clause is going to eventually discover that such a failure is an occupational health hazard. This is includes members of the judiciary who intend to entangle the government with the destructive religion of Secular Humanism. To better understand the Life Appropriation Act, which requires the government to stop funding convenience abortions with tax payer funds watch this hearing before the Finance Committee in Rhode Island: https://youtu.be/wVDrnFTwJJo.  To better understand the Disentanglement Act, which requires that the government completely disentangle itself with the LGBTQ church, watch this short three minute video: https://youtu.be/VhFM-Hg7298.

18.   The Black Lives Matters organization is "organized, full, and has a code by which members may guide their daily lives," making it fit the legal definition of a religious organization as defined by the Court in *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*,150F. Supp. 3d 419, (3d Cir. Aug. 4, 2017).

19.   The evidence shows that the Black Lives Matters cult hosts public ritualistic atonement ceremonies and incantations that are predicated on a series of unproven faith-based assumptions that are implicitly religious and inseparably linked to the religion of Secular Humanism.

20.   Instead of having a cross, the ten commandments, or the star and crescent, the Black Lives Matters  cult has its own religious symbols such as a raised fist to symbolize its unproven religious values.[8]

21.   Here are just some of the naked assertions and unproven faith-based assumptions that are controversial and implicitly religious that the Black Lives Matter cult believe:

(a) Black lives do not matter to the Black Lives Matter cult unless a black person was killed by a white police officer in the line of duty;

(b) Black lives would be safer if Article II was spontaneously gutted from the Constitution and the government lost its policing powers;

(c) Segments of law enforcement purpose to systematically and endemically marginalize and oppress certain citizens because of their skin pigmentation without probable cause due to racial animus that the members of Black Lives Matter claim to not suffer from ad nauseum;

---

[8] https://i.redd.it/m5ackmclri351.jpg

(d) By encouraging self-help criminal acts of vandalism and assault against innocent people, the justice system will ensure outcomes desired by Black Lives Matter cult in criminal trials involving defendants they disfavor; and

(e) The gay civil rights movement should be treated equal to the race-based civil rights movement, even though the race-based civil rights movement was actually based on genetics and immutability, whereas the gay civil rights movement is based on faith-based self-identification and unproven religious theories; (see www.disentanglementact.com);[9]

(f) Disrupting disrupt the Western-prescribed nuclear family structure is a moral virtue;

22. Defendant Bowser knew that when she erected the permanent Black Lives Matter display on 16th Street and when she changed the street name that she was taking direct and symbolic action pay respect to the Black Lives Matter orthodoxy with the government's imprimatur at the taxpayer expense she was excessively entangling the government with a narrow and exclusive religion that is controversial and divisive.

23. The Plaintiffs in this action disagree with the plausibility of the unproven truth claims floated by the Black Lives Matter cult and find their orthodoxy to be intellectually dishonest, immoral, manipulative, and licentious, not to mention racially and emotionally exploitative. The Plaintiffs object to Defendant Bowsers misappropriation of their tax dollars to display and maintain the Black Lives Matter banner on 16th Street and the changing of a nearby street name to Black Lives Matter Plaza.

---

[9] According to the Black Lives Matter website, the Black Lives Matter cult is in bed with the LGBTQ church. In their marxist manifesto, the Black Lives Matter cult makes the following statements: "We are self-reflexive and do the work required to dismantle cisgender privilege and uplift Black trans folk, especially Black trans women who continue to be disproportionately impacted by trans-antagonistic violence." The Plaintiffs believe that there are no such thing as transvestite, but that there are some people who for some period of time self-identity as transgender for some period of time.

24.   The Black Lives Matter cult says that it is "unapologetically Black in [their] positioning" because it is an black identitarian group, just as the Democrats other favorite racist religious organization, the KKK, is a white identitarian group. The Democrats do not care about race. They care about division and imperialistic conquer and divide strategies to amass power around themselves.

25.   Throughout their manifestos, the Black Lives Matter cult uses the word "comrade" to virtue signal that they are a pro-communist group that is trying to impose communism in a capitalist Nation from the inside out through unlawful self-help measures that can only be described as seditious.

## V.  THE PARTIES

26.   THE MAYOR OF MORAL RELATIVISM: Muriel Bowser is the Mayor of the District of Columbia and chief executive officer.  Because the Plaintiffs are color blind they are not sure what race she is, just as they are not sure what race they are, but none of that matters. Defendant Bowser ordered the non-secular permanent display of the Black Lives Matters banner to convey to all citizens of the District and to the Nation that the Black Lives Matter cult's version of Secular Humanism is the favored religion of the District and of the Nation. She also ordered that the name of a street near the White House be changed to "Black Lives Matter." Defendant Bowser intentionally disregarded her Article VI oath of office in violating the Establishment Clause in a manner that put law enforcement and military members in immediate danger. She is well aware that the Black Lives Matter movement causes law enforcement assets to be less responsive to criminal acts in black communities, which puts black lives in danger. She

is being sued in her official capacity as the Mayor who misused taxpayer dollars to erect the challenged displays.

27.  At the time that Defendant Bowser ordered the Black Lives Matter display to be erected on 16th Street and the name of nearby street to be changed to "Black Lives Matter Plaza," she knew that:

(a)  Black Lives Matter is a religious organization that is deeply controversial;

(b) Black Lives Matter advocated ideology that was in-part inconsistent with the peace and safety of the state and is warranted the same kind of limited free exercise protections as the Democrats other favored race obsessed group, the Klu Klux Klan;

(c) 16th Street and the street renamed Black Lives Matter are free and open to the public to include people, like the Plaintiffs, who sincerely believe that the Black Lives Matter cult is a dishonest, dangerous, depersonalizing, desensitizing, and dehumanizing institution;

(d) she was weaponizing race issues for personal political gain at the expense of her oath of office undertaken pursuant to Article VI of the United States Constitution;

(e) law enforcement personnel in the District of Columbia consists of members of every race and religion;

(f) law enforcement officers are bound by oath to uphold the Constitution of the United States and the Constitution of this state and to dispassionately enforce the law as agents of the executive branch;

(g) skin pigmentation is predicated on immutability and genetics and the government is prohibited from discrimination on the basis of race pursuant to the Fourteenth Amendment's Equal Protection Clause of the United States Constitution;

(h)  the District of Columbia and all 50 states already have in place robust procedures that prohibit and punish misconduct or unlawful behavior of a police officer and that allow a victim of police brutality to seek compensation from the victims compensation fund; and

(i) very few citizens of this state actually believe that a person's life does not matter as the result of the skin pigmentation they were born with;

28.  Beliefs about racial superiority, no matter how rare or morally repugnant, are afforded limited protection as a religious concept under the First Amendment's Free Exercise Clause of the United States Constitution because the beliefs comes out of the religion of Secular Humanism and are inconsistent with the peace and safety of the state;

29.  While there is a well-documented history of immoral policies that unjustifiably permitted discrimination on the basis of race in the Jim Crow and slavery era, those laws have been repealed and replaced with policies that prohibit and punish race-based discriminatory practices, as required by the Fourteenth Amendment of the United States Constitution and in the interest of justice;

30.  The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Bill of Rights, and the Equal Protection guarantees that all lives matter, to include members of a non-obvious suspect class;

31.  Black Lives Matter banner would cause law enforcement assets to be reluctant to be responsive to criminal acts perpetrated by black Americans, which would cause more black Americans to suffer harm without adequate protection, which is of course the actual goal of the Black Lives Matter cult.

32.  <u>THE CHRIST FOLLOWING PLAINTIFFS</u>: The Plaintiffs are Christians. They believe in the radically transformative power of Jesus Christ. The Plaintiffs believe that when the laws of the United States parallel Christian principles our citizens flourish. The fundamental principle at the heart of Christianity is a man who claimed to be God who while dying on the cross following a sham trial before an inept judiciary loved his enemies and told his followers to do the same.  Jesus commands his followers to treat people who think differently than they do to be better than themselves. Yet, the Plaintiffs' personal religious beliefs are almost entirely irrelevant in these proceedings. What is relevant is that the Plaintiffs do not want to be coercively required to kneel before the altar of the Black Lives Matter cult as Defendant Bowser is symbolically and directly requiring through her erection of the challenged displays.

33.  Unlike Defendant Bowser, the Plaintiffs are not before this Court attempting to unconstitutionally convert the government into their own private church in a pathetic effort to feel less shamed and inadequate.  Christianity stands on its own without the government's endorsement. Besides, even if the government were to unlawfully make Christianity the official religion of the Country, it would create the very legalism that Christ himself was so adamantly opposed to. It is debatable as to whether legalism or moral relativism is a worse form of governance. This is a simple action where the Plaintiffs are asking this Court to manifest the intellectual honesty to order the removal of the Black Lives Matter banner and street sign because the displays were the result of sham policies by Mayor who lacks the character fitness to understand the difference between right and wrong, real and fake, and secular and non-secular.

34.  TAXPAYER STANDING:  The Plaintiffs all pay a variety of taxes in the District of

Columbia, including sale taxes and all other forms of taxes. They will continue to pay taxes in

the District of Columbia.[10]

35.  1LT CHRIS SEVIER ESQ. Chris Sevier is a former Judge Advocate General,

founder of De Facto Attorneys General DC division, author of a litany of Constitutional based

legislation for all 50 states and the federal Congress, combat infantry officer, target of countless

government reprisal campaigns chaired by moral relativists who have an emotional problem with

the truth. Plaintiff Sevier remains a favorite target of dishonest fake news media enterprise that

relentlessly conspires with the Democrat party to entangle the government with their asinine

religion of moral relativism. He is an international electronic vocalist with a lot to say. [11] Like

recording artist Lil Wayne who was rescued by a police officer named "Uncle Bob" following an

accidental shooting, Plaintiffs Sevier does not know "what racism is," [12]

36.  PASTOR RICH PENKOSKI: Pastor Penkoski is the founder of the DC chapter of

Warriors For Christ. See https://www.facebook.com/RealWarriorsforChrist/.  There are countless

people of color in Pastor Penkoski's congregation who support his decision to bring this action

---

[10] The Plaintiffs have personally authored legislation for all 50 states and the Federal government that defines
taxpayer standing as a low threshold to meet. It is a long standing jurisprudence that Congress is free to legislate
away prudential restraints and confer standing to the extent permitted by Article III.
[11] Plaintiff Sevier is the founder of the DC division of De Facto Attorneys General, a former Judge Advocate
General and combat infantry officer, who was assigned to work on the rule of law mission to ensure that other
countries comply with their Constitution.  He is author of a litany of legislation author through federal litigation, to include
the Human Trafficking And Child Exploitation Prevention Act (see www.humantraffickingpreventionact.com); the
Stop Social Media Censorship Act (see www.stopsocialmediacensorshipact.com); the Disentanglement Act; (see
www.disentanglementact.com); the Life Appropriaton Act (see www.lifeappropriationact.com); the Stop Guilt By
Accusation Act (see www.stopguiltbyaccusationact.com) ; the Elevated Marriage Act; and a resolution that resolves
that Black Lives Matter is a religious organization that touts disfavored unprotected speech (see
www.blacklivesmattercult.com).

[12] https://www.youtube.com/watch?v=8r5KFAeujww

against "Mayor Bowser the loser," as his members affectionately refer to her on social media websites operated by Warriors For Christ.  Plaintiff Penkoski and his congregation believe as black American Thomas Sorwell does that "Racism is not dead. But it is on life-support, kept alive mainly by the people [like Mayor Bowser] who use it for an excuse or to keep minority communities fearful or resentful enough to turn out as a voting bloc on election day." Plaintiff Penkoski is deeply offended by the display of the Black Lives Matters banner by the Defendant in a manner that makes himself and his congregation members feel like second class citizens, while detracting from their ministries efforts.

37.  TEX CHRISTOPHER: Tex Christopher is a community organizer who works with a host of mult-racial Pastors on social and political issues in an effort to restore breakdowns in the rule of law and to promote family values. As former bull rider, Plaintiff Christopher is used to all kinds of political and legal rodeos with the unruly to include political ones involving brainwashed moral relativist Mayors who let the DNC do the thinking for them.

## VI.  PLAINTIFFS LOGICAL NEXUS TO SUE

38.  The Plaintiffs have a logical nexus to assert taxpayer standing for several reasons.

39.  CHILLING EFFECT ON THE PLAINTIFFS: Pastor Penkoski, Plaintiff Sevier, and Plaintiff Christopher all walk past and are exposed to the unavoidable Black Lives Matter display Defendant Bowser on 16th Street and on the renamed street.

40.  Defendant Bowser intended the display to be permanent and unavoidable to coercively convey to all citizens that Black Lives Matters is the favored religion of the city of and of the Nation.  This is the message the Plaintiffs receive. The display also suggest to the Plaintiffs that the black race is so superior to all others that the police should be stifled from

responding to criminal acts because some black people allegedly had unjustified trouble with law enforcement.

41. Pastor Penkoski is a street preacher who now feels unable to preach on the streets where Defendant Bowser erected the challenged displays.

42. Plaintiffs Sevier and Christopher are required to walk past the challenged display as they carry out official business at the Supreme Court, White House, and Congressional buildings that associate directly with legislative measures that require all aspects of government to disentangle itself from the Secular Humanist religion. The display interferes with the Plaintiffs efforts to carry out the rule of law mission and to better secure Constitutional compliance of government actors. While Defendant Bowser thinks that the Constitution's First Amendment Establishment Clause is an inconvenient suggestion, the Plaintiffs are on a continuing mission to demonstrate that it is not and that government must disentangle itself with the orthodoxy of all denominations of the church of Secular Humanism, include the LGBTQ community, Planned Parenthood, and Black Lives Matter.  If the government continues to fail to be responsive to this call of separation of church and state, we will continue to spiral into violence, division, and sedition.

43. It is these kinds of factors that cause the Plaintiffs to believe that they have a logical nexus to seek accountability. This is especially true since Plaintiff Sevier has, himself, defined what the definition of a logical nexus is for different state legislative bodies.

44. The challenged religious display amounts to an intimidation tactic for non-observers of the Black Lives Matter religion, like the Plaintiffs, and its display cultivates a chilling effect that causes the Plaintiffs to actually feel like second class citizens, compelling them to file suit to

remove a religious display that is based on unproven truth claims that is causing division, crime, and violence, as the result of encouraging the non-responsiveness of law enforcement officials.

45. <u>ALLEGATIONS OF ALLEGED POLICE MISCONDUCT DOES NOT JUSTIFY THE NON-SECULAR DISPLAY</u>:  Plaintiff Sevier, himself, has been the subject of all kinds of malicious police brutality that completely lacked probable cause and yet he is an ardent supporter of law enforcement.  Devout members of the Black Live Matters cult and disciples of their sister denomination, the LGBTQ church, have acted in concert to maliciously weaponize the police to harass Plaintiff Sevier simply because they disagree with his proposed legislation.  This has led to an unbelievable amount of malicious prosecution, abuse of process, and police brutality.[13] But the Plaintiff Sevier does not hold law enforcement accountable because he knows that they are merely reacting to fake new narratives floated by devout moral relativists or false reports lodged by zealous atheistic activists who maliciously misuse the police for ulterior purposes.

46. <u>GREEN LIVES MATTER PERSONAL CONNECTION</u>: As members of the Military, Plaintiff Sevier and Pastor Penkoski are deeply offended at the Defendant's religious display and what it symbolizes in terms of the Defendant Bowser service discrediting

---

[13] Plaintiff Sevier is all too familiar with abusive practices of law enforcement and other state actors personally. Plaintiff Sevier has been systematically targeted and victimized by police assets that were falsely weaponized in a malicious prosecution and abuse of process political power plays, simply because someone disagreed with his political and religious worldview. This would especially include police assets at state capitols, like South Carolina, Georgia, Iowa, Maryland, South Dakota, Missouri, West Virginia, Kentucky, Alabama, Mississippi, Arkansas, and yet, Plaintiff Sevier is a major proponent of law enforcement and the Military, having attended combat basic training, Officer Candidate School, and Officer Basic Training at TJAGLCS.  Plaintiff Sevier understands from direct experience that police and military personnel are held to higher disciplinary standards and subjected to a litany of putative measures for misconduct and unlawful acts.  He acknowledges that the job of law enforcement is incredibly difficult, complex, nuanced, critical, and demanding. He is deeply offended at the assault that Black Lives Matters has launched against law enforcement personnel based on religious assumptions that are more likely than not removed from reality and impersonalistically floated to advance a self-serving and dangerous political agenda that is inconsistent with the peace and safety of the state.  Plaintiff Sevier has been the target of moral relativist in office like Krisann Hodges at the Tennessee Board of Professional Responsibility, who can abuse the law with actual impunity. Plaintiff Sevier is resolved to regulate deep state ethics commission who actually suffer from a lack of material checks and balances and who tend to be run by "careerist pigs."

mistreatment of members of the National Guard who were summoned to the Capitol city in

response to the recent riots that Mayor Bowser could not handle due to her profound

incompetency and non-existent leadership.  Part of Black Lives Matter gospel narrative

manifested in the challenged displays is that self-help measures can be taken against National

Guard members and police officers, which is offensive to the Plaintiff Sevier and Plaintiff

Penkoski, who served and continue to advance the mission of DOD. Such per se service

discrediting misconduct undertaken by Defendant Bowser, who has never served anything in life

other than her own personal interest, constitutes an additional reason why the Plaintiffs have a

logical nexus to ask this court to grant the relief sought.

47. PROTECTING FAMILIES V. DESTROYING THEM: The Black Lives Matter cult

purposes to "disrupt the Western-prescribed nuclear family structure" whereas, the Plaintiffs, the

authors of the Human Trafficking And Child Exploitation Prevention Act, relentlessly fight to

strengthen and protect the Western-prescribed nuclear family structure, which causes the

Plaintiffs to be deeply offended by the challenged displays. (see

www.humantraffickingpreventionact.com) (https://youtu.be/Yit6YveYQ0Y)

48. VICTIMS OF CANCEL CULTURE: The Plaintiffs are victims of cancel culture

because of their opposition against Black Lives Matters movement and their sister denomination

the LGBTQ church. The record company Anjuna Beats, headed up by Above and Beyond, which

markets itself as place of inclusion and tolerance economically injure Plaintiff Sevier for his

instance as a rule of law Judge Advocate General that state actors in the United States comply

with the United States Constitution by disentangling itself with all aspects of the Secular

Humanist religion. The religious persecution has gotten so out of control that Plaintiff Sevier is

left with no choice but to prosecute Anjuna Beats into the ground for its decision to meddle in Constitutional politics in the United States.

49. PERSONAL ASSAULT AND HARASSMENT:  The Plaintiffs have been the subject of an unbelievable amount of well documented unlawful harassment and abuse by the phony tolerant Black Lives Matter congregational members and members of other affiliate denominational sects that fall under the same religion of Secular Humanism. For these reasons and others, the evidence shows that the Plaintiffs have a logical nexus to pursue this cause of action to restore order, peace, and Constitutional supremacy.

## VII.  JURISDICTION AND VENUE

50.  Jurisdiction is based on 28 U.S.C. § 1343 and 42 U.S.C. § 1983 for claims arising under the United States Constitution. Declaratory relief is authorized by 28 U.S.C. § 2201 and § 2202 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by the United States Code and Rule 65 of the Federal Rules of Civil Procedure.

51.  This Court has jurisdiction under the First Amendment Establishment Clause because the Defendant's actions violated the "lemon" test and "coercion" test, a.  Lynch v. Donnelly, 465 U.S. 668, 687-94 (1984)(lemon test), *Lee v. Weisman*, 505 U.S. 577 (1992); *School District v. Doe*, 530 U.S. 290 (2000); *County of Allegheny v. ACLU*, 492 U.S. 573 (1989)(coercion test); *McCreary Cnty, Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); Engel v. Vitale, 370 U.S. 421, 431 (1962). This Court has jurisdiction under the Fourteenth Amendment Equal Protection Clause because the banner is under inclusive and does not represent the non-obvious classes of a suspect class.

52. This Court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. § 1331 and § 1367(a). Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to this action occurred in the District of Columbia.

53. The Plaintiffs are taxpayers who have standing to enjoin the Defendants under *Flast v. Cohen*, 392 U.S. 83 (1968) exception and for other reasons.

## VIII.  COUNT ONE
## FIRST AMENDMENT ESTABLISHMENT CLAUSE VIOLATION

54. Plaintiffs re-allegeand re-aver all of the allegations contained in the previous paragraphs. 42 U.S.C. § 1983 prohibits Defendant Bowser from depriving Plaintiffs of "rights, privileges and immunities secured by the Constitution and laws" of the United States of America.

55. The Establishment Clause of the First Amendment to the United States Constitution provides that a state"shall make no law respecting an establishment of religion." It is made applicable to Defendant Bowswer through the Fourteenth Amendment.

56. The Establishment Clause of the First Amendment forbids the enactment of any law, program, or practice "respecting an establishment of religion." Mayors are required to pursue a course of neutrality with respect to religion.

57. From the reasonable person perspective, Defendant Bowser's decision to display the Black Lives Matter banner in the manner complained of fails all three prongs of the Lemon Test and violates the First Amendment Establishment Clause for constituting a non-secular sham that lacks a primary secular purpose that has cultivated an indefensible legal weapon against

non-observers of the Blacks Live Matter Cult and for serving to excessively entangle the

government with the religion of Secular Humanism.[14]

58.   The Plaintiffs are only required to show that Defendant Bowser's decision to display

the Black Lives Matter banner fails just one prong of the Lemon Test in order to acquire an

injunction. The evidence shows that Defendant's actions fail all three prongs of the Lemon Test

by a landslide. Here is a short 3 minute video that explains what the Lemon Test is:

https://youtu.be/_hYslZWsjxA.

59.   The Plaintiffs, like millions of other Americans to include Black Americans, believe

that Black Lives Matters dogma is destructive and immoral. They also believe that to enable acts

of immorality is itself an act of immorality. Therefore,  Defendant Bowser's decision to allocate

taxpayer resources to erect the challenged displays causes the Plaintiffs to violate their own

conscience by the simple act of paying taxes. It is an evil that the Establishment Clause of the

United States Constitution was designed to prohibit.

---

[14] To pass muster under the Establishment Clause, a practice must satisfy the *Lemon* test, pursuant to which it must:
(1) have a valid secular purpose; (2) not have the effect of advancing, endorsing, or inhibiting religion; and (3) not
foster excessive entanglement with religion. Id. at 592 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). It is
important to understand that government action "violates the Establishment Clause if it fails to satisfy any of these
prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *Agostini v. Felton*, 521 U.S. 203, 218 (1997).  The
evidence will show that Mayor's Black Lives Matter displays all three prongs of the  *Lemon* Test. At the core of the
"Establishment Clause is the requirement that a government justify in secular terms its purpose for engaging in
activities which may appear to endorse the beliefs of a particular religion." *ACLU v. Rabun Cnty. Chamber of
Commerce, Inc.,*698 F. 2d 1098, 1111 (11th Cir.1983).This secular purpose must be the "pre-eminent" and
"primary" force driving the government's action, and "has to be genuine, not a sham, and not merely secondary to a
religious objective." *McCreary Cnty, Ky. v. ACLU of Ky.,* 545 U.S. 844 (2005). Under this second prong of the
*Lemon* test, courts ask, "irrespective of the . . . stated purpose, whether [the state action] . . has the primary effect of
conveying a message that the [government] is advancing or inhibiting religion." *Indiana Civil Liberties Union v.
O'Bannon,* 259 F.3d 766, 771 (7th Cir. 2001). The "effect prong asks whether, irrespective of government's actual
purpose," *Wallace v. Jaffree,* 4 72 U.S. 38, 56 n.42 (1985), the "symbolic union of church and state...is sufficiently
likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as
a disapproval, of their individual religious choices." *School Dist. v. Ball*, 473 U.S. 373, 390 (1985); *see also Larkin
v. Grendel's Den*, 459 U.S. 116, 126-27 (1982)(even the "mere appearance" of religious endorsement is prohibited).
The Mayor's display of the Black Lives Matters banner amounts to a "legal weapon that no [Christian or
non-observer of Secular Humanism] can obtain." *City of Boerne v. Flores,* 521 U.S. 507 (1997).

60. The Plaintiffs are not saying that Defendant Bowser is prohibited from favoring and respecting the Black Lives Matter cult in her private capacity. She even can exercise her free exercise right to endorse Black Lives Matter to some extent in her government capacity in public speeches, for example. But the displays called into question in this action are non-secular in nature and constitute the exact kind of religious displays that the Establishment Clause of the First Amendment was designed to prohibit. This is especially true since Black Lives Matter's orthodoxy amounts to a form of dangerous hate speech that has incited criminal conduct and cultivated a chilling effect on law enforcement that has put all lives, but especially black ones, in immediate danger.

61. Defendant Bowser may have emotional reasons for erecting the display on 16th street and for changing the street name, but it is a long standing jurisprudence that emotional appeals, even really good ones, cannot be used to usurp the Establishment Clause of the First Amendment. See *Holloman v. Harland*, 370 F.3 1252 (11th Cir. 2004).

### XI.  COUNT TWO
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

62. Plaintiffs re-allegeand re-aver all of the allegations contained in the previous paragraphs.  The Equal Protection Clause of the Fourteen Amendment of the United States Constitution prohibits a government actor from discriminating on the basis for race.

63. The Equal Protection Clause is not designed to merely prevent the government from discriminating against the minority members of a suspect class, but all members of all suspect classes to include non-obvious suspect classes.

64. The banner displayed by the Mayor on 16th Street and the street name change amount to under inclusive government action that violates the equal protection rights of the Plaintiffs and serve to undermine a culture of rights and sacred civil liberties.

## X.  DECLARATORY JUDGMENT

65. Plaintiffs re-allegeand re-aver all of the allegations contained in the previous paragraphs. Plaintiffs are entitled to declaratory judgment pursuant to 28 U.S.C. § 2201 and in accordance with Federal Rules of Civil Procedure Rule 57, that Defendants' actions are in violation of the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## XI.  INJUNCTIVE RELIEF

66. Plaintiffs re-allegeand re-aver all of the allegations contained in the previous paragraphs. Plaintiffs have suffered, and will continue to suffer, immediate and irreparable harm upon each time the Plaintiffs are required to interface with the non-secular display that is on a public street that is accessible to the general public.

67. Accordingly, temporary, preliminary, and permanent injunctive relief is hereby requested pursuant to Federal Rules of Civil Procedure, Rule 65.

## XII. DAMAGES

68.  Plaintiffs re-allegeand re-aver all of the allegations contained in the previous paragraphs. As a result of the Defendants' violations of the Plaintiffs' constitutional rights, the Plaintiffs have suffered, or shall suffer, damages, including mental anguish and emotional distress.

69. In the alternative, Plaintiffs request nominal damages for the violation of their constitutional rights.

### XIII.  INJUNCTION ELEMENTS

70.  <u>IRREPARABLE HARM:</u>  Due to the Defendants' unlawful discrimination and disparate treatment of Plaintiff, the Plaintiff has and will suffer and will continue to suffer irreparable harm to their First Amendment constitutional rights as citizens who must interface with the non-secular displays on the challenged streets. The Plaintiff's injuries will be continuing and repeated each day the display is permitted to remain in violation of the United States Constitution.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); see also, e.g., *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235-36 (10th Cir. 2005) (noting presumption of irreparable harm where First Amendment rights are implicated). "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). Furthermore, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).

71. <u>NO ADEQUATE LEGAL REMEDY</u>. The Plaintiffs have no adequate remedy at law because legal relief cannot remedy the denial of the Plaintiffs First, and Fourteenth Amendment fundamental rights. Unless the Display is removed by order of this Court, Plaintiffs' constitutional rights will continue to be violated.

72.  BALANCE OF HARM. The balance of harm as to irreparable injury to the Plaintiffs in comparison to the "harm" to Defendants weighs in Plaintiffs' favor. When a law that government actors or voters wish to enact is likely unconstitutional, their interests do not outweigh those of the Plaintiff in having his constitutional rights protected. *Awad v. Ziriax*, 670 F.3d at 1132 citing *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 699 (9th Cir. 1997).

73.  PUBLIC INTEREST. In view of the mayhem and riots in DC, fire to private property, and calls to abolish the police, granting of declaratory and injunctive relief will be in the public interest, in that there is always a public interest in the protection of constitutional rights, especially fundamental rights. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d at 1132 quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). ( "While the public has an interest in the will of the voters being carried out . . . the public has a more profound and long-term interest in upholding an individual's constitutional rights." Id.; see also *Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983) (noting "[t]he strong public interest in protecting First Amendment values").

74. The government's sponsorship and maintenance of the Black Lives Matter display constitutes a subsidy or subsidies of religion, religious speech, and religious practices, constituting an evil that the Establishment Clause of the First Amendment was designed to prohibit.

## XIV.  RELIEF

75. Plaintiffs re-allegeand re-aver all of the allegations contained in the previous paragraphs.

WHEREFORE,

1. Plaintiffs pray that Defendant Bowser be duly cited to appear and answer this Complaint; that she be served with a copy of the complaint and that after all legal delays have expired and due proceedings be had, there be judgment in favor of the Plaintiffs, and against the Defendant, for temporary, preliminary, and permanent injunctive and declaratory relief, all damages, attorney's fees and costs of these proceedings, together with interest and all legal and equitable relief.

2. The Plaintiffs seek a temporary and permanent order that forces Defendant Bowser to remove the Black Lives Matters display on 16th Street immediately and to change the name of the street Black Lives Matter to something neutral and secular and non-controversial.

3. In the alternative, after the removal of the Black Lives Matter banner, for every day that the Black Lives Matter's banner was featured on 16th Street, the Plaintiffs ask the Court to order the city to display three separate banners for the same duration in the same time, place, scale, and manner to symbolize the restoration of Constitutional order. The first of the three banners should read "Blue Lives Matter" to show respect for law enforcement, which is a secular statement that represents the government's inherent police power and different provisions of Article II of the United States Constitution. The Second banner should read "Green Lives Matter" to show respect for the Army National Guard units that responded to the call to defend the city from rioters that the Mayor encouraged. The third sign should read "All Lives Matter,"

which is a secular self-evident  all inclusive truth claim that reflects what the Fourteenth Amendment Equal Protection Clause of the United States Constitution requires from government actors and is a self-evident neutral message that is in the Declaration of Independence itself.

4. Because Black Lives Matters is a black identitarian group, the Plaintiffs ask for an order that requires the Mayor to remove all Black Lives Matter's graffiti displayed throughout the District of Columbia on public and non-public property, if requested by the property owner.

5. The Plaintiffs ask that they be given permission to file through ECF.

6. Plaintiff Penkoski and Plaintiff Christopher ask that counsel be allowed to appear pro hac vice in due course.

/s/Chris Sevier Esq./
DE FACTO ATTORNEYS GENERAL
Mailing address: 9 Music Square Square South
Nashville, TN 37203
(615) 500-4411
ghostwarsmusic@gmail.com
www.blacklivesmattercult.com
www.humantraffickingpreventionact.com
www.stopsocialmediacensorshipact.com
www.stopguiltbyaccusationact.com
www.disentanglementact.com
www.lifeappropriationact.com
DC residential address deleted for safety reasons
Former attorney for the National Alliance of Black Pastors.

/s/Pastor Rich Penkoski/
WARRIORS FOR CHRIST
Mailing address: 9 Music Square Square South
Nashville, TN 37203
(931) - 881 - 8504
pastor@wfcchurch.org
https://www.wfcchurch.org/
https://www.facebook.com/RealWarriorsforChrist/
DC residential address deleted for safety reasons
(To Be Represented by Counsel Pro Hac Vice)

/s/Tex Christopher/
SPECIAL FORCES OF LIBERTY
(832) 233-8879
Mailing address: 9 Music Square Square South
Nashville, TN 37203
DC residential address deleted for safety reasons
https://www.facebook.com/votetex/
ghostwarsmusic@gmail.com
(To Be represented by Counsel Pro Hac Vice)

Introduced Version

---

Key: Green = existing Code. Red = new code to be enacted

HOUSE CONCURRENT RESOLUTION 95

(By Delegate Butler)

[Introduced February 17, 2020]

To recognize and acknowledge that the State of West Virginia is prohibited from taking direct or symbolic action to respect nonsecular self-asserted sex-based identity narratives or sexual orientation orthodoxy pursuant to the Establishment Clause of the First Amendment of the United States Constitution and Article III Section 15 of the West Virginia Constitution.

Whereas, Article III Section 15 of the West Virginia Constitution states, "No man shall be compelled to frequent or support any religious worship, place or ministry whatsoever; nor shall any man be enforced, restrained, molested or burthened, in his body or goods, or otherwise suffer, on account of his religious opinions or belief, but all men shall be free to profess and by argument, to maintain their opinions in matters of religion; and the same shall, in nowise, affect, diminish or enlarge their civil capacities; and the Legislature shall not prescribe any religious test whatever, or confer any peculiar privileges or advantages on any sect or denomination, or pass any law requiring or authorizing any religious society, or the people of any district within this state, to levy on themselves, or others, any tax for the erection or repair of any house for public worship, or for the support of any church or ministry, but it shall be left free for every person to select his religious instructor, and to make for his support, such private contracts as he shall please;"

Whereas, The United States is a Constitutional Republic that the State of West Virginia is part of;

Whereas, Constitutional law preempts Federal law and State law;

Whereas, The Establishment Clause of the First Amendment of the United States Constitution states that "[The Government] shall make no law respecting an establishment of religion"

Whereas, The United States Supreme Court held in *Everson v. Bd of Education*, 330 U.S. 1 (1947) that the Establishment Clause of the First Amendment applies to the States through the Fourteenth Amendment; and

Whereas, The United States Supreme Court held in *Hein v. Freedom From Religion Foundation,* 551 U.S. 587 (2007) that the Establishment Clause applies to the executive branch, which includes this State's executive branch; and

Whereas, All religion amounts to is a set of unproven answers to the greater questions like why are we here, what gives us identity, what should we be doing as humans, and what happens after death; and

Whereas, The Establishment Clause of the United States Constitution was never solely designed to prohibit the government from respecting and recognizing the doctrines of institutionalized religions but of noninstitutionalized religions, like Secular Humanism, as well; and

Whereas, The religion of Secular Humanism is also commonly referred to by scholars as postmodern individualistic moral relativism or expressive individualism; and

Whereas, The United States Supreme Court found that Secular Humanism is a religion for the purposes of the First Amendment Establishment Clause in *Torcaso v. Watkins*, 367 U.S. 488 (1961), stating "among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism, and others. See Oklahoma Ethical Society v. District of Columbia, 101 U. S. App. D. C. 371, 249 F. 2d 127; *Fellowship of Humanity v. County of Alameda*, 153 Cal. App. 2d 673, 315 P. 2d 394; II Encyclopedia of the Social Sciences 293; 4 Encyclopedia Britannica (1957 ed.) 325-327; 21 id., at 797; Archer, *Faiths Men Live By* (2d ed.

revised by Purinton), 120-138, 254-313; 1961 World Almanac 695, 712; Year Book of American Churches for1961, at 29, 47;"

Whereas, Most of the Federal Courts of appeals have found that Secular Humanism is a religion for the purpose of the First Amendment Establishment Clause in cases such as *Malnak v. Yogi*, 592 F.2d 197, 200-15 (3d Cir.1979), *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th Cir.1977), *Thomas v. Review Bd.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003), *Real Alternatives, Inc. v. Sec'y Dep 't of Health & Human Servs.,* 150 F. Supp. 3d 419, 2017 WL3324690 (3d Cir. Aug. 4, 2017), and *Wells v. City and County of Denver*, 257 F.3d 1132, 1148 (10th Cir. 2001); and

Whereas, The sworn testimonies provided by ex-gays, medical experts, persecuted Christians, and licensed ministers demonstrate that there is no real proof that a gay gene exists, that the idea that sexual orientation is predicated on immutability is not proven, and that sexual orientation is a mythology, dogma, doctrine, ideology, and orthodoxy that is inseparably linked to the religion of Secular Humanism; and

Whereas, The LGBTQ community is organized, full, and has a code by which members may guide their daily lives, making LGBTQ Secular Humanism a religion in view of the definition of what constitutes a religion provided by the Court in *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,* 150 F. Supp. 3d 419, (3rd Cir. Aug. 4, 2017); and

Whereas, Instead of having a cross, the ten commandments, or the star and crescent, the LGBTQ Secular Humanist church has the rainbow-colored flag to symbolize their religious beliefs, practices, and values, which at least one person in every District believes is offensive, implausible, and objectionable; and

Whereas, When a person says that "they were born with a gay gene," that they were "born in the wrong body," or that they "came out of an invisible closet and were baptized homosexual," they are making a series of unproven faith-based naked assertions that are implicitly religious and cannot be used as the basis for law or policy because the Establishment Clause preempts such action from being legally recognized, endorsed, or respected by government; and

Whereas, Regardless of political affiliation, all members of the general assembly and all executive and judicial officers bound by oath to put their own political and religious beliefs aside and to comply with their duty to honor their oath of office pursuant to Article VI to uphold the United States Constitution and to, therefore, immediately stop creating, respecting, and enforcing policies that condone the plausibility of self-asserted sex-based identity narratives and sexual orientation orthodoxy because all of those policies fail all three prongs of the Lemon Test established by the United States Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) for:

(1) Constituting nonsecular shams;

(2) Cultivating indefensible legal weapons against nonobservers of the religion of Secular Humanism; and

(3) Serving to excessively entangle the government with the religion of Secular Humanism; and

Whereas, The United States Supreme Court in *Edwards v. Aguillard*, 482 U.S. 578 (1987) and *Agostini v. Felton*, 521 U.S. 203, 218 (1997) found that if government action fails one prong of the Lemon Test, it is unconstitutional, and the evidence shows that the enforcement and creation of policies that respect nonsecular self-asserted sex-based identity narratives or sexual orientation ideology fail at least one prong of Lemon, if not all three; and

Whereas, The decisions in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) and *United States v. Windsor*, 133 S. Ct. 2675 (2013) were unequivocally part of an unprincipled ploy, political power play, and nonsecular sham that has not created a land rush on gay marriage and tolerance but has cultivated a land rush on Christian persecution and a land rush for devout Secular Humanists to infiltrate public elementary schools and public libraries with the sole purpose of indoctrinating minors with the sexualized religion of Secular Humanism with the government's stamp of approval, demonstration that those decisions themselves where nonsecular shams that constitutes government action that fails the prongs of the Lemon Test; and

Whereas, The United States Supreme Court in *Lee v. Weisman*, 505 U.S. 577, 592 (1992) found that there are "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and

secondary public schools [and in public libraries]," while also holding in *Edwards v. Aguillard,* 482 U.S. 578, 583 (1987) that the government "should be particularly vigilant in monitoring compliance with the Establishment Clause in the public-school and [public library] context," when minors are subjected to religious indoctrination with the perception of the government's stamp of approval, and the State of West Virginia joins the high court in being vigilant in regards to those heightened concerns; and

Whereas, Nonsecular self-asserted sex-based identity narratives fall within the exclusive jurisdiction of the Free Exercise and Establishment Clause of the First Amendment of the United States Constitution, having nothing to do with the Fourteenth Amendment; and

Whereas, Attempts to shoehorn sexual orientation or nonsecular self-asserted sex-based identity narratives that are questionably real, moral or plausible into a Fourteenth Amendment Equal Protection or Substantive Due Process narrative by any state actor is a per se act of Constitutional, political and governmental malpractice; and

Whereas, The Supreme Court's position in *INS v. Chada*, 462 U.S. 919 (1983) and Nixon v. U.S., 506 U.S. 224 (1993) emphasized that the legislative branch must serve as a check on the Judicial and executive branch, and this state has a duty owed pursuant to Article VI to hold the other branches of government, whether they be state or federal, accountable; and

Whereas, The federal courts have held in cases like *Holloman v. Harland*, 3 70 F.3 1252 (11th Cir. 2004) that neither emotional appeals nor sincerity of belief can be used to usurp the Establishment Clause of the First Amendment; and

Whereas, The decisions in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) and *United States v. Windsor*, 133 S. Ct. 2675 (2013) hijacked the Fourteenth Amendment and were based solely on a series of emotional appeals as a way to get around the Establishment Clause of the First Amendment of the United States Constitution and constitute one of the greatest shams since the inception of American jurisprudence; and

Whereas, The government's endorsement and entanglement with LGBTQ and transgender ideology has been based purely on emotion in direct violation of the Establishment Clause of the United States Constitution, generating a per se constitutional crisis; and

Whereas, The United States Supreme Court held in *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) and in *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38 (1936) that "Stare Decisis is at its weakest when the Supreme Court interprets the Constitution because its decisions can be altered only by constitutional amendment or by overruling prior decisions;" and

Whereas, The decisions in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) and *United States v. Windsor*, 133 S. Ct. 2675 (2013) exclusively involved constitutional interpretation in five to four splits that caused dissenting justices to make unprecedented statements such as "just who do we think we are" and "I write separately to call attention to this court's threat to American Democracy;" and

Whereas, Enacting the Establishment Act will ultimately serve to restore constitutional order by overruling *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) and *United States v. Windsor*, 133 S. Ct. 2675 (2013) through overcoming stare decisis by relying on a superior jurisprudence acknowledged by the United States Supreme Court in *Cooper Industries, Inc. v. Aviall Services, Inc.* 543 U.S. 157 (2004) that "[constitutional] questions which merely lurk in the record, neither brought to [the] attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents;" and

Whereas, First Amendment Establishment Clause questions are lurking in the shadows of *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) and *United States v. Windsor*, 133 S. Ct. 2675 (2013) but were neither brought to the attention of the court nor ruled upon, which means that both of those Supreme Court decisions do not constitute binding precedent and must immediately be disregarded by this state in accordance with the Legislature and Governor's continuing duties to comply with their oath of office pursuant to Article VI to uphold the Constitution of the United States no matter whom it offends, regardless of political or religious affiliation, and despite any emotional objections; and

Whereas, The Free Exercise Clause of the First Amendment of the United States Constitution states, "Congress shall make no law...prohibiting the free exercise [of religion];" and

Whereas, Enacting the Establishment Act clarifies that the original underlying legal basis behind the marriage bans that were struck down by the Supreme Court in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) that limited legally recognized marriage to a man and a woman was the First Amendment Establishment Clause and that the second legal basis for the original marriage bans was the state's narrowly tailored compelling interest to uphold contemporary community standards of decency and discourage licentiousness, constituting issues that were lurking in the shadows but never addressed in Obergefell by the defendants, which means that Stare Decisis does not spare Obergefell from being ignored, disregarded, and overturned; and

Whereas, The United States Supreme Court has repeatedly held that the states have a compelling interest to uphold community standards of decency, to discourage licentiousness, and to enact policies that stop attempts to justify practices that are inconsistent with the peace and safety of the state; and

Whereas, The court in *Schlegel v. United States*, 416 F. 2d 1372, 1378 (Ct. Cl. 1969) held that "any schoolboy knows that a homosexual act is immoral, indecent, lewd and obscene. Adult persons are even more conscious that this is true;" and

Whereas, The United States Supreme Court held in *Ginsberg v. New York*, 390 U.S. 629, (1968) and *Mishkin v. State of New York*, 383 U.S. 502 (1966) that "to simply adjust the definition of obscenity to social realities has always failed to be persuasive before the courts of the United States" and such adjustments fail to be persuasive to the State of West Virginia; and

Whereas, While Secular Humanism is a protected religion pursuant to the First Amendment Free Exercise Clause, it is a disfavored religion insofar that it often involves obscene speech that erodes contemporary community standards of decency, desensitize, divides, dehumanize, depersonalize, and has been shown to increases suicide rates; and

Whereas, In the wake of the government's endorsement of LGBTQ ideology following the decisions in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) and *United States v. Windsor*, 133 S. Ct. 2675 (2013), it is evident that people who are "intolerant" of "intolerant people" are "intolerant," people who are "judgmental" against "judgmental people" are "judgmental," and people who are "dogmatic" about not "being dogmatic" are "dogmatic;" and

Whereas, When a person gets legally married, they are entitled to a constellation of benefits that flow out of the state's general fund at the expense of the taxpayers; and

Whereas, There are taxpayers in every voting district who believe that homosexuality, zoophilia, polygamy, transgenderism, and other nonsecular self-asserted sex-based identity narratives and sexual orientation ideology and the practices associated with them are immoral, and those taxpayers believe that to enable acts of immorality is itself an act of immorality, and therefore, this state must be prohibited from appropriating any public funds that promote, condone, endorse, or advance nonsecular sex-based identity narratives or sexual orientation ideology because such state action coercively causes those taxpayers to violate their own conscience by the simple act of paying taxes, making such governmental action an evil that the Establishment Clause of the First Amendment of the United States Constitution was designed to prohibit; and

Whereas, The state has a compelling interest and duty owed pursuant to Article VI to zealously defend the integrity of the Fourteenth Amendment and to prevent it from being hijacked to accomplish non-secular agendas by the Federal judicial branch; and

Whereas, The aim of the LGBTQ Secular Humanist church's push to entangle the government with their religious beliefs is "dominance," not "tolerance," and the objection to this unconstitutional entanglement is based on "secular biology," not "malicious bigotry," and a desire to restore the rule of law and the Supremacy of the United States Constitution for the welfare of our Constitutional Republic; and

Whereas, The State of West Virginia has a compelling interest to untwist intellectual dishonesty perpetrated by the judicial branch and a duty to defend the integrity of the First Amendment and the Fourteenth Amendment of the United States Constitution by enacting the Establishment Act to ultimately overrule the *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) and by showing that the Obergefell decision was itself a nonsecular sham for purposes of prong I of Lemon because if marriage really was an "existing right/individual right" (according to the Supreme Court in *Loving v. Virginia,* 388 U.S. 1, 12 (1967)) and a "fundamental right" (according to the Supreme Court in *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)) based on a "personal choice" (according to the Supreme Court in *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 63940 (1974)) for self-identified homosexuals pursuant to the Fourteenth Amendment's Equal Protection and Substantive Due Process Clauses as the Supreme Court pretended in Obergefell, then marriage must be an existing right, individual right and fundamental right based on the personal choice for self-identified polygamists, zoophiles and objectophiles based on the Fourteenth Amendment's Equal Protection and Substantive Due Process Clauses under the Obergefell holding as well, but since that is not true, then the entire effort to have the government endorse nonsecular of LGBTQ Secular Humanist ideology is a nonsecular sham that has at all times been in perpetual violation of the Establishment Clause; and

Whereas, The Supreme Court resolved in *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273 (1976) that there is no such thing as a partial civil rights movement, when it found that even nonobvious components of a suspect class are entitled to civil rights under the Fourteenth Amendment; and

Whereas, If sexual orientation really was a suspect class for the purpose of the Fourteen Amendment, then all individuals in the nonobvious suspect classes would be entitled to civil rights, but they are not because sexual orientation is an unproven religious doctrine that is inseparably linked to the religion of Secular Humanism and its recognition by government is nothing more than a nonsecular sham that divides us; and

Whereas, The seven to two decision reached by the Supreme Court in *Masterpiece Cakeshop*, 138 S.Ct. 1719 (2018), following *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) decision unequivocally demonstrates that self-identified homosexuals or transgenders are not a people group for the purposes of the *Fourteenth* Amendment, like people of color are, which means that the Supreme Court in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) and *United States v. Windsor,* 133 S. Ct. 2675 (2013) were merely tampering with the Fourteenth Amendment in a manner that undermines the sovereignty of the United States Constitution, which obligates this state to cure an overt constitutional crisis by enacting the Establishment Act to restore constitutional order to prevent a religious/cultural civil war; and

Whereas, This state has a compelling interest and duty to defend the race-based civil rights movement that was proven to be predicated on the Fourteenth Amendment based on the reasonable observer standard, whereas it has not been proven that the plight of self-identified homosexuals was based on genetics or immutability, which means that for any state actor to equate those two plights as if they are equal has engaged in an act of racial animus in kind that manages to be racially, sexually and emotionally exploitative and intellectually dishonest; and

Whereas, There are no ex-blacks, but there are thousands of ex-gays, who abandoned nonsecular self-asserted sex-based identity narratives and adopted one that accords with self-evident, secular, biological design; and

Whereas, People of color at one point in this country had to ride on the back of the bus, walk to school, and drink from inferior water fountains for reasons that were predicated on immutable traits, and for any state actor to equate the race-based civil rights plight to the plight of self-identified homosexuals in order to get around the Establishment Clause has engaged in a per se act of racial animus that is deeply offensive to many people of color in the State of West Virginia; and

Whereas, Nonsecular marriages have never been a part of American tradition and heritage and have nothing to do with the Substantive Due Process Clause of the Fourteenth Amendment; and

Whereas, The state is prohibited under the First Amendment Establishment Clause and Article III Section 15 of the West Virginia Constitution from recognizing homosexuals, but it does recognize the Free Exercise Clause of the First Amendment and Article III Section 15 of the West Virginia Constitution right for an individual to self-identify as a homosexual, polygamist, zoophile, objectophile, etc.; and

Whereas, Because the United States Supreme Court found in *Cantwell v. Connecticut*, 310 U.S. 296 (1940) that Free Exercise Clause of the First Amendment applies to the states through the Fourteenth Amendment, any person within this state's jurisdiction can freely form any self-asserted sex-based identity narrative with impunity as permitted by the Free Exercise Clause of the First Amendment no matter how perceptively morally repugnant or offensive, and they can live in accordance with those beliefs as long as the practices do not violate existing state or federal laws because the freedom of religion is not absolute; and

Whereas, In view of the Free Exercise Clause of the First Amendment, this state does not object to the decision in *Lawrence v. Texas*, 539 U.S. 558 (2003) which overruled *Bowers v. Hardwick*, 478 U.S. 186 (1986), which was a decision that had the effect of overruling state policies that made it illegal for two consenting adults of the same sex to privately engage in sexual acts; and

Whereas, The state government is not a church nor is it a redeemer, and the government is barred from allowing devout Secular Humanist to enshrine their ideology through state action in the hopes that it will make them feel less ashamed and inadequate about engaging in faith-based practices that naturally cultivate feelings of shame and inadequacy for going against the way that we are and the way that things are from the reasonable observer standpoint; and

Whereas, The Supreme Court in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) was correct in finding that the United States Constitution is not silent as to how the states must legally define marriage - the Establishment Clause of the First Amendment only allows the state to legally recognize marriage between a man and a woman because it is the only secular form; and

Whereas, Civilizations for millennia have defined marriage as a union between a man and a woman, making it the only form of secular marriage that the government is allowed to legally recognize and respect; and

Whereas, Marriage between a man and a woman arose out of the nature of things, and marriage between a man and a woman is natural, neutral, and noncontroversial, unlike non-secular marriages that do not involve a man and a woman and are deeply controversial and divisive; and

Whereas, Marriages policies that endorse marriage between a man and a woman are secular in nature for purposes of the Establishment Clause insofar as the policies accomplish their purpose, fulfill a compelling state interest, are predicated on self-evident truth, and do not put religion over nonreligion in their making and in their enforcement, unlike nonsecular marriage policies; and

Whereas, The United States Supreme Court in *Church of the Holy Trinity v. United States,* 143 U.S. 457 (1892) was not necessarily correct in declaring that "America is a Christian Nation" and the United States Supreme Court in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) was not correct in implying that America is a Secular Humanist Nation, when it enshrined the modern cultural mindset by declaring that "at the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe;" and

Whereas, The State of West Virginia is at best part of an unofficial Christian Nation insofar as the laws of the United States must be predicated on self-evident, neutral, natural, morality, which only happens to parallel the doctrine of some institutionalized religions, like Christianity, by coincidence in the same way that parts of the United States Constitution and the Bill of Rights do, yet there will never be a mandate that requires citizens to accept Christianity, Secular Humanism, or any other religion by this state because the Establishment Clause prohibits such mandates and the Free Exercise Clause permits individuals the fundamental right to worship what they want without government interference; therefore, be it

Resolved by the Legislature of West Virginia:

That The Legislature recognizes that Secular Humanism is a religion for the purpose of the Establishment Clause of the First Amendment of the United States Constitution and Article III Section 15 of the West Virginia Constitution and that it is a religion that has limited protections under the Free Exercise Clause of the First Amendment of the United States Constitution and Article III Section 15 of the West Virginia Constitution because it tends to erode community standards of

decency, promote licentiousness, and attempt to justify practices that are inconsistent with the peace and safety of the state; and

*Further Resolved,* Pursuant to the First Amendment Establishment Clause of the United States Constitution, Article III Section 15 of the West Virginia Constitution, and the state's compelling interest to uphold contemporary community standards of decency, an agent of the state shall not directly or symbolically create or enforce policies that respect or recognize non-secular self-asserted sex-based identity narratives or sexual orientation orthodoxy, which means that agent of the state shall not:

(1) Issue or recognize a marriage license that does not involve a secular marriage.

(2) Appropriate, distribute, or award public funds in a manner that directly or indirectly respects, promotes or endorses the plausibility of nonsecular self-asserted sex-based identity narratives, sexual orientation orthodoxy, or nonsecular marriage ideology;

(3) Appropriate, distribute or award a grant of public funds to cover the cost of sex reassignment surgery.

(4) Prohibit or unduly restrict conversion therapy;

(5) Display a flag that promotes nonsecular self-asserted sex-based identity narratives or sexual orientation orthodoxy in a manner that would be unconstitutional for the same state actor to display a flag that respects or promotes the edicts of an institutionalized religion;

(6) Promote the use of puberty blockers, especially to minors;

(7) Permit a person who was born as a biological male to change their gender to female on their birth certificate, driver's license, or any other official government form;

(8) Permit a person who was born as a biological female to change their gender to male on their birth certificate, driver's license, or any other official government form;

(9) Assign or house an inmate who was born as a biological male in a ward or cell designated for inmates who were born as biological females;

(10) Assign or house an inmate who was born as a biological female in a ward or cell designated for inmates who were born as biological males; or

(11) Mandate pronoun changes in an effort to show respect to sexual orientation orthodoxy; and, be it

*Further Resolved*, That pursuant to the First Amendment Establishment Clause of the United States Constitution, Article III Section 15 of the West Virginia Constitution, and the state's compelling interest to discourage licentiousness, under the heightened standard to protect children from state-sponsored indoctrination, a public school and its agent shall not create or enforce policies that respect or recognize nonsecular self-asserted sex-based identity narratives or sexual orientation orthodoxy, which means that a public school and its agent shall not:

(1) Expose students to curriculum concerning nonsecular self-assertedsex-based identity ideology or sexual orientation orthodoxy unless the programming is part of a sex-education program and only after a student's parents have:

(A) Intentionally opted their child into participating in the programming in writing;

(B) Received a warning from the school or department of education that the messaging could expose their child to licentiousness and one particular religious worldview.

(2) Permit a student was born as a biological male to participate in sports designated for biological females;

(3) Permit a student was born as a biological female to participate in sports designated for biological females;

(4) Permit a person who was born as a biological male to enter or use a locker room or restroom designated for biological females;

(5) Permit a person who was born as a biological female to enter or use a locker room or restroom designated for biological males;

(6) Mandate pronoun changes in an effort to show respect to doctrines of Secular Humanism; or

(7) Host or sponsor Drag Queen Story Time for children or similar programming; and, be it

*Further Resolved,* That pursuant to the First Amendment Establishment Clause of the United States Constitution, Article III Section 15 of the West Virginia Constitution, and the state's compelling interest to discourage licentiousness, under the heightened standard to protect children from state-sponsored indoctrination, a public library and its agents shall not host, sponsor, promote or condone Drag Queen Storytime for children or similar programming; and, be it

*Further Resolved,* Policies that respect and endorse a secular marriage between a man and a woman shall continue to be enforced, recognized and respected and agents of the state shall only issue and recognize secular marriage licenses because of the policies:

(1) Are natural, neutral, noncontroversial and secular in nature;

(2) Fulfill their actual purpose;

(3) Fulfill a narrowly tailored compelling state interest by upholding community standards of decency; and

(4) Do not:

(A) Violate the United States Constitution or the Constitution of the State of West Virginia;

(B) Fail the Lemon Test;

(C) Promote licentiousness;

(D) Attempt to justify practices that are inconsistent with the peace or safety of the state;

(E) Put religion over nonreligion; or

(F) Constitute a nonsecular sham, calculated ploy, power grab, or political power play.

*Further Resolved*, That the Clerk of the House of Delegates shall forward a copy of this resolution to the Governor and the United States Congress.

H-4632.1

## HOUSE BILL 2935

**State of Washington**          **66th Legislature**          **2020 Regular Session**

**By** Representative Klippert

Read first time 02/11/20.   Referred to Committee on Health Care & Wellness.

1    AN ACT Relating to the prohibition of direct and indirect
2 appropriation of public funds to finance convenience abortions
3 pursuant to the establishment clause of the First Amendment of the
4 United States Constitution and Article I, section 11 of the
5 Washington state Constitution, establishing of the Washington foster
6 care and adoption initiatives fund to be administered by the
7 department of children, youth, and families for the benefit of
8 government and, especially, nongovernment groups, and prohibiting
9 discrimination pursuant to the free exercise clause of the First
10 Amendment and Article I, section 11 of the Washington state
11 Constitution; adding a new chapter to Title 70 RCW; creating new
12 sections; and declaring an emergency.

13 BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:

14    NEW SECTION.  **Sec. 1.**   (1) The state of Washington facilitates
15 the disbursement of both state and federal public funds to qualifying
16 entities for purposes of conducting certain activities.
17    (2) Public dollars awarded to qualifying entities may facilitate
18 or subsidize directly or indirectly expenses or activities not
19 directly related to those for which the funds were intended,
20 including without limitation shared administrative costs, overhead,
21 employee salaries, rent, utilities, and various other expenses.

1   (3) It is possible that public funds made available by or through
2   the state of Washington may be appropriated to an entity that
3   performs convenience abortions or subsidizes or otherwise facilitates
4   the entity's ability to perform convenience abortions although the
5   funds were not disbursed specifically for the purpose of performing
6   convenience abortions.

7   (4) As elected representatives of the people of Washington, the
8   legislature is entrusted with ensuring that all activities conducted
9   with the aid of public funds are in accordance with the wishes of the
10  people of Washington, the intent of the laws of this state, and the
11  United States Constitution.

12  (5) It is within the purview of the legislature to establish
13  criteria as the basis on which public funds are disbursed unless the
14  appropriation is prohibited by the United States Constitution.

15  (6) The United States is a constitutional republic that the state
16  of Washington is part of.

17  (7) The United States Constitution preempts state action that
18  conflicts with it under the doctrine of preemption.

19  (8) As elected representatives, the legislature has a duty under
20  Article IV of the United States Constitution to not appropriate funds
21  in a manner that violates the establishment clause of the United
22  States Constitution.

23  (9) The free exercise clause of the First Amendment of the United
24  States Constitution states "Congress shall make no law... prohibiting
25  the free exercise [of religion]" and Article I, section 11 of the
26  Washington state Constitution states, "Absolute freedom of conscience
27  in all matters of religious sentiment, belief and worship, shall be
28  guaranteed to every individual, and no one shall be molested or
29  disturbed in person or property on account of religion; but the
30  liberty of conscience hereby secured shall not be so construed as to
31  excuse acts of licentiousness or justify practices inconsistent with
32  the peace and safety of the state."

33  (10) The United States supreme court found in *Cantwell v.*
34  *Connecticut*, 310 U.S. 296 (1940) that the free exercise clause of the
35  First Amendment applies to the states through the Fourteenth
36  Amendment.

37  (11) The establishment clause of the First Amendment of the
38  United States Constitution states that "Congress shall make no law
39  respecting an establishment of religion" and Article I, section 11 of
40  the Washington state Constitution states, "No public money or

1   property shall be appropriated for or applied to any religious
2   worship, exercise or instruction, or the support of any religious
3   establishment".

4   (12) The United States supreme court held in *Everson v. Bd of*
5   *Education*, 330 U.S. 1 (1947) that the establishment clause of the
6   First Amendment applies to the states through the Fourteenth
7   Amendment.

8   (13) The United States supreme court held in *Hein v. Freedom From*
9   *Religion Foundation*, 551 U.S. 587 (2007) that the establishment
10  clause applies to the executive branch, which includes this state's
11  executive branch.

12  (14) All religion amounts to is a set of unproven answers to the
13  greater questions like, Why are we here? What gives us identity? What
14  should we be doing as humans? and What happens after death?

15  (15) The establishment clause of the United States Constitution
16  was never solely designed to prohibit the government from respecting
17  and recognizing the doctrines of institutionalized religions but of
18  noninstitutionalized religions, like secular humanism, as well.

19  (16) The religion of secular humanism is also commonly referred
20  to by scholars as postmodern individualistic moral relativism or
21  expressive individualism.

22  (17) The United States supreme court found that secular humanism
23  is a religion for the purposes of the First Amendment establishment
24  clause in *Torcaso v. Watkins*, 367 U.S. 488 (1961), stating "among
25  religions in this country which do not teach what would generally be
26  considered a belief in the existence of God are Buddhism, Taoism,
27  Ethical Culture, Secular Humanism, and others. See *Oklahoma Ethical*
28  *Society v. District of Columbia*, 101 U.S. App. D.C. 371, 249 F.2d
29  127; *Fellowship of Humanity v. County of Alameda*, 153 Cal. App. 2d
30  673, 315 P.2d 394; II Encyclopaedia of the Social Sciences 293; 4
31  Encyclopaedia Britannica (1957 ed.) 325-327; 21 id., at 797; Archer,
32  Faiths Men Live By (2d ed. revised by Purinton), 120-138, 254-313;
33  1961 World Almanac 695, 712; Year Book of American Churches for 1961,
34  at 29, 47."

35  (18) Most of the federal courts of appeals have found that
36  secular humanism is a religion for the purpose of the First Amendment
37  establishment clause in cases such as *Malnak v. Yogi*, 592 F.2d 197,
38  200-15 (3d Cir. 1979), *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th
39  Cir. 1977), *Thomas v. Review Bd.*, 450 U.S. 707, 714, 101 S.Ct. 1425,
40  67 L.Ed.2d 624 (1981), *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th

1   Cir. 2003), *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human*
2   *Servs.*, 150 F. Supp. 3d 419, 2017 WL3324690 (3d Cir. Aug. 4, 2017),
3   and *Wells v. City and County of Denver*, 257 F.3d 1132, 1148 (10th
4   Cir. 2001).

5      (19) The claims that "abortion is not murder," "that abortion is
6   not immoral," and that "life does not begin at conception" are
7   unproven faith-based assumptions and naked assertions that are
8   implicitly religious and are inseparably linked to the religion of
9   secular humanism.

10     (20) Convenience abortions fall directly within the exclusive
11  jurisdiction of the free exercise and establishment clause of the
12  First Amendment of the United States Constitution, having nothing to
13  do with the Fourteenth Amendment.

14     (21) Attempts to shoehorn convenience abortion into a Fourteenth
15  Amendment equal protection or substantive due process narrative by
16  any state actor is a per se act of constitutional, political, and
17  governmental malpractice that threatens the integrity of the
18  Fourteenth Amendment itself.

19     (22) The supreme court's position in *INS v. Chada*, 462 U.S. 919
20  (1983) and *Nixon v. U.S.*, 506 U.S. 224 (1993) emphasized that the
21  legislative branch must serve as a check on the judicial and
22  executive branch, and this state has a duty owed pursuant to Article
23  VI of the United States Constitution to hold the other branches of
24  government accountable in both the federal and state government.

25     (23) The federal courts have held in cases like *Holloman v.*
26  *Harland*, 3 70 F.3 1252 (11th Cir. 2004) that neither emotional
27  appeals nor sincerity of belief can be used to usurp the
28  establishment clause of the First Amendment.

29     (24) No emotional appeal can justify the state's direct or
30  indirect funding of convenience abortions with public funds.

31     (25) There are taxpayers in every district who believe that
32  convenience abortions are immoral, and they also believe that to
33  enable acts of immorality is itself an act of immorality. Therefore,
34  the state of Washington must always remain prohibited from
35  appropriating public funds to convenience abortion providers because
36  such an appropriation coercively causes many taxpayers to violate
37  their own conscience by the simple act of paying taxes, constituting
38  an evil that the establishment clause of the First Amendment was
39  designed to prohibit.

1  (26) Some taxpayers in Washington consider convenience abortions
2 to be modern-day child sacrifice conducted on the altar of
3 convenience, which is a practice that is nonsecular and
4 controversial.

5  (27) The establishment clause prohibits the state of Washington
6 from enforcing, respecting, recognizing, favoring, or endorsing
7 policies that finance convenience abortion facilities with public
8 funds because such an appropriation fails the three prongs of the
9 Lemon test by constituting a nonsecular sham that cultivates an
10 indefensible legal weapon against nonobservers of the religion of
11 secular humanism, while having the effect of excessively entangling
12 the government with the religion of secular humanism.

13  (28) The direct or indirect subsidization or facilitation of
14 abortion with funds distributed by the state constitutes paying for
15 an abortion and, therefore, must be barred by the First Amendment
16 establishment clause of the United States Constitution and by Article
17 I, section 11 of the Washington state Constitution.

18  (29) The state of Washington may not favor or endorse one
19 religion over another, nor may the state of Washington favor or
20 endorse the religion of secular humanism generally over nonreligion,
21 especially because it is a religious worldview that tends to promote
22 licentiousness.

23  (30) When the state creates or enforces policies that respect or
24 fund adoption facilities or the foster care system, it is not putting
25 religion over nonreligion because such an appropriation is neutral,
26 natural, noncontroversial, and secular in nature, but the same cannot
27 be said of policies that respect and finance convenience abortion
28 practices.

29  (31) The United States supreme court has consistently held that
30 the states have a fundamental, protected, and compelling interest to
31 uphold contemporary community standards of decency and to discourage
32 practices that promote licentiousness.

33  (32) The state of Washington has a compelling interest to uphold
34 community standards of decency and to discourage licentiousness.

35  (33) Abortion facilities that provide convenience abortions tend
36 to erode community standards of decency normalizing false permission-
37 giving beliefs about sex.

38  (34) It is the policy of the state of Washington to:

1    (a) Favor childbirth and family planning services that do not
2 include convenience abortions or the promotion of convenience
3 abortions within the continuum of care or services; and
4    (b) Avoid the direct or indirect use of public funds to promote
5 or support convenience abortions.

6    <u>NEW SECTION.</u>  **Sec. 2.**  The definitions in this section apply
7 throughout this chapter unless the context clearly requires
8 otherwise.
9    (1) "Abortion referral" means the act of recommending a pregnant
10 woman to a doctor, clinic, or other person or entity for the purpose
11 of obtaining or learning about obtaining a convenience abortion.
12    (2) "Affiliate" means an individual or entity that, directly or
13 indirectly, owns, controls, is controlled by, or is under the common
14 control of another person or entity, in whole or in part, or a
15 subsidiary, parent, or sibling entity.
16    (3) "Convenience abortion" means an elective or nontherapeutic
17 abortion as defined in RCW 9.02.170. An act is not a convenience
18 abortion if the act is performed with the intent to:
19    (a) Save the life of the mother or resolve a medical emergency;
20    (b) Save the life or preserve the health of the unborn child;
21    (c) Remove a dead unborn child caused by spontaneous abortion;
22    (d) Remove an ectopic pregnancy;
23    (e) Abort and remove an unborn child that is the result of rape
24 or incest reported to a law enforcement agency; or
25    (f) Abort and remove an unborn child because of a fetal
26 malformation that is incompatible with the baby being born alive.
27    (4) "Emotional appeal" is a method of persuasion through
28 sentiment, not logic, that is designed to create an emotional
29 response.
30    (5) "Infertility prevention project" means the infertility
31 prevention project operated by the United States centers for disease
32 control and prevention.
33    (6) "Lemon test" means:
34    (a) A three-prong test that was originally created by the United
35 States supreme court and now adopted by this state that is used to
36 determine if government action is unconstitutional under the
37 establishment clause. The test requires that state action or
38 government policy:
39    (i) Have a valid secular purpose;

1   (ii) Not have the effect of advancing, endorsing, or inhibiting
2   religion; and
3   (iii) Not foster excessive entanglement with religion.
4   (b) Government action violates the establishment clause if it
5   fails to satisfy any of the prongs.
6   (7) "Medical emergency" means that condition which, on the basis
7   of the physician's good faith clinical judgment, so complicates the
8   medical condition of a pregnant woman as to necessitate the immediate
9   abortion of her pregnancy to avert her death or for which a delay
10  will create serious risk of substantial and irreversible impairment
11  of a major bodily function.
12  (8) "Minority HIV/AIDS initiative" means the minority HIV/AIDS
13  initiative operated by the office of minority health in the United
14  States department of health and human services.
15  (9) "Nongovernment group" means a nonprofit organization exempt
16  from federal income taxation under section 501(c)(3) of the internal
17  revenue code or any other individual or group that is working to:
18  (a) Advance:
19  (i) Birth;
20  (ii) The interests, knowledge, safety, health, and welfare of
21  expecting mothers;
22  (iii) The facilitation of quality, safe, and healthy adoption and
23  the cultivation of strong nurturing families; and
24  (iv) The quality, strength, safeness, and effectiveness of the
25  foster care system; and
26  (b) Provide:
27  (i) Ultrasound testing;
28  (ii) Access to employment opportunities for single mothers who
29  are expecting;
30  (iii) Counseling and therapy for expecting or new mothers;
31  (iv) Community for expecting or new mothers.
32  (10) "Nonsecular sham" means a policy, a course, or principle of
33  action adopted or proposed by a state actor which endorses, respects,
34  or favors the beliefs of a particular religion where the preeminent
35  and primary force driving the state's action is not genuine, but is a
36  sham that ultimately has a primary religious objective. The term
37  refers to a type of policy that is predicated on a series of unproven
38  faith-based assumptions and naked assertions that are implicitly
39  religious.

1      (11)  "Personal  responsibility  education  program"  means  the
2  program administered by the administration for children and families
3  in  the  United  States  department  of  health  and  human  services  to
4  educate  adolescents  on  abstinence  and  contraception  for  the
5  prevention of pregnancy and sexually transmitted infections.

6      (12)  "Physician"  has  the  same  meaning  as  described  in  RCW
7  9.02.170(4).

8      (13)  "Pregnant"  or  "pregnancy"  means  the  female  reproductive
9  condition of having an unborn child in the woman's uterus.

10     (14)  "Promote" means to advocate for, assist with, encourage, or
11  popularize through advertising or publicity.

12     (15)  "Public  funds"  means  any  funds  received  or  controlled  by
13  this state or any agency or political subdivision thereof, including,
14  but  not  limited  to,  funds  derived  from  federal,  state,  or  local
15  taxes, gifts or grants from any source, public or private, federal
16  grants or payments, or intergovernmental transfers.

17     (16)  "Religion"  means  a  set  of  unproven  answers  to  the  greater
18  questions  such  as  "Why  are  we  here?"  "What  should  we  be  doing  as
19  humans?"  "How  do  we  get  our  identity?"  and  "What  happens  after
20  death?"  that  are  predicated  on  an  institutionalized  or
21  noninstitutionalized faith-based worldview flowing out of a community
22  that  is  organized,  full,  and  has  a  code  by  which  members  may  guide
23  their daily lives.

24     (17)  "Secular  abortion"  means  an  abortion  as  defined  in  RCW
25  9.02.170 carried out to:

26     (a) Save the life of the mother or resolve a medical emergency;

27     (b) Save the life or preserve the health of the unborn child;

28     (c) Remove a dead unborn child caused by spontaneous abortion;

29     (d) Remove an ectopic pregnancy;

30     (e)  Abort  and  remove  an  unborn  child  that  is  the  result  of  rape
31  or incest reported to a law enforcement agency; or

32     (f)  Abort  and  remove  an  unborn  child  because  of  a  fetal
33  malformation that is incompatible with the baby being born alive.

34     (18)  "Secular  humanism"  means  a  faith-based  worldview  that  is
35  also  referred  to  as  postmodern  western  individualistic  moral
36  relativism,  expressive  individualism,  or  leftism.  A  belief  system
37  that  is  protected  by  the  free  exercise  clause  of  the  First  Amendment
38  of  the  United  States  Constitution  and  Article  I,  section  11  of  the
39  Washington  state  Constitution  and  centered  on  the  unproven  assumption
40  that  there  are  no  moral  absolutes  and  that  one  moral  doctrine  should

1  be used as the superior basis for law and policy. The term includes a
2  series of unproven faith-based assumptions and naked assertions that
3  suggest that morality and truth are man-made conventions and that at
4  the heart of liberty is man's ability to define his own meaning of
5  the Universe. The term refers to a religion that does not fulfill any
6  compelling state interest but instead tends to erode community
7  standards of decency and promote harmful licentiousness. The term
8  refers to the unproven belief that convenience abortions are moral or
9  plausible. The term includes sexual orientation orthodoxy and
10 nonsecular, self-asserted, sex-based identity narratives. The term
11 refers to the belief that man is merely a bundle of chemicals,
12 animated pieces of meat, or accidental particles and that nature is
13 all there is. The term refers to the unproven faith-based assumption
14 or Nietzschean theory that man evolved from monkeys and should,
15 therefore, love one another just because.

16     (19) "Secular policy" means a course or principle of action
17 adopted or proposed by a state actor that is natural, neutral, and
18 noncontroversial that is based on self-evident morality and objective
19 truth from the reasonable observer perspective. The term includes
20 government procedure or state action that generally accomplishes its
21 goals and does not tend to put religion over nonreligion or one
22 religion over another or does not convey to a reasonable observer
23 that the state favors one religion. The term includes a course of
24 government action where the preeminent and primary force driving the
25 policy is genuine, not a sham, and not merely secondary to a
26 religious objective.

27     (20) "The fund" means the Washington foster care and adoption
28 initiatives fund.

29     (21) "Unborn child" means the offspring of human beings from
30 fertilization until birth.

31     NEW SECTION.  **Sec. 3.**   (1) An agency or instrumentality of the
32 state is prohibited from appropriating or awarding a grant of public
33 funds to pay the direct or indirect costs of performing, inducing,
34 referring individuals for, or counseling in favor of convenience
35 abortions because such state action fails the Lemon test and violates
36 the First Amendment establishment clause of the United States
37 Constitution and Article I, section 11 of the Washington state
38 Constitution for:

39     (a) Constituting a nonsecular sham;

1    (b) Cultivating indefensible legal weapons against nonobservers
2  of the religion of secular humanism; and

3    (c) Having the effect of excessively entangling the government
4  with the religion of secular humanism.

5    (2) Because such appropriations have the effect of endorsing
6  nonsecular practices that excessively entangles the government with
7  the religion of secular humanism, pursuant to the First Amendment
8  establishment clause of the United States Constitution, Article I,
9  section 11 of the Washington state Constitution, and the state's
10  compelling interest to discourage licentiousness, an agency or
11  instrumentality of the state shall not grant, appropriate, or
12  distribute a grant of public funds to an individual or entity that:

13    (a) Performs convenience abortions, induces convenience
14  abortions, provides convenience abortion referrals, or counsels in
15  favor of convenience abortions; and

16    (b) Is an affiliate of an individual or entity that performs
17  abortions, induces abortions, provides abortion referrals, or
18  counsels in favor of convenience abortions.

19    (3) Pursuant to the First Amendment establishment clause of the
20  United States Constitution, Article I, section 11 of the Washington
21  state Constitution, and the state's compelling interest to uphold
22  community standards of decency, an agency or instrumentality of the
23  state shall not appropriate or award a grant of public funds to pay
24  the direct or indirect costs of performing, inducing, referring
25  individuals for, or counseling in favor of convenience abortions
26  including without limitation:

27    (a) Administrative costs and expenses;

28    (b) Overhead costs;

29    (c) Employee salaries;

30    (d) Rent and mortgage payments; and

31    (e) Telephone and other utility payments.

32    (4) Because such appropriations have the effect of endorsing
33  nonsecular practices that excessively entangles the government with
34  the religion of secular humanism, pursuant to the First Amendment
35  establishment clause of the United States Constitution, the
36  Washington state Constitution, and the state's compelling interest to
37  discourage licentiousness, the department of health and all other
38  state agencies shall ensure that public funds received through the
39  federal violence against women act, the breast and cervical cancer
40  mortality prevention act, the infertility prevention project, the

1  minority HIV/AIDS initiative, the infant mortality reduction or
2  infant vitality initiative, the personal responsibility education
3  program, or any other similar federal program shall not be used to do
4  any of the following:
5      (a) Perform convenience abortions;
6      (b) Promote convenience abortions;
7      (c) Contract with any entity that performs or promotes
8  convenience abortions;
9      (d) Be used to affiliate with any entity that performs or
10  promotes convenience abortions.
11     (5) Any taxpayer of this state or its political subdivisions
12  shall have standing to bring suit in a court of competent
13  jurisdiction to enforce the provisions of this section. The
14  prevailing party may seek attorney fees, costs, and other forms of
15  equitable relief.
16     (6) Any officer or employee of the state who knowingly authorizes
17  the use of public funds prohibited by this section may have their
18  employment immediately terminated.
19     (7) This section does not affect the funding of a hospital,
20  medical school, or university.
21     (8) The restrictions under this section do not apply to funding
22  available through the state's plan for medical assistance as required
23  by Title XIX of the federal social security act, if and only if the
24  Hyde Amendment applies and blocks public funds from being
25  appropriated to convenience abortion providers in the state of
26  Washington because:
27     (a) The underlying legal basis for the Hyde Amendment is the
28  First Amendment establishment clause of the United States
29  Constitution; and
30     (b) The First Amendment establishment clause of the United States
31  Constitution mirrors the restrictions under Article I, section 11 of
32  the Washington state Constitution.

33     NEW SECTION.  **Sec. 4.**  (1) The Washington foster care and
34  adoption initiatives fund is created in the custody of the state
35  treasurer.
36     (2) The fund shall consist of:
37     (a) Moneys collected from any fines imposed on convenience
38  abortion providers for cultivating secondary harmful effects or
39  eroding community standards of decency;

1    (b) Any fines or monetary penalties awarded to the state against
2    convenience abortion providers, physicians, or facilities for
3    violating state law under:

4    (i) RCW 9.02.100 through 9.02.170; and

5    (ii) RCW 9.02.900 and 9.02.902; and

6    (c) Any other appropriations, gifts, grants, donations, and
7    bequests.

8    (3) Public funds that would have otherwise been appropriated in
9    the past to facilities providing convenience abortions may be
10   appropriated to the fund.

11   (4) All interest earned on the fund shall be credited to the
12   fund.

13   (5) The purpose of the fund is to provide grant funding for
14   foster care and adoption services and initiatives for both government
15   and, especially, nongovernment groups and individuals.

16   (6) The department of children, youth, and families or its
17   designee shall administer the fund and adopt rules to administer the
18   fund. The department of children, youth, and families shall allocate
19   moneys from the fund according to the following distribution:

20   (a) Fifty percent of the moneys in the fund shall be used for
21   foster care services and initiatives; and

22   (b) Fifty percent of the moneys in the fund shall be used for
23   adoption services and initiatives or to care for unborn children and
24   their mothers.

25   (7) The department of children, youth, and families or its
26   designee shall evaluate activities conducted under this section
27   annually and, on or before February 15th, submit an annual report
28   containing the evaluation to the secretary of the senate and the
29   chief clerk of the house of representatives and notify the
30   legislature that the report is available. The report must include the
31   manner in which the funds in the account were maintained and
32   distributed.

33   NEW SECTION.  **Sec. 5.**  (1) Pursuant to the free exercise clause
34   of the First Amendment of the United States Constitution and Article
35   I, section 11 of the Washington state Constitution:

36   (a) No hospital or any other state actor shall discriminate
37   against or discipline a person because of the person's moral
38   religious beliefs in favor or against convenience abortion or secular
39   abortion ideology and practices;

1     (b) No private or denominational hospital shall be required to
2  permit its facilities to be utilized for the performance of
3  convenience abortions; and

4     (c) No person shall be required, as a condition of training,
5  employment, pay, promotion, or privileges, to agree to perform or
6  participate in the performing of convenience abortions.

7     (2) A civil action for damages or reinstatement of employment, or
8  both, may be brought for any violation of this subsection. The
9  prevailing party may seek attorneys' fees, costs, and other forms of
10  equitable relief.

11     <u>NEW SECTION.</u>  **Sec. 6.**   (1) This chapter does not create or
12  recognize:

13     (a) A right to experience or provide a convenience abortion;

14     (b) A right to public funds, a contract, or a grant.

15     (2) The purpose of this chapter is not to:

16     (a) Prove or disprove that life begins at conception;

17     (b) Abolish or criminalize convenience abortion practices or
18  ideology or other secular humanist practices or ideology;

19     (c) Limit convenience abortion practice to a certain time.

20     (3) The purpose of this chapter is to:

21     (a) Distinguish secular abortion from convenience abortion;

22     (b) Reinforce that all members of the legislature and all
23  executive and judicial officers are bound by oath or affirmation
24  pursuant to Article VI of the United States Constitution to not
25  create or enforce policies that violate the establishment clause or
26  free exercise clause of the First Amendment of the United States
27  Constitution regardless of the members' or officers' party
28  affiliation or personal religious beliefs;

29     (c) Codify the well-established jurisprudence that emotional
30  appeals, even good ones, cannot be used to usurp the establishment
31  clause of the First Amendment of the United States Constitution or
32  Article I, section 11 of the Washington state Constitution in an
33  effort to justify appropriating public funds to convenience abortion
34  providers;

35     (d) Restore the integrity of the Fourteenth Amendment equal
36  protection and substantive due process clauses that the judicial
37  branch has misused because there is no right of privacy mentioned or
38  implied in the United States Constitution and because the substantive
39  due process and the equal protection clauses of the Fourteenth

1   Amendment have nothing to do with convenience abortions and do not
2   require the state to endorse, respect, promote, or fund convenience
3   abortion practices that are inherently nonsecular procedures;
4   (e) Establish that:
5   (i) Convenience abortion ideology is inseparably linked to the
6   religion of secular humanism;
7   (ii) While secular humanism is a religion for the purposes of the
8   First Amendment establishment clause as the United States supreme
9   court already resolved, secular humanism is a disfavored religion
10  because it involves indecent speech that tends to erode community
11  standards of decency and promote licentiousness;
12  (iii) This state has a protected and compelling interest to
13  uphold community standards of decency and to discourage
14  licentiousness;
15  (iv) It is the policy of this state to favor childbirth and
16  family planning services that do not include convenience abortions or
17  the promotion of convenience abortions within the continuum of care
18  or services;
19  (v) The state of Washington has a compelling interest to not only
20  help unborn children flourish but also born children who are subject
21  to adoption or who are placed in the foster care system; and
22  (vi) Public funds that might have been appropriated to
23  convenience abortion providers in the past could be redirected to
24  adoption and foster care services to better enable human flourishing
25  without violating the Constitution of the United States or of this
26  state because such an appropriation amounts to a secular policy and a
27  secular use of public funds.
28  (4) This chapter is constructed on the premise that:
29  (a) The state of Washington is part of a constitutional republic;
30  (b) The United States Constitution is the supreme sovereign law
31  of this country that preempts all state and federal law;
32  (c) The First Amendment of the United States Constitution applies
33  to the state of Washington through the Fourteenth Amendment of the
34  United States Constitution;
35  (d) The establishment clause of the First Amendment of the United
36  States Constitution and Article I, section 11 of the Washington state
37  Constitution prohibits the appropriation of public funds to
38  convenience abortion providers because such an appropriation
39  constitutes state action that fails the prongs of the Lemon test
40  established by the United States supreme court for:

1   (i) Constituting a nonsecular sham;

2   (ii) Cultivating an indefensible legal weapon against
3   nonobservers of the religion of secular humanism; and

4   (iii) Having the effect of excessively entangling the government
5   with the religion of secular humanism;

6   (e) The free exercise clause of the First Amendment of the United
7   States Constitution affords a person the right to hold nonsecular
8   moral beliefs in favor or against convenience abortion practices
9   without fear of discrimination by a state actor;

10   (f) The right to form and express a religious belief is distinct
11   from the right to practice it;

12   (g) Nonsecular practices that excuse acts of licentiousness or
13   justify practices inconsistent with the peace or safety of the state
14   can be restricted by the state because the freedom of religion is not
15   absolute.

16   NEW SECTION.   **Sec. 7.**   Sections 2 through 6 of this act
17   constitute a new chapter in Title 70 RCW.

18   NEW SECTION.   **Sec. 8.**   This act may be known and cited as the
19   life appropriations act.

20   NEW SECTION.   **Sec. 9.**   This act is necessary for the immediate
21   preservation of the public peace, health, or safety, or support of
22   the state government and its existing public institutions, and takes
23   effect immediately.

--- END ---