**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RICH PENKOSKI**, *et al.*, | |
| **Plaintiffs**, | |
| **v.** | **Civil Action No. 20-1519 (TNM)** |
| **MURIEL BOWSER**, | |
| **Defendant.** | |

**DEFENDANT'S MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTIONS FOR PRELIMINARY AND PERMANENT
INJUNCTION AND CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

   I.    The Federal Government's Use of Force Against Peaceful Protesters ............................ 2

   II.   The Mayor's Response to the Federal Government's Use of Force .................................. 3

   III.  Procedural History ........................................................................................................... 5

LEGAL STANDARD .......................................................................................................... 6

   I.    Preliminary Injunction ..................................................................................................... 6

   II.   Summary Judgment ......................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

   I.    Plaintiffs Are Not Entitled to a Preliminary Injunction. ................................................. 8

     A.  Plaintiffs Are Not Likely to Succeed on the Merits Because They Fail to Establish a
        Violation of the Establishment Clause or the Equal Protection Clause, and the
        Remainder of Their Claims Are Not Properly Before This Court or Fail on the Merits.  8

      1.  Plaintiffs Lack Standing To Bring Their Claims. .......................................................... 8

        a.   The *Flast* Exception to the Rule Against Taxpayer Standing Does Not Apply to
            Municipal Taxpayers and Even If It Did Plaintiffs Have Not Established that They
            Are Resident Municipal Taxpayers. ......................................................................... 8

        b.   Plaintiffs Cannot Establish that They Have Standing Based on the Theory that the
            Displays Produce a "Chilling Effect" or Allegations that They Have Been Harassed
            by Third Parties. ...................................................................................................... 12

      2.  Plaintiffs Are Unlikely to Succeed on Their Establishment Clause Claim Because
         Black Lives Matter is Not a Religion. ...................................................................... 15

        a.   Black Lives Matter Is Not a Religion. ..................................................................... 15

        b.   Even if Plaintiffs Were Correct that Black Lives Matter Is a Denomination of
            Secular Humanism, the Establishment Clause Still Would Not Apply Because
            Secular Humanism Is Not a Religion for Purposes of the Establishment Clause ... 18

        c.   Based on History and Context, the Mural and Symbolic Street Naming Could Not
            Be Reasonably Understood To Endorse a Religion. ................................................. 18

        d.   Even if Black Lives Matter Were a Religion, the Displays Would Still Not Violate
            the Establishment Clause Under the *Lemon* Test. .................................................. 20

      3.  Plaintiffs Are Unlikely to Succeed on Their Claim Under the Equal Protection Clause
         Because the Challenged Displays Do Not Deny Plaintiffs Equal Protection of the
         Laws Based on Their Race or Religion. ................................................................... 24

      4.  Plaintiffs Cannot Succeed on Claims That Are Not Alleged in the Complaint, But

Even If Properly Brought, Plaintiffs' Newly Raised Claims Are Unlikely to Succeed. ..................................................................................................... 27

    a.    Plaintiffs' Viewpoint Discrimination Claim Is Unlikely to Succeed Because the Displays Constitute Government Speech Not Subject to First Amendment Scrutiny. .................................................................................................................. 28

    b.    Plaintiffs Cannot Succeed on Their Free Exercise Claim Challenging the District's Stay-At-Home Order Because the Protection of Public Health and Safety Is a Compelling Government Interest that Justifies the Burden Imposed by the Stay-At-Home Order. ................................................................................................. 30

    c.    Plaintiffs' District Law Claims Are Unlikely to Succeed Because There is No Private Right of Action and the District Statute and Regulations Plaintiffs Cite Do Not Apply. ....................................................................................................... 34

  B.  Plaintiffs Will Not Suffer Irreparable Harm Absent Relief Because They Have Not Suffered an Injury. ........................................................................................................ 36

  C.  The Balance of the Equities and the Public Interest Weigh Against Removing the Displays. ....................................................................................................................... 38

 II.   The District Is Entitled to Judgment As a Matter of Law on All Claims. ..................... 40

CONCLUSION ............................................................................................................................ 42

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) …………………………………………………....… 6

*Adair v. England*,
183 F. Supp. 2d 31 (D.D.C. 2002) …………………………………………………..31

*Africa v. Pennsylvania*,
662 F.2d 1025 (3d Cir. 1981) …………………………………………………………..17

*Agnosti v. Felton*,
521 U.S. 203 (1997) ……………………………………………………………………23

*Allen v. Morton*,
495 F.2d 65 (D.C. Cir. 1973) ………………………………………………………….22

*Allen v. Wright*,
468 U.S. 737 (1984) …………………………………………………………………….13

*Altman v. Bedford Cent. Sch. Dist.*,
245 F.3d 49 (2d Cir. 2001) ………………………………………………...…………17

*Alvarado v. City of San Jose*,
94 F.3d 1223 (9th Cir. 1996) ………………………………………………..…………17

*Am. Legion v. Am. Humanist Ass'n*,
139 S. Ct. 2067 (2019) ……………………………………………...……10, 13, 20

*Amoco Prod. Co. v. Gambell*,
480 U.S. 531 (1987) …………………………………………………………………….38

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) …………………………………………………………….7, 40

*Archdiocese of Wash. v. WMATA*,
897 F.3d 314 (D.C. Cir. 2018) ……………………………………………………….36

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
281 F. Supp. 3d 88 (D.D.C. 2017) ……………………………………………………..31

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) ………….…………………………………………………...11

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) …………………………………………………………35

*Banner v. United States*,
    428 F.3d 303 (D.C. Cir. 2005) …………………………………………………..25, 26

*BEG Invs., LLC v. Alberti*,
    85 F. Supp. 3d 13 (D.D.C. 2015) ………..……………………………………25, 41

*Bonham v. D.C. Library Admin.*,
    989 F.2d 1242 (D.C. Cir. 1993) ………………..……………………………………20

*Bowen v. Kendrick*,
    487 U.S. 589 (1988) ……………………………………………………………..9

*Brodie v. U.S. Dep't Health and Human Servs.*,
    715 F. Supp. 2d 74 (D.D.C. 2010) ……………..……………………………………38

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) …………………………………………………..……..40

*Catholic Charities of Diocese of Albany v. Serio*,
    859 N.E.2d 459 (N.Y. 2006)…………………………………………………33

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ……………………………………………………………..7

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ……………………………………………………37

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ……………………………………………..…………..31

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ………………………………………….………………38

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) …………………………………………………..29, 30

*Craig v. Boren*,
    429 U.S. 190 (1976) …………………………………………………………25

*Crowley v. Smithsonian Inst.*,
    636 F.2d 738 (D.C. Cir. 1980) …………………………………………………15

*Ctr. for Auto Safety v. Dole*,
    582 F. Supp. 1444 (D.D.C. 1984) …………………..……………………………………38

*Daniel Chapter One v. FTC*,
    405 F. App'x 505 (D.C. Cir. 2010) …………………………………………………………19

*Davis v. Mnuchin*,
    Civil Action No. 18-00447, 2018 WL 8584035 (D.D.C. Nov. 13, 2018) ………………..28

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) …………………………..……………………………………..7

*Diamond v. Charles*,
    476 U.S. 54 (1986) ……………………………………………………………..……………13

*District of Columbia v. U.S. Dep't of Agric.*,
    Civil Action No. 20-00119, 2020 WL 1236657 (D.D.C. March 13, 2020) ………………39

*Doe v. Pompeo*,
    Civil Action No. 20-00065, 2020 WL 1556251 (D.D.C. Apr. 1, 2020) …………………28

*Dumaquin v. Sec'y of Health & Human Serv.*,
    28 F.3d 1218 (D.C. Cir. 1994) ……………………………………………………………26

*Elrod v. Burns*,
    427 U.S. 347 (1976) …………………………………………………………………36, 37

*Faison v. Vance-Cooks*,
    896 F. Supp. 2d 37 (D.D.C. 2012) ……………………………………………………..41

*Fields v. Speaker of Pennsylvania House of Representatives*,
    936 F.3d 142 (3d Cir. 2019) ……………………………………………………………20

*Flast v. Cohen*,
    392 U.S. 83 (1968) ………………………………………………………………………9

*Franks v. Salazar*,
    816 F. Supp. 2d 49 (D.D.C. 2011)……………………………………………………...28

*Greene v. Dalton*,
    164 F.3d 671 (D.C. Cir. 1999) …………………………………………………………41

*Hagans v. Lavine*,
    415 U.S. 528 (1974) ……………………………………………………………………11

*Hein v. Freedom from Religion Found.*
    551 U.S. 587 (2007) …………………………………………………………..9

*Heller v. Doe,*
    509 U.S. 312 (1993)……………………………………………………………26

*In re Navy Chaplaincy,*
    534 F.3d 756 (D.C. Cir. 2008) …………………………………………...13, 14

*In re Navy Chaplaincy,*
    738 F.3d 425 (D.C. Cir. 2013) …………………………………………...20, 22

*Kaemmerling v. Lappin,*
    553 F.3d 669 (D.C. Cir. 2008) ………………………………………………26

*Kalka v. Hawk,*
    215 F.3d 90 (D.C. Cir. 2000) …………………………………………………18

*Kondrat'yev v. City of Pensacola,*
    949 F.3d 1319 (11th Cir. 2020) ……………………………………………20

*Larkin v. Grendel's Den,*
    459 U.S. 116 (1982) …………………………………………………………23

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) …………………………………………………...8, 12, 14

*Lynch v. Donnelly,*
    465 U.S. 668 (1984) …………………………………………………………..21

*Maryland v. King,*
    133 S. Ct. 1 (2012) …………………………………………………………..38

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) …………………………………………………...10, 11

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.,*
    545 U.S. 844 (2005)…...........…………………………………………19, 21

*Mount Royal Joint Venture v. Kempthorne,*
    477 F.3d 745 (D.C. Cir. 2007) ………………………………………………23

*Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.,*
    435 F.3d 326 (D.C. Cir. 2006) ………………………………………………39

*Newdow v. Bush,*
    355 F. Supp. 2d 265 (D.D.C. 2005) ……………………………………………………13

*Nken v. Holder,*
    556 U.S. 418 (2009) ……………………………………………………………………7

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992) …………………………………………………………………..25, 26

*\*Orr v. Orr,*
    440 U.S. 268 (1979) …………………………………………………………………25

*Parker v. Hoglander,*
    Civil Action No. 15-926, 2016 WL 3527014 (D.D.C. June 23, 2016) …………………………7

*Peloza v. Capistrano Unified Sch. Dist.,*
    37 F.3d 517 (9th Cir. 1994) ……………………………….…………………………...17

*Perrier-Bilbo v. United States,*
    954 F.3d 413, 424-25 (1st Cir. 2020) ……………………………………………………..20

*Personnel Adm'r v. Feeney,*
    442 U.S. 256 (1979)……………………………………………………………………25

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009)……………………………………………………………...29, 30

*Priests for Life v. United States Dep't of Health & Human Servs.,*
    7 F. Supp. 3d 88 (D.D.C. 2013) ……………………………………………………..33

*Proctor v. District of Columbia,*
    310 F.Supp.3d 107 (D.D.C. 2018) ……………………………………………………..36

*Real Alternatives, Inc. v. Burwell,*
    150 F. Supp. 3d 419 (M.D. Pa. 2015) …………………………………………………16

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,*
    867 F.3d 338 (3d Cir. 2017) ………………………………………………………16

*Reinhard v. Johnson,*
    209 F. Supp. 3d 207 (D.D.C. 2016) …………………………………………………38

*Ricci v. DeStefano,*
    557 U.S. 557 (2009) ……………………………………………………………41

*Salazar v. Buono*,
    559 U.S. 700 (2010) ……………………………………………………………38

*See S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) …………………………………………………...33, 34

*Seeger v. United States Dep't of Def.*,
    306 F. Supp. 3d 265 (D.D.C. 2018) …………………………………………37

*\*Sevier v. Lowenthal*,
    302 F. Supp. 3d 312 (D.D.C. 2018) …………………………………..16, 17, 19, 40

*Sherley v. Sebelius*, 644 F.3d 388
    (D.C. Cir. 2011) ………………………………………………………………6, 8

*Smith v. Henderson*,
    944 F. Supp. 2d 89 (D.D.C. 2013) …………………………………………………8

*Soos v. Cuomo*,
    Civil Action No. 20-651, 2020 WL 3488742 (N.D.N.Y June 26, 2020) ……………………27

*Stefanelli v. Minard*,
    342 U.S. 117 (1951) …………………………………………………………39

*Suhre v. Haywood Cty.*,
    131 F.3d 1083 (4th Cir. 1997) ………………………………………………13

*Sweis v. U.S. Foreign Claims Settlement Comm'n*,
    950 F. Supp. 2d 44 (D.D.C. 2013) …………………………………………………8

*Tex. Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989) ……………………………………………………………10

*Torcaso v. Watkins*,
    367 U.S. 488 (1961) …………………………………………………………18

*U.S. v. Allen*,
    760 F.2d 447 (1985) ……………………………………………………...16, 17

*United States v. Holland*,
    810 F.2d 1215 (D.C. Cir. 1987) ………………………………..……………………26

*United States v. Seeger*,
    380 U.S. 163 (1965) …………………………………………………………16

*Valley Forge Christian College v. Americans United for Separation of Church & State*,
  454 U.S. 464 (1982) … …………………………………………...……...……8, 12, 13

*Van Orden v. Perry*,
  545 U.S. 677 (2005) …………………………………………………..………..*passim*

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ……………………………………………..………………………29

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) …………………………………………………………………..22

*Warth v. Seldin*,
  422 U.S. 490 (1975) ……………………………………………………………..8

*Weinbaum v. Las Cruces Pub. Sch.*,
  465 F. Supp. 2d 1116 (D.N.M. 2006) ………………………………………...19, 22

*Williamson v. Lee Optical of Okla., Inc.*,
  348 U.S. 483 (1955) ………………………………………………………... 26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ………………………………………….……………………6, 8, 37

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ……………………..…………………………………………16

*Women Prisoners v. D.C. Dep't of Corrs.*,
  93 F.3d 910 (D.C. Cir. 1996) …………………………………………………..24

*Zelman v. Simmons–Harris*,
  536 U.S. 639 (2002) ………………………………………………………………22

*Zubik v. Burwell*,
  136 S.Ct. 1557 (2016)…………………………………………………………..33

**Statutes and Regulations**

D.C. Code § 1-325.101………………………………………………………………..35

D.C. Code § 9-204.01……………………………………………..………………………36

D.C. Code § 9-204.02…………………………………………………………………34, 36

D.C. Code § 9-204.03a…………………………………………………………….…36

18 D.C.M.R. § 2102………………………………………………………………....34

24 D.C.M.R. § 100.6………………………………………………………………34

24 D.C.M.R. § 1006……………………………………………………………...34

24 D.C.M.R. § 1108.10……………………………………………………....34, 35

24 D.C.M.R. § 1101………………………………………………………...…35

**Other Authorities**

Fed. R. Civ. P. 8(a)………………………………………………………27

Fed. R. Civ. P. 56(a)………………………………………………..7, 14

Fed. R. Civ. P. 56(b)………………………………………………7

U.S. Const. amend. I…………………………………………….. *passim*

U.S. Const. amend. V……………………………………………*passim*

U.S. Const. amend. XIV………………………………………*passim*

# INTRODUCTION

Plaintiffs Rich Penkoski, Chris Sevier and Tex Christopher challenge defendant Mayor Muriel Bowser's (the District) decisions to paint a mural with the phrase "BLACK LIVES MATTER" on a portion of 16th Street, N.W. in the District of Columbia and to symbolically name portions of the street "Black Lives Matter Plaza." Plaintiffs allege that the displays violate the Establishment Clause of the First Amendment based on the theory that Black Lives Matter is a religion, and that the displays convey the message that Black Lives Matter is the favored religion of the District of Columbia and the Nation. They further allege that the displays violate the Equal Protection Clause based on the theory that the displays are underinclusive and convey that Blacks are the favored race. Both claims lack merit. Black Lives Matter is not a religion and no reasonable observer aware of the context and history of the displays would determine that they are religious. And even if Black Lives Matter were a religion, the displays do not violate the Establishment Clause because they (1) convey a secular message (namely, that the District of Columbia is a safe space for peaceful protesters); (2) do not advance or inhibit religion; and (3) do not foster excessive entanglement between the District and any religious group. The displays also do not violate the Equal Protection Clause because nothing about the displays' mere presence in the District of Columbia denies plaintiffs equal protection of the laws. Plaintiffs raise additional claims in their motions for preliminary and permanent injunction—including viewpoint discrimination, violation of the Free Exercise Clause and various local law claims—but these claims are not pled in the Complaint and otherwise lack merit.

As discussed below, plaintiffs are not entitled to a preliminary or permanent injunction. They are unlikely to succeed on the merits of their claims because they lack standing to challenge the displays and they cannot establish a constitutional violation under the Establishment Clause or

the Equal Protection Clause. Plaintiffs also fail to identify any plausible injury as a result of the displays, and thus are unable to establish that they would suffer irreparable harm absent injunctive relief. On top of this, the balance of the equities and the public interest weigh against removing the displays because it would undermine the message that the District of Columbia is a safe space for peaceful protesters. The Court should therefore deny plaintiffs' motions for injunctive relief.

Plaintiffs' claims not only fail to satisfy the standard for obtaining such relief, the claims also fail as a matter of law. The material facts in this case are not in dispute and plaintiffs fail to allege any basis or provide any evidence on which to prevail on the merits. As a result, the Court should grant the District's cross-motion for summary judgment.

## BACKGROUND

### I.    The Federal Government's Use of Force Against Peaceful Protesters

On June 1, 2020, protesters descended upon the District of Columbia—and cities across the Nation—to express their concerns about the deaths of George Floyd and other unarmed African Americans during interactions with law enforcement. *See, e.g.*, Dalton Bennett, *et al.*, *The crackdown before Trump's photo op: How law enforcement cleared protesters outside the White House*, Wash. Post. (June 8, 2020), *available at* https://www.washingtonpost.com/investigations/2020/06/08/timeline-trump-church-photo-op/.[1]

At approximately 6:30 p.m. that same evening, before the 7:00 p.m. curfew went into effect, federal law enforcement officers cleared Lafayette Square so that President Trump could

---

[1]    Although Mayor Bowser acknowledged that protesters were entitled to exercise their First Amendment rights, she issued a curfew for 7:00 p.m. that evening because of potential public safety concerns. *See* Mayor's Order 2020-069 (June 1, 2020), available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%2 7s%20Order%202020-069.pdf. The Mayor had lifted the District's stay-at-home order several days before. *See* Mayor's Order 2020-067 (May 27, 2020).

walk across 16th Street from the White House to St. John's Episcopal Church for a photo opportunity. *Id.* To accomplish this, the federal law enforcement officers deployed tear gas, rubber bullets and flash canisters in an effort to move the peaceful protesters who were present on the street.[2] Prior to walking across Lafayette Square, President Trump gave a statement in the Rose Garden of the White House and expressed his intention to "dominate the streets" through use of military force. *Statement by the President*, www.whitehouse.gov (June 1, 2020), *available at* https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/.

## II.   The Mayor's Response to the Federal Government's Use of Force

Tensions remained high in the days after the events of June 1 and the community was on edge. *See* Patricia Sullivan, *et al.*, *Protests heat up early Wednesday with pepper pellets and fireworks near White House*, Wash Post. (June 3, 2020), *available at* https://www.washingtonpost.com/dc-md-va/2020/06/02/dc-protest-george-floyd-white-house. To restore a sense of calm, and in light of President Trump's intention to "dominate the streets," Mayor Bowser expressed a desire to honor the protesters from June 1 and send a message that District streets are a safe space for peaceful protesters. Declaration of John Falcicchio (Falcicchio Decl.), Ex. A ¶ 6. With those goals in mind, the Mayor directed District staff to erect two displays on 16th Street at the site of the June 1 protests—a painted mural with the words "BLACK LIVES

---

[2]      Representatives from both the U.S. Secret Service and the U.S. Park Police subsequently admitted that their employees had engaged in these practices. *See* Ledyard King, *Secret Service admits it used pepper spray to clear protesters prior to Trump photo op at St. John's Church*, USA Today (June 13, 2020), *available at* https://www.usatoday.com/story/news/politics/2020/06/13/floyd-protests-secret-service-used-pepper-spray-trump-photo-op/3184223001/; Laura Egan, *Secret Service now says it did use pepper spray to clear protesters during the Trump church photo op*, NBCNews (June 13, 2020), *available at* https://www.nbcnews.com/politics/white-house/secret-service-now-says-it-did-use-pepper-spray-clear-n1231022.

MATTER" and street signs symbolically naming that section of the street "Black Lives Matter Plaza." *Id.* ¶ 7.

The mural was commissioned by the D.C. Department of Public Works (DPW) and painted by artists from MuralsDC, a program within DPW. *Id.* ¶ 8. MuralsDC has commissioned dozens of murals throughout the District, on both public and private property, that are designed to reflect the character of the community. *See Our Mission*, MuralsDC Project, *available at* http://muralsdcproject.com/our-mission/.[3] On June 5, 2020, a group of eight artists from MuralsDC and five apprentices met in the early morning to start painting the mural, which they completed at approximately 11:30 a.m. that day. Falcicchio Decl. ¶ 8. Several dozen District government employees and local residents joined to help complete the project. *Id.*

At the direction of the Mayor, employees within the District Department of Transportation (DDOT) made street signs bearing the symbolic name "Black Lives Matter Plaza." Falcicchio Decl. ¶ 9. Shortly after the mural was completed, DDOT staff placed the signs at each corner of 16th Street where it intersects with H Street, K Street and I Street. *Id.* To complete the symbolic naming process, DDOT staff drafted legislation for the Council of the District of Columbia to designate the area "Black Lives Matter Plaza." *Id.* ¶ 10. The legislation was introduced on June 8, 2020 and enacted by the Council the next day. *Id.*; *see* PR 23-428, Coronavirus Support

---

[3]     Examples include a mural at 2nd and D Streets N.W. next to the Creative Center for Nonviolence entitled "Homeless Lives Matter," *Homeless Lives Matter*, MuralsDC Project, *available at* http://muralsdcproject.com/mural/homeless-lives-matter/, a mural bearing the words "Language Access for all in DC" on MacFarland Middle School on 13th Street, N.W., *Language Access for All in* DC, MuralsDC Project, *available at* http://muralsdcproject.com/mural/language-access-for-all-in-dc/, and a mural depicting members of the armed forces on the outside of a liquor store on Rhode Island Avenue, N.E. entitled "Support Our Troops," *Support Our Troops*, MuralsDC Project, *available at* http://muralsdcproject.com/mural/support-our-troops/.

Clarification Emergency Declaration Resolution of 2020, § 2(e), *available at*
https://lims.dccouncil.us/Legislation/PR23-0827.[4]

## III.    **Procedural History**

In the Complaint, plaintiffs allege that the District's displays violate the Establishment
Clause of the First Amendment and the Equal Protection Clause, and they seek declaratory and
injunctive relief, damages, costs and attorney's fees. Compl. at 23-24, 26. Plaintiffs request that
the District remove the painted mural on 16th Street and replace it with three separate murals
stating "Blue Lives Matter," "Green Lives matter," and "All Lives Matter," each for the same
duration and in the same scale and manner as the Black Lives Matter mural. *Id.* at 26-27. In
addition, plaintiffs request that the Black Lives Matter Plaza signs be removed and replaced with
signs bearing a secular name, or in the alternative that a comparable street be named "Jesus is the
answer Plaza," and that the District remove all Black Lives Matter graffiti on public property, and
on private property if requested by the owner. *Id.* at 3, 27.

On June 16, 2020, plaintiffs moved for a temporary restraining order (TRO) and
preliminary injunction (PI). The Court contacted the Parties the next day and set a hearing on the
TRO for June 18. After hearing oral arguments, the Court denied plaintiffs' motion for a TRO. *See*
June 18, 2020 Minute Entry. In response to the Court's order, plaintiffs stated that they intended

---

[4]      This was not the first time the Council had enacted legislation to symbolically name a street
on an emergency basis. For example, on January 9, 2018, the Council passed an emergency
resolution to symbolically name a portion of Wisconsin Avenue, N.W. "Boris Nemtsov Plaza" in
time to commemorate the three-year anniversary of Russian politician Boris Nemtsov's
assassination. PR 22-387, Boris Nemtsov Plaza Designation Emergency Declaration Resolution
of 2018, *available at* https://lims.dccouncil.us/Legislation/PR22-0700. Mr. Nemtsov had been an
advocate for democracy, and the emergency resolution stated, "[T]he designation is a symbol of
the District's commitment to democracy and sends a message of solidarity to those fighting for
democratic principles around the world." *Id.* § 2(b), (d).

to file a new PI motion, and the Court ordered that the Parties' briefing on plaintiffs' new motion be consolidated with the Parties' briefing on the merits. *Id.*

Between June 29, 2020 and June 30, 2020, plaintiffs submitted a variety of filings (some of which were submitted after the Court's deadline), including three motions for a preliminary and permanent injunction. *See* Pls.' Mem. in Supp. Mot. Prelim. and Permanent Inj. (Christopher PI) [18]; Pls.' Mem. in Supp. Mot. Prelim. and Permanent Inj. (Penkoski PI) [20]; and Pl.'s Mem. in Supp. Mot. Prelim. and Permanent Inj. (Sevier PI) [22]. Plaintiffs' motions raised claims not pled in the Complaint, including viewpoint discrimination, violation of the Free Exercise Clause and various statutory and regulatory claims under District law. Plaintiffs request that the District "temporarily modify" the Black Lives Matter mural to say "ALL LIVES MATTER" in red, white and blue paint and then permanently remove the painting. Sevier PI at 2. And they request that 16th Street "be renamed to '16th Street' once again." *Id.*

## LEGAL STANDARD

### I.   <u>Preliminary Injunction</u>

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (emphasis added). The latter two factors merge

when the government is opposing an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A plaintiff seeking emergency injunctive relief bears the burden of proving all four prongs of the standard before relief can be granted. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

## II.    <u>Summary Judgment</u>

Under Fed. R. Civ. P. 56(a), a court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party may move "for summary judgment at any time," including at the beginning of a case before discovery has commenced. Fed. R. Civ. P. 56(b); *see also Parker v. Hoglander*, Civil Action No. 15-00926, 2016 WL 3527014, at *3-4 (D.D.C. June 23, 2016). The movant has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the nonmovant must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). Although the court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in its favor, the "mere existence of a scintilla of evidence in support of" the nonmovant is "insufficient" to stave off summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The nonmovant must adduce "evidence on which the jury could reasonably find for" it at trial. *Id.*

**ARGUMENT**

I.   **Plaintiffs Are Not Entitled to a Preliminary Injunction.**

A.   **Plaintiffs Are Not Likely to Succeed on the Merits Because They Fail to Establish a Violation of the Establishment Clause or the Equal Protection Clause, and the Remainder of Their Claims Are Not Properly Before This Court or Fail on the Merits.**

Demonstrating a likelihood of success on the merits is a free-standing requirement for a preliminary injunction, *Sherley*, 644 F.3d at 393 (quotation omitted), and "a failure to show a likelihood of success on the merits is alone sufficient to defeat a preliminary-injunction motion." *Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013). The Court need not conclude that plaintiffs will lose on the merits, only that they have not met the extraordinary burden of showing a clear entitlement to immediate, extraordinary relief. *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013). They must show not merely that success is a "possibility" but that it is "likely." *Winter*, 555 U.S. at 20-22.

Here, for the reasons below, plaintiffs have not met their burden because they have not demonstrated that success on the merits is a possibility, let alone a likelihood.

1.   **Plaintiffs Lack Standing To Bring Their Claims.**

a.   **The *Flast* Exception to the Rule Against Taxpayer Standing Does Not Apply to Municipal Taxpayers and Even If It Did Plaintiffs Have Not Established that They Are Resident Municipal Taxpayers.**

As a general rule, plaintiffs cannot assert that they have standing based merely on their status as taxpayers because federal courts cannot adjudicate "generalized grievances" that are common to all taxpayers. *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 474-75 (1982) (citing *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975)); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992) ("We have consistently

held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."). Nevertheless, plaintiffs argue that they have standing based on an exception to the rule against taxpayer standing recognized by the Supreme Court in *Flast v. Cohen*, 392 U.S. 83 (1968). Although *Flast* did create a "narrow exception" to "the general rule against taxpayer standing," *Bowen v. Kendrick*, 487 U.S. 589, 618 (1988), that exception does not apply here, and plaintiffs cannot rely upon it to establish that they have standing to pursue their claims.

In *Flast*, the Court held that "a taxpayer will be a proper party to allege the unconstitutionality *only* of exercises of congressional power under the taxing and spending clause of Art. I, s 8, of the Constitution." *Id.* at 102 (emphasis added). Here, plaintiffs are not challenging a congressional action under the Taxing and Spending Clause; they are challenging an executive action by a municipal government. Therefore, the *Flast* exception does not apply.[5]

As the Supreme Court held in *Hein v. Freedom from Religion Found., Inc.*, acts of "executive discretion," rather than legislative action, are not subject to the *Flast* exception. 551 U.S. 587, 605 (2007). In *Hein*, the Court considered whether to extend the *Flast* exception to executive actions and expressly declined to do so. *See id.* at 609 ("*Flast* focused on congressional action, and we must decline this invitation to extend its holding to encompass discretionary Executive Branch expenditures."). In declining to extend the *Flast* exception further, the plurality

---

[5]     The case *Bowen v. Kendrick*, 487 U.S. 589 (1988) is not to the contrary. There, the Court held that the *Flast* exception applied because there was "a sufficient nexus between the taxpayer's standing as a taxpayer and the *congressional* exercise of *taxing and spending power*." *Id.* at 619 (emphasis added).

in *Hein* noted, "It is significant that, in the four decades since its creation, the *Flast* exception has largely been confined to its facts." *Id.* The *Flast* exception simply does not apply to a case such as this one, where plaintiffs challenge an executive action by the Mayor.

Separately, even if the *Flast* exception were extended to *municipal* taxpayers, in addition to federal taxpayers, plaintiffs still have not demonstrated that they have the requisite stake in the outcome of the case to establish Article III standing. *See Flast*, 392 U.S. at 101 (holding that to satisfy the Article III standing requirement a plaintiff asserting taxpayer standing still must have "the requisite personal stake" in the case.). Significantly, the municipal taxpayer standing rule articulated by the Court in *Massachusetts v. Mellon* is limited to "resident" municipal taxpayers. 262 U.S. 447, 486 (1923). Plaintiffs have not provided evidence that they are *residents* of the District. Instead, they have merely asserted that they pay sales taxes in the District, just like countless other nonresidents who visit the District each year.

In support of their argument that paying sales taxes gives them standing, plaintiffs rely on *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989). There, the publisher of a nonreligious periodical challenged a state law exempting religious periodicals from sales taxes. *Id.* at 6. Notably, the Court did not address taxpayer standing in *Bullock*. Although the Court did address the plaintiff's standing, the Court's standing analysis was limited to whether the plaintiff had suffered a redressable injury. *Id.* at 7-8.[6] *Bullock* does not stand for the broad proposition that any plaintiff who pays sales taxes has satisfied Article III's requirement for taxpayer standing in all cases—that

---

[6] Indeed, as Justice Gorsuch subsequently noted, the Court in *Bullock* found that the plaintiff in that case had standing based on their being "denied government benefits because they do not practice a favored religion." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2102-03 (2019) (Gorsuch, J., concurring) (citing *Bullock*, 489 U.S. at 7-8). The plaintiff in *Bullock* never argued that it had standing simply because it paid sales taxes, nor did the Court find that the plaintiff had satisfied Article III's standing requirement on that ground.

issue was not before the Court. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed."); *Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974) ("[W]hen questions of jurisdiction have been passed on in prior decisions sub silentio, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.").

What is more, the plaintiff in *Bullock* had a much greater stake in the outcome than any individual subscriber who purchased a magazine. Here, on the other hand, plaintiffs are *individuals* who pay sales taxes, not an *entity* that collects sales tax payments from thousands of different individuals and then pays them to the government. Plaintiffs in this case therefore have a much smaller stake in the outcome of this case than the plaintiff publisher did in *Bullock*.

Indeed, plaintiffs' interest in the District's use of municipal funds is no different than that of the "millions of others" who do not live in the District (and do not file taxes in the District as resident taxpayers) but pay sales taxes whenever they visit the District and purchase goods or services. *Cf. Mellon*, 262 U.S. at 486-87.[7] Their interest in the use of District funds is "comparatively minute and indeterminable" compared to that of resident taxpayers who file taxes

---

[7]     In *Mellon*, the Court concluded that resident municipal taxpayers have a stronger interest in cases involving the expenditure of municipal funds than federal taxpayers in cases involving the expenditure of federal government funds. The Court held that resident municipal taxpayer standing was therefore appropriate under Article III because "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." 262 U.S. at 486. On the other hand, "the relation of a taxpayer of the United States to the federal government is very different" because "[h]is interest in the moneys of the treasury … is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain." *Id.* at 487. Therefore, when a federal taxpayer sues the federal government over its use of taxpayer funds "no basis is afforded for an appeal to the preventive powers of a court of equity." *Id.*

with the District government each year as residents of the District. *Id.* at 487. Plaintiffs' interest in the present case, much like that of a federal taxpayer in a suit against the federal government is "so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventative powers of a court of equity." *Id.*

As a fallback, plaintiffs argue that the Court should find that they have standing as taxpayers based on legislation that they have introduced in other states. Penkoski PI at 17. Congress has not enacted this legislation, nor has the taxpayer standing theory described in this legislation been adopted by the Supreme Court or the D.C. Circuit. Plaintiffs cannot rely on this unenacted legislation to overcome their lack of standing.

> **b.   Plaintiffs Cannot Establish that They Have Standing Based on the Theory that the Displays Produce a "Chilling Effect" or Allegations that They Have Been Harassed by Third Parties.**

Alternatively, plaintiffs argue that they have standing based on allegations that they walk past the displays and that the displays have produced a "chilling effect" on their business activities. Compl. ¶¶ 39-42, 44. They further argue that they have "a logical nexus to pursue this cause of action" because they have been harassed by members of the Black Lives Matter organization. *Id.* ¶ 49. These allegations are insufficient to establish Article III standing.

To satisfy Article III's standing requirement, plaintiffs must have suffered an injury in fact that is fairly traceable to the challenged conduct and likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.[8] Plaintiffs cannot satisfy any of these elements here. For starters, they

---

[8]   Establishment Clause cases are no different. As the Court acknowledged in *Flast*, "Federal judicial power is limited to those disputes … capable of resolution through the judicial process." *Flast*, 392 U.S. at 97; *see also Valley Forge*, 454 U.S. at 472 (noting that plaintiffs must have suffered an "actual injury redressable by the court" to satisfy Article III's standing requirement); *id.* at 473 (noting that federal courts are not "merely publicly funded forums for the ventilation of

have not suffered an injury. The mere presence of the displays does not deny plaintiffs equal protection of the laws—Article III standing is limited to "those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (internal quotation marks omitted); *see Valley Forge*, 454 U.S. at 485-86 ("[Plaintiffs] fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms."). Plaintiffs may disagree with the message conveyed by the displays, or even find them offensive, but "[t]he presence of a disagreement, however sharp and acrimonious it may be, is insufficient itself to meet Art. III's [standing] requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986). Plaintiffs' "'offended observer' theory of standing has no basis in law." *Am. Legion*, 139 S. Ct. at 2098 (Gorsuch, J., concurring).

The fact that plaintiffs walk past the displays to conduct business activities does not amount to an injury-in-fact under Article III. Although some courts have found that plaintiffs can satisfy Article III's injury-in-fact requirement solely based on "frequent contact" with purported religious displays, *see Newdow v. Bush*, 355 F. Supp. 2d 265, 278 n.11 (D.D.C. 2005) (examining *Suhre v. Haywood Cty.*, 131 F.3d 1083 (4th Cir. 1997)), the Supreme Court never has,[9] and neither has the D.C. Circuit. What the D.C. Circuit has held is that plaintiffs cannot "claim injury-in-fact from

---

public grievances" and that Article III "forecloses the conversion of courts of the United States into judicial versions of college debating forums").

[9]    In fact, the Supreme Court held in *Van Orden v. Perry* that the State of Texas's public display of the Ten Commandments was permissible under the Establishment Clause when plaintiffs merely alleged that they "walked by the monument for years." 545 U.S. 677, 678 (2005) (plurality).

their being subjected to [a] 'message' of religious preference" that "makes them feel like second-class citizens." *In re Navy Chaplaincy*, 534 F.3d 756, 763 (D.C. Cir. 2008). That is exactly what plaintiffs are alleging here. *See* Compl. ¶ 44 (stating that the displays "cultivate[ ] a chilling effect that causes the Plaintiffs to actually feel like second class citizens."). And unlike in other religious display cases, the displays at issue here do not "communicat[e] a religious message through religious words or symbols." *In re Navy Chaplaincy*, 534 F.3d at 764.[10] Indeed, "[u]nder plaintiffs' theory, every government *action* that allegedly violates the Establishment Clause could be re-characterized as a governmental *message* promoting religion." *Id*.

Even if plaintiffs *had* suffered an injury, that injury would not be fairly traceable to the District's conduct. Plaintiffs allege that they have been harassed by members of the Black Lives Matter organization who are not parties to this case, Compl. ¶ 49, but as the Court held in *Lujan*, the causal connection between the alleged injury and the challenged conduct at issue in the case cannot be "th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.[11]

Moreover, like the plaintiffs in *Lujan*, plaintiffs have failed to show that it is likely that any of their alleged injuries would be redressed by a favorable decision. *Id.* at 568-71. There is no

---

[10]     Plaintiffs allege that like recognized religious organizations, Black Lives Matter "has its own religious symbols such as a raised fist to symbolize its unproven religious values." Compl. ¶ 20; Penkoski PI at 10 ("Instead of having a cross, the ten commandments, or the star and crescent, the Black Lives Matters cult has its own religious symbols such as a raised fist to symbolize its unproven religious values."). However, the displays plaintiffs are challenging do not include a raised fist, or any other symbol analogous to "a cross, the ten commandments, or the star and crescent," nor have plaintiffs alleged that the displays include any religious words that "symbolize [Black Lives Matter's] unproven religious values."

[11]     Plaintiffs say that they have *personally* defined what should constitute a logical nexus for Article III standing purposes in various draft legislation. Compl. ¶ 43; Penkoski PI at 17. But as with their taxpayer standing argument, plaintiffs cannot unilaterally redefine what constitutes Article III standing by referencing unenacted legislation that is not the law.

indication that removing the displays would put an end to the alleged harassment by third parties.

### 2. Plaintiffs Are Unlikely to Succeed on Their Establishment Clause Claim Because Black Lives Matter is Not a Religion.

#### a. Black Lives Matter Is Not a Religion.

Plaintiffs base their Establishment Clause claim on the faulty premise that Black Lives Matter is a religion.[12] Specifically, plaintiffs contend that Black Lives Matter "is a denominational sect that is inseparably linked to the religion of Secular Humanism." Christopher PI at 2. As their evidence in support, plaintiffs predominately rely on the "What We Believe" section of the Black Lives Matter Global Network's website and affidavits from so-called religious experts. *See* Christopher PI at 5; Penkoski PI at 6.

Plaintiffs fail to establish that Black Lives Matter is a religion. Although the D.C. Circuit Court and Supreme Court have not clearly defined "religion" for purposes of the Establishment Clause, courts have provided guidelines for the analysis that contradict plaintiffs' arguments. Plaintiffs contend that Black Lives Matter is a religion because "[i]t takes a huge amount of faith to believe" in the "fundamental unproven truth claim[s]" associated with their moral views. Penkoski PI at 6-7. But the D.C. Circuit has explicitly rejected that reasoning. In *Crowley v. Smithsonian Institution*, the D.C. Circuit found that "[t]he fact that religions involve acceptance of some tenets on faith without scientific proof obviously does not mean that all beliefs and all theories which rest in whole or in part on faith are therefore elements of a religion as that term is used in the [F]irst [A]mendment." 636 F.2d 738, 742 (D.C. Cir. 1980).

---

[12]    At various points in their briefs, plaintiffs use interchangeably phrases such as "Black Lives Matter," the "Black Lives Matter cult," and the "Black Lives Matter Global Network" to refer to the alleged "religion" at issue here. *See generally* Sevier PI, Christopher PI and Penkoski PI. Although these are arguably different entities, the District analyzes them together and assumes that plaintiffs refer generally to the Black Lives Matter movement and the individuals who support it.

Common belief in a particular philosophy or political stance—as is the case with the Black Lives Matter movement—is also not sufficient to create a religion in the eyes of the Constitution. *See, e.g.*, *United States v. Seeger*, 380 U.S. 163, 165 (1965) (recognizing the difference between religious beliefs and beliefs that are "essentially political, sociological, or philosophical"); *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972) (same). Plaintiffs define religion as systems that are "organized, full, and provide a comprehensive code by which individuals may guide their daily activities," but the case plaintiffs depend on for this proposition illustrates the flaws in plaintiffs' reasoning. Penkoski PI at 8; *see Real Alternatives, Inc. v. Burwell*, 150 F. Supp. 3d 419, 440 (M.D. Pa. 2015), *aff'd sub nom.*, *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338 (3d Cir. 2017). In *Real Alternatives*, the court held that a pro-life organization was not a religion even though it had a mission statement based on moral beliefs because "it does not provide a comprehensive code to guide individuals in their day-to-day life challenges" and "[i]t does not operate to fill the same position in one's mind that religion can occupy." *Real Alternatives, Inc.*, 150 F. Supp. 3d at 444. Rather, the court held that the organization was "[m]ore akin to a political position with moral underpinnings than a coherent ideology." *Id.* Such is the case here. Plaintiffs similarly rely on the Black Lives Matter Global Network's statements about their beliefs that— even if they are moral positions—still lead to the conclusion that the organization is political, not religious. *See also Sevier v. Lowenthal*, 302 F. Supp. 3d 312, 321 (D.D.C. 2018) ("If the mere acceptance of homosexuality—or support for gay rights—constitutes a 'religion' for Establishment Clause purposes, then the same conclusion would presumably follow for any value judgment about how people should or should not live their lives.").

Other indicators courts have recognized in assessing whether an entity is a religion are also not present here. For example, plaintiffs offer no evidence that Black Lives Matters supporters

consider Black Lives Matter to be a religion. *See U.S. v. Allen*, 760 F.2d 447, 450 (1983) (refusing "to recognize as a 'religion' what the religion's alleged adherents have not identified as such"). Plaintiffs provide no evidence that Black Lives Matter offers a comprehensive belief system. *Africa v. Pennsylvania*, 662 F.2d 1025, 1032, 1035 (3d Cir. 1981) (religious "indicia" include "address[ing] fundamental and ultimate questions having to do with deep and imponderable matters;" creating a "comprehensive … belief[ ]system;" and having certain "[s]tructural characteristics"). Black Lives Matter is also not generally regarded as a religion. *Alvarado v. City of San Jose*, 94 F.3d 1223, 1227 (9th Cir. 1996) (noting that "Establishment [Clause] cases usually … involve well-known religions").

Courts can also rely on common sense to determine whether an entity or movement is a religion for Establishment Clause purposes. In fact, the Court similarly relied on common sense two years ago in *Sevier v. Lowenthal*, when it dismissed plaintiff Sevier's Establishment Clause claim based on his theory that support for homosexuality is a religion and rainbow flags in the halls of Congress were unconstitutional. 302 F. Supp. 3d at 322 (finding that "common sense … forecloses Sevier's claim" and that the "gay rights movement bears no trappings of 'religion' as that concept is widely understood"). "Courts are well-equipped to weed out spurious Establishment Clause 'religions' on grounds of common sense." *Id.* at 320-21 (citing *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 79 (2d Cir. 2001) (holding that an "objective observer" would not consider a public school's celebration of Earth Day to be a religious endorsement); *see Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 520-21 (9th Cir. 1994) (rejecting "evolutionism" as a religion); *United States v. Allen*, 760 F.2d 447, 449-51 (2d Cir. 1985) (rejecting "nuclearism" (the view that nuclear weapons are "sacred objects") as a religion)). Here, too, the Court should reject plaintiffs' claim that Black Lives Matter is a religion.

17

> **b.** **Even if Plaintiffs Were Correct that Black Lives Matter Is a Denomination of Secular Humanism, the Establishment Clause Still Would Not Apply Because Secular Humanism Is Not a Religion for Purposes of the Establishment Clause.**

Even if plaintiffs were correct that Black Lives Matter is a denomination of Secular Humanism—for which they offer no evidence—their claim still fails because neither the Supreme Court nor the D.C. Circuit recognizes Secular Humanism as a religion for purposes of the Establishment Clause. To support their argument that Secular Humanism is a religion, plaintiffs rely on dicta in *Torcaso v. Watkins*, 367 U.S. 488 (1961), where the Supreme Court references Secular Humanism as a religion in a footnote. *See* Penkoski PI at 7. But the D.C. Circuit later clarified that *Torcaso* referred only to "a particular group of humanists" and that "it is not clearly established law that 'humanism in general' is a religion." *Kalka v. Hawk*, 215 F.3d 90, 93 (D.C. Cir. 2000). The D.C. Circuit remarked that "[i]nformation considered by the Religious Issues Committee suggested that the American Humanism Association's precepts were rooted in philosophy not religion." *Id.* Thus, plaintiffs' argument that Black Lives Matter is a religion because Secular Humanism is a religion for Establishment Clause purposes also fails.

> **c.** **Based on History and Context, the Mural and Symbolic Street Naming Could Not Be Reasonably Understood To Endorse a Religion.**

Recent jurisprudence suggests that a historical and contextual approach, through the eyes of a reasonable observer, should guide the assessment of whether a purported religious display complies with the Establishment Clause. *See Van Orden,* 545 U.S. at 686 (plurality) (stating "our analysis is driven both by the nature of the monument and by our Nation's history"); *id.* at 700 (Breyer, J., concurring in the judgment) (stating that formal tests are no "substitute for the exercise of legal judgment" that "take[s] account of context and consequences measured in light of th[e] purposes" of the Establishment Clause).

To successfully allege an Establishment Clause claim, plaintiffs must show that a reasonable observer would view the challenged government display as religious in character. *See Sevier,* 302 F. Supp. 3d at 320 (citing *Van Orden*, 545 U.S. at 682-83). A reasonable observer is "mindful of the history, purpose and context" of the challenged display. *Van Orden*, 545 U.S. 682-83 (plurality) (finding that a reasonable observer would not believe that a passive Ten Commandments monument conveyed the message that the State was seeking to endorse religion); *see McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 869 (2005) (evaluating whether a "reasonable observer could … think that the Counties meant to emphasize and celebrate the [display's] religious message"); *Daniel Chapter One v. FTC*, 405 F. App'x 505, 506 (D.C. Cir. 2010) (finding that an Establishment Clause claim is based on a "faulty premise" if the government action is not religious in character).

Here, any reasonable observer mindful of the Black Lives Matter protests and the events of June 1, 2020 in Lafayette Square would understand that the displays were intended to show support for the peaceful protesters in the District, not to endorse a religious message. Plaintiffs rely on their own personal opinion and affidavits of so-called religious experts, *see, e.g.*, Penkoski PI at 6, but those opinions are not relevant to the Establishment Clause inquiry and plaintiffs offer no evidence that such views reflect the thoughts of a reasonable observer. *Cf. Weinbaum v. Las Cruces Pub. Sch.*, 465 F. Supp. 2d 1116, 1144 (D.N.M. 2006) (noting that plaintiff "misstates the reasonable observer standard" because "[t]he endorsement test does not look to whether '*some*' Las Crucens believe that Defendants' purpose in displaying the sculpture is to endorse Christianity") (emphasis in original).

**d.      Even if Black Lives Matter Were a Religion, the Displays Would Still Not Violate the Establishment Clause Under the *Lemon* Test.**

Even if plaintiffs could establish that Black Lives Matter were a religion and the Court applied the *Lemon* test, the displays still would not violate the Establishment Clause.[13] "In order to pass constitutional muster under the *Lemon* test, laws and government practices involving religion must:  (1) have a secular legislative purpose; (2) have a principal or primary effect that neither advances nor inhibits religion; and (3) not result in excessive entanglement with religion or religious institutions." *In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013) (citing *Bonham v. D.C. Library Admin.*, 989 F.2d 1242, 1244 (D.C. Cir. 1993)). Here, plaintiffs fail to establish that the displays violate any of the three prongs of the *Lemon* test and therefore plaintiffs cannot show a violation of the Establishment Clause.

First, the displays were erected for the secular purpose of providing calm in response to the federal government's use of force on peaceful protesters, and to show that the District is a safe space for peaceful protest. Falcicchio Decl. ¶ 6. Plaintiffs' argument regarding the first prong of the *Lemon* test is implausible and contradictory on its face. Plaintiffs state that "[t]he challenged displays lack a primary secular purpose because the Black Lives Matter displays do not signify the

---

[13]      Although plaintiffs applied the *Lemon* test in support of their Establishment Clause claim, the Supreme Court has largely abandoned the test, especially for the types of passive displays at issue here. *See Van Orden*, 545 U.S. at 686 ("[W]e think [the *Lemon* test is] not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds[.]"). In *American Legion,* the Supreme Court recently declined to apply the *Lemon* test when it found that a longstanding, religious monument did not violate the Establishment Clause, and, as a result, many Circuits have abandoned the *Lemon* test altogether—especially for cases involving religious displays. *Am. Legion*, 139 S.Ct. at 2067; *see, e.g., Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1322 (11th Cir. 2020); *Perrier-Bilbo v. United States*, 954 F.3d 413, 424-25 (1st Cir. 2020); *Fields v. Speaker of Pa. House of Representatives*, 936 F.3d 142, 149 (3d Cir. 2019). Because the D.C. Circuit has not ruled on an Establishment Clause case since *American Legion*, the status of the *Lemon* test in this Circuit is uncertain.

position that 'black lives matter'" and a reasonable observer would see that the "challenged displays mean that the favored religion of the city and of the Nation is the marxist implicitly religious orthodoxy advocated by the devout BLM cult members as described in their liturgical manifesto that is accessible to the public on their official website and elsewhere." Penkoski PI at 19. Plaintiffs' beliefs about the displays are manifestly unreasonable. The fact that plaintiffs' *own* view is that the displays lack a secular purpose does not render the displays constitutionally impermissible because "[t]he eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, [history] and implementation of … the official act." *McCreary Cty., Ky.*, 545 U.S. at 866 (internal quotation marks and citations omitted).

A *reasonable* observer would be aware of the context of nationwide protests and hostility toward peaceful protesters, and would likely recognize that the text "Black Lives Matter" means precisely that. Even if the displays were construed as an acknowledgment of religion, "acknowledgments of religion serve … the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch v. Donnelly*, 465 U.S. 668, 693 (1984) (O'Connor, J., concurring). The District erected the displays for purely secular purposes,[14] and the displays satisfy the first prong of the *Lemon* test.

---

[14]    As Chief Justice Rehnquist stated in his plurality opinion in *Van Orden*, "Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." 545 U.S. at 690. Furthermore, even if the secular purpose of erecting the displays were not the only purpose, the displays still would not fail the first prong of the *Lemon* test because the displays would not be "wholly motivated by religious considerations." *See Lynch v. Donnelly,* 465 U.S. 668, 680 (1984) ("The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations."); *see also id.* ("Even where the benefits to religion were substantial … we saw a secular purpose and no

Second, the displays do not have the primary effect of advancing or inhibiting religion because no reasonable observer would consider the displays an endorsement of a particular religion. *In re Navy Chaplaincy*, 738 F.3d at 430 (finding that the reasonable observer in an endorsement inquiry "must be deemed aware of the history and context underlying the challenged program") (citing *Zelman v. Simmons–Harris,* 536 U.S. 639, 655 (2002)). Plaintiffs argue that the displays "select[] certain religious groups for preferential treatment" and, therefore, endorse a particular religion. Penkoski PI at 24. But plaintiffs fail to demonstrate what religion is being disfavored as a result of the Black Lives Matter displays or how a reasonable observer aware of the context of the displays would come to that conclusion. Even if the Black Lives Matter mural did contain religious imagery, "it is well-established that government sponsored artwork that incorporates a religious symbol does not necessarily convey a message of endorsement or disapproval." *Weinbaum*, 465 F. Supp. 2d 1116 at 1148 (internal quotation marks omitted) (collecting cases). Here, plaintiffs substitute their political grievances for the *Lemon* test's objective analysis in an effort to meet their burden on this prong. That is not enough to render the displays impermissible. *See Van Orden*, 545 U.S. at 684 ("[T]his Court has not held that political divisiveness alone can serve to invalidate otherwise permissible conduct.").[15]

---

conflict with the Establishment Clause."); *Wallace v. Jaffree*, 472 U.S. 38, 56-57 (1985) (finding that legislation lacked a secular purpose when "[t]he State did not present evidence of *any* secular purpose"). Indeed, "[i]n certain contexts" a religious display "can convey not simply a religious message but also a secular moral message," which is constitutionally permissible. *Van Orden*, 545 U.S. at 699 (Breyer, J. concurring).

[15]    In essence, plaintiffs would require the District to take a position of absolute neutrality with respect to all positions taken by the Black Lives Matter organization. But absolute neutrality, even among religious organizations, is not constitutionally required. *Allen v. Morton*, 495 F.2d 65, 76 n.19 (D.C. Cir. 1973) (Tamm, J.) ("Absolute neutrality is different from constitutional neutrality, and thus statements that the Government is not 'absolutely' neutral- in that here it co-sponsors an event with a Christian religious symbol while it does not co-sponsor one with a non-Christian or, to the extent possible, a non-secular symbol- do not move me to automatically conclude that its

Third, the displays do not create excessive entanglement between government and religion. Under the third prong of the *Lemon* test, only "excessive" entanglement runs afoul of the Establishment Clause. *Agnosti v. Felton*, 521 U.S. 203, 233 (1997); *see Larkin v. Grendel's Den*, 459 U.S. 116, 123 (1982). Here, plaintiffs cannot demonstrate that there is any entanglement between government and religion, much less *excessive* entanglement, because the displays do not create a relationship between government and a religious entity. Even if Black Lives Matter were a religion, the displays do not create any ongoing relationship between the city and the Black Lives Matter organization or movement. To assess whether there is excessive entanglement, the Supreme Court has examined the "character and purpose of the institution that benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Agnosti*, 521 U.S. at 206 (collecting cases). The D.C. Circuit has found that there is no excessive entanglement were the government neither "regulate[s] religious practices nor increases … influence over management" of the religious institution. *Mount Royal Joint Venture v. Kempthorne,* 477 F.3d 745, 758 (D.C. Cir. 2007); *Cf. Larkin*, 459 U.S. at 126-27 (finding excessive entanglement between government and religion when churches were given authority to veto liquor licenses, thus creating "a fusion of governmental and religious functions" and "enmesh[ing] churches in the process of government") (citation omitted). These considerations are inapplicable here.

Even assuming Black Lives Matter were a religion, the challenged displays create no entanglement because there is no aid or influence flowing from the District to an organization related to the movement as a result of the murals, nor is there any ongoing relationship as a result

---

action is constitutionally defective."); *see also Van Orden*, 545 U.S. at 699 (Breyer, J., concurring) ("[T]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious.").

of the displays. As plaintiffs note, Black Lives Matter DC did not support the Black Lives Matter displays, making the entanglement that plaintiffs allege even less plausible. *See* Penkoski PI at 2. Plaintiffs also argue that the use of taxpayer dollars to fund the display constitute excessive entanglement, *see* Penkoski PI at 27, but the entanglement analysis is not concerned with city expenditures unless they are benefiting a religious institution, which plaintiffs do not claim. As a result, the challenged displays do not violate the third prong of the *Lemon* test.

### 3. Plaintiffs Are Unlikely to Succeed on Their Claim Under the Equal Protection Clause Because the Challenged Displays Do Not Deny Plaintiffs Equal Protection of the Laws Based on Their Race or Religion.

Plaintiffs allege that the District's displays violate the Equal Protection Clause on the theory that the displays are underinclusive and do not represent their own personal views, and that the displays "convey that black people are the favored race" of the District of Columbia and the Nation. Compl. ¶ 6. In their motions for preliminary and permanent injunction, plaintiffs add that they believe the displays "symbolize" that they are not entitled to equal protection under the law because they do not fit into the race or religion represented by the displays. Sevier PI at 36. Plaintiffs' claim under the Equal Protection Clause fails because nothing about the mere existence of the displays denies plaintiffs equal protection of the laws.

Under the Equal Protection Clause of the Fourteenth Amendment, a State cannot "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "requires States to treat similarly situated persons alike," *Women Prisoners v. D.C. Dep't of Corrs.*, 93 F.3d 910, 924 (D.C. Cir. 1996), and this requirement applies to the District through the Fifth Amendment's Due Process Clause. *Id.* To state a claim under the Equal Protection Clause, "a plaintiff must assert facts that support the allegation that the

government intentionally treated [him or her] differently from others who were similarly situated." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 34 (D.D.C. 2015) (citation omitted).

As an initial matter, plaintiffs allege that Mayor Bowser's conduct—erecting the displays—should be subject to strict scrutiny. Sevier PI at 9-10. Strict scrutiny applies when the challenged practice "jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic. *Banner v. United States*, 428 F.3d 303, 307 (D.C. Cir. 2005) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). But plaintiffs do not identify a fundamental right that the displays infringe upon, nor do they allege that the displays categorize them based on a suspect characteristic; therefore, as discussed below, strict scrutiny does not apply.

Plaintiffs ostensibly argue that the displays signal a "preference" for African Americans that gives other people such as plaintiffs the "apprehension" that the government will not treat them equally. Sevier PI Memo at 14. But unlike, for example, a veterans preference statute, *Personnel Administrator v. Feeney*, 442 U.S. 256 (1979), a law prescribing different age restrictions for purchasing alcohol based on gender, *Craig v. Boren*, 429 U.S. 190 (1976), or a law requiring male spouses to pay alimony but not female spouses, *Orr v. Orr*, 440 U.S. 268 (1979), nothing about the displays at issue here creates classifications between groups of individuals. In other words, the displays are not a District law or policy that imposes different benefits or burdens on individuals based on their membership in a specific class. *See id.* at 282-83 (holding that classifications that "generate[ ] additional benefits" based on gender "cannot survive equal protection scrutiny"). The displays do not allocate benefits or burdens based on race or religion— so as to potentially deny plaintiffs equal protection under the law—simply by virtue of their mere existence.

When the challenged government conduct does not disadvantage a suspect class or impinge upon a fundamental right, the Equal Protection Clause "requires only that the classification rationally further a legitimate state interest." *Banner*, 428 F.3d at 307 (quoting *Hahn*, 505 U.S. at 10). This is also known as rational basis review. Under rational basis review, "[A] classification must be upheld against equal protection challenge if there is any reasonable conceivable state of facts that could provide a rational basis for the classification." *Dumaquin v. Sec'y of Health & Human Serv.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994) (quoting *Heller v. Doe*, 509 U.S. 312 (1993)). Even if a classification were at issue here, the District's actions easily satisfy that standard. By erecting the displays, Mayor Bowser furthered two legitimate state interests:  (1) restoring calm after the death of George Floyd (and other unarmed African Americans in interactions with law enforcement) and the federal government's use of force against peaceful protesters; and (2) affirming the humanity of African Americans.

Although plaintiffs argue that the displays are underinclusive because they only address the inherent humanity of one race, the District is permitted to address issues affecting different classes of citizens "one step at a time." *Kaemmerling v. Lappin*, 553 F.3d 669, 685 (D.C. Cir. 2008) (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)). The fact that the displays are "neglecting the others" does not render the displays constitutionally impermissible. *Id.* (quoting *Williamson, Inc.*, 348 U.S. at 489); *cf. United States v. Holland*, 810 F.2d 1215, 1219 (D.C. Cir. 1987) ("[E]qual protection of the laws does not require [the government] in every instance to order evils hierarchically according to their magnitude and to legislate against the greater before the lesser.").

26

As a fallback, plaintiffs argue that the displays violate the Equal Protection Clause because the Mayor's *stay-at-home order* violates their rights under the Equal Protection Clause.[16] Sevier PI at 14, 19. These allegations are defective in several respects. For starters, the stay-at-home order is not part of the displays. Plaintiffs cannot rely on classifications in the stay-at-home order as a basis for challenging the displays, which themselves make no classifications and impose no benefits or burdens on citizens. Additionally, in the case plaintiffs rely on, *Soos v. Cuomo*, Civil Action No. 20-00651, 2020 WL 3488742 (N.D.N.Y June 26, 2020), the court was addressing a different stay-at-home order (New York's), and the court expressly declined to consider whether that stay-at-home order violated the Equal Protection Clause. *Id.* at *8 n.4. Even if *Soos* were binding on this Court, it does not support plaintiffs' theory that the District's stay-at-home order— a law that the court did not consider—violates the Constitution based on a theory that the court did not address.

### 4. Plaintiffs Cannot Succeed on Claims That Are Not Alleged in the Complaint, But Even If Properly Brought, Plaintiffs' Newly Raised Claims Are Unlikely to Succeed.

Plaintiffs cannot add additional claims through their motion for injunctive relief; claims are only properly raised in the complaint. *See* Fed. R. Civ. P. 8(a) (requiring "a short and plain statement of the claim showing the pleader is entitled to relief"). In spite of this well-established

---

[16]     Plaintiffs appear to blend together arguments that the displays deny them equal protection under the law based on their race and based on their religion. Plaintiff Sevier argues that the displays are racially underinclusive and "causes reasonable observers of the races not included to have the apprehension that the government will not treat them equally under the law." Sevier PI at 13. But then, without reference to race, he states that "Defendants' selective enforcement of the stay-at-home order against Christians but not against BLM cult members reinforces that the Plaintiffs' apprehension is justified." *Id.* at 14. He also argues that the Mayor's stay-at-home order has been selectively enforced against "theistic institutionalized houses of worship" but not against "nontheistic noninstitutionalized houses of worship." *Id.* at 19. Regardless of how plaintiffs' Equal Protection Clause theory is construed, the displays do not deny plaintiffs equal protection of the laws based on race, religion or any combination of the two.

rule, plaintiffs discuss several new claims for relief not alleged in their Complaint, including: (1) viewpoint discrimination in violation of the First Amendment, *see* Sevier PI at 26-39; (2) a Free Exercise Clause claim in violation of the First Amendment, *see id.* at 14-25; and (3) a variety of District statutory and regulatory violations, *see* Christopher PI at 29-32. These claims are improperly raised in plaintiffs' motions for preliminary and permanent injunction and the Court should not consider them. *See Davis v. Mnuchin*, Civil Action No. 18-00447, 2018 WL 8584035, at *4 (D.D.C. Nov. 13, 2018) (finding that "any pre-trial additions or modifications to [the claims in the complaint] must be made in a motion to amend pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure"); *Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011); *Doe v. Pompeo*, Civil Action No. 20-00065, 2020 WL 1556251, at *17 (D.D.C. Apr. 1, 2020) (McFadden, J.) ("[P]laintiffs cannot use their summary judgment briefing to press claims not raised in their ... complaint."). But—even if properly brought—the new claims lack merit and are unlikely to succeed.

> **a.      Plaintiffs' Viewpoint Discrimination Claim Is Unlikely to Succeed Because the Displays Constitute Government Speech Not Subject to First Amendment Scrutiny.**

Plaintiffs allege that the District violated the First Amendment by denying their request to modify the Black Lives Matter mural to read "ALL LIVES MATTER," but—even if plaintiffs' facts were taken as true—such a denial would not run afoul of the First Amendment's prohibition of viewpoint discrimination in public forums. *See* Sevier PI at 39. Plaintiffs' argument is simply that if the District can paint "Black Lives Matter" on a public street, they should be permitted to paint "ALL LIVES MATTER" on a public street. *Id.* at 28. But plaintiffs fail to consider the proper viewpoint discrimination standard and well-established case law permitting the government to express viewpoints; their claim therefore fails on the merits.

Plaintiffs make the conclusory assertion that the Black Lives Matter mural turned the District's streets into a "limited public forum" or a "nonpublic forum." Sevier PI at 22. A "limited public forum" is created "where the government has reserved a forum for certain groups or for the discussion of certain topics" and a "nonpublic forum" is created "where the government is acting as a proprietor, managing its internal operations." *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215-16 (2015) (internal citation and quotation marks omitted). Private speech in such forums would enjoy First Amendment protections against viewpoint discrimination. *Id.*

But the Black Lives Matter display did not create a "limited" or "nonpublic" forum. A limited public forum is created when the government "intentionally open[s] a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). To determine whether that is the case, courts examine the "policy and practice of the government." *Id.* Here, the District painted the mural itself, and it did not open the streets (a nontraditional forum for painting murals) to the public to add their own painted messages. The District also did not create a "nonpublic" forum because it did not "manag[e] government property" where individuals could express their views; instead, it "engaged in expressive conduct" by painting a mural conveying its choice of message. *See Walker*, 576 U.S. at 217.

Rather than creating a forum for private speech, the Black Lives Matter mural is a clear example of government speech, not subject to First Amendment scrutiny. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). Governments are permitted to express viewpoints and doing so does not trigger the obligation to allow other viewpoints to be similarly expressed; "[w]ere the Free Speech Clause interpreted otherwise,

government would not work." *Walker*, 576 U.S. at 207 (rhetorically asking "[h]ow could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary?").

The Supreme Court has found displays to be government speech in situations analogous to the one here, holding, for example, that a city's monuments and a state's license plates are government speech. *See, e.g.*, *Walker*, 576 U.S at 212-13 (holding that the messages on license plates were considered government speech because license plates historically carry government messages, the messages are aimed at the public and the state exercises control of the message); *Summum,* 555 U.S. at 470-71 (holding that privately donated monuments displayed in a public park were considered government speech because monuments traditionally carry messages of the entity who owns the land on which they sit and the city controlled the selection of the monuments).

Finally, courts should consider "historical context" and "observers' reasonable interpretation of the messages." *Walker*, 576 U.S. at 217. Here, the District exercised control of the message conveyed in the mural, and the District's art on a city street is reasonably understood to express the government's viewpoint; namely, that the District was conveying its message of support for peaceful protesters on its city streets. As a result, the Black Lives Matter mural is government speech and plaintiffs' viewpoint discrimination claim fails.

> **b.     Plaintiffs Cannot Succeed on Their Free Exercise Claim Challenging the District's Stay-At-Home Order Because the Protection of Public Health and Safety Is a Compelling Government Interest that Justifies the Burden Imposed by the Stay-At-Home Order.**

Plaintiffs allege that Mayor Bowser's Emergency Order (Mayor's Order) prohibiting outdoor gatherings of more than ten people violates the Free Exercise Clause of the First

Amendment based on the theory that it treats "theistic institutionalized houses of worship," like Christianity, differently from "nontheistic noninstitutionalized houses of worship," which they claim describes Black Lives Matter. Penkoski PI at 20. Plaintiffs, however, cannot succeed on their Free Exercise claim because it lacks merit.

When examining whether laws violate the First Amendment by "prohibiting the free exercise" of religion, courts consider whether the challenged law is both neutral and generally applicable. *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 112 (D.D.C. 2017) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993)). If the challenged law is both neutral and generally applicable, it "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Adair v. England*, 183 F. Supp. 2d 31, 53 (D.D.C. 2002). But if the law is either not neutral or not generally applicable, courts must apply strict scrutiny, upholding the law only if it is "justified by a compelling governmental interest" and is "narrowly tailored to advance that interest." *Id.*

Here, the Mayor's Order is neutral and generally applicable because it offers a broad cap on gatherings for *anyone*, regardless of whether they belong to any particular class or have a particular religious affiliation. *See* Mayor's Order 2020-054 § II.4 (Mar. 30, 2020); Mayor's Order 2020-067 § II.5. Moreover, the law "does not establish any preference for or against one religion over another." *See, e.g., Archdiocese of Washington*, 281 F. Supp. at 95. And it does not "in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 113 (citing *Lukumi Babalu*, 508 U.S. at 543). Strict scrutiny, therefore, does not apply and the Mayor's Order overcomes a challenge if it advances a legitimate government interest. The Mayor's Order easily clears that low hurdle because prohibiting large gatherings advances the interest of keeping

31

the public safe during the COVID-19 pandemic. Even if the Court were to examine the Mayor's Order in the context of this lawsuit and determine that the order was not neutral and generally applicable, the Mayor's Order would still withstand strict scrutiny analysis because limiting gatherings to ten people or less is narrowly tailored to promoting the government's interest in protecting the public from COVID-19.

Additionally, as noted above, plaintiffs' reliance on *Soos v. Cuomo*, Civil Action No. 20-00651, 2020 WL 348872 (N.D.N.Y. June 26, 2020), is misplaced. *See* Sevier PI at 15-16. Apart from being a nonbinding, out-of-circuit district court case, the facts in New York are distinguishable from those in the District. In *Soos*, the court granted preliminary injunctive relief enjoining the city and state defendants from enforcing certain indoor and outdoor gathering limitations because the law at issue there was not neutral and generally applicable—it contained numerous provisions that treated religious entities differently from nonreligious entities. For example, it included a provision capping the capacity of houses of worship at 25% while permitting other non-essential business to operate at 50% capacity, *id.* at *1, and also contained an exemption for outdoor graduation services of 150 people without providing one for religious organizations, *id*. at *4. Finding the graduation exception especially troublesome, the court reasoned, "there is nothing materially different about a graduation ceremony and a religious gathering such that defendants' justifications for a difference in treatment can be found compelling." *Id*. at *12. The court also found that the city and state's selective enforcement of the gathering restrictions problematic; state and city officials strictly enforced the provisions on outdoor gathering by religious groups but failed to enforce the cap on protests. *Id*. at *5, *12.

By comparison, the Mayor's Order does not contain any of the exemptions or restrictions the court found problematic in *Soos*. Mayor Bowser barred *all* non-essential indoor

gatherings and placed a blanket cap of ten people for all outdoor gatherings, Mayor's Order 2020-054 § II.4 (Mar. 30, 2020); Mayor's Order 2020-067 § II.5 (May 27, 2020). The District's law does not have any exemptions that apply for similarly situated non-essential activities and not for houses of worship, like the graduation exemption in New York. Additionally, plaintiffs cite no evidence that the District strictly enforced the ten-person limit on outdoor religious gatherings while creating a *de facto* exemption for Black Lives Matter protests. Even if the District had created a *de facto* exemption for Black Lives Matter protesters, one exemption does not establish a violation of the Free Exercise Clause, even if the exemption involves religion. *See Priests for Life v. United States Dep't of Health & Human Servs.*, 7 F. Supp. 3d 88, 105 (D.D.C. 2013) ("As several other courts considering the issue have found, carving out an exemption for defined religious entities does not make a law nonneutral as to others") (internal quotation marks omitted), *vacated on alternative grounds*, *Zubik v. Burwell*, 136 S.Ct. 1557 (2016); *Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 464 (N.Y. 2006) ("To hold that any religious exemption that is not all-inclusive renders a statute non-neutral would be to discourage the enactment of any such exemptions—and thus to restrict rather than promote, freedom of religion.").

Moreover, the Supreme Court recently denied a house of worship's request for injunctive relief against similar restrictions on religious gatherings imposed by the State of California. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020). In his opinion concurring with the Court's denial of plaintiffs' request for injunctive relief, Chief Justice Roberts stated that the California law was "consistent with the Free Exercise Clause" because it treated comparable secular gatherings, like concerts, similarly or more restrictively, and only dissimilar activities more leniently. *Id.* The same is true of the restrictions at issue here, which are

distinguishable from those in *Soos.* Unlike the law at issue in *Soos*, the Mayor's Order does not exceed the "broad limits" of the government's ability to protect the general public from the COVID-19 pandemic by placing restrictions on houses of worship. *Id.* at 1613-14. Thus, plaintiffs' challenge under the Free Exercise Clause fails.

<div style="margin-left:2em">

**c.      Plaintiffs' District Law Claims Are Unlikely to Succeed Because There is No Private Right of Action and the District Statute and Regulations Plaintiffs Cite Do Not Apply.**

</div>

Plaintiffs' request that the Court "order the Mayor to take down the challenged displays for violating multiple city ordinances" is deeply flawed. Penkoski PI at 11. Plaintiffs allege that the District violated local statutes and regulations by (1) prohibiting an individual from pouring an "oily substance or liquid" on any street, *see* 24 D.C.M.R. § 1006; (2) permitting the "install[ation] of public art in the public space between the sidewalk and property, *see* 24 D.C.M.R. § 1108.10; and (3) designating the naming convention for District Streets, *see* D.C. Code § 9-204.02. Christopher PI at 31. But plaintiffs misinterpret or misapply these provisions to reach the conclusion that the challenged displays violate local laws, and—regardless of the claims' merits— plaintiffs are not entitled to seek a remedy on this basis.

First, plaintiffs' claim that the District is not permitted to paint its own streets, Christopher PI at 30, is plainly incorrect. Plaintiffs contend that the paint used for the Black Lives Matter mural is a prohibited "oily substance or liquid" on the road, but this is not a valid claim for relief. There is no private right of action to bring a claim under this statute, and it is—again, on yet another ground—improperly before the Court. 24 D.C.M.R. § 100.6 (noting that violations of this provision "shall, upon conviction, be punished by a fine of not more than three hundred dollars") And plaintiffs' interpretation of this provision is not sensible. A city must be allowed to paint its own streets for basic road maintenance and traffic control purposes. *See, e.g.*, 18 D.C.M.R. § 2102

(prohibiting markings, signs and traffic control devices on city streets without the permission of the Department of Public Works). The Department of Public Works is in charge of the MuralsDC program that coordinated painting the Black Lives Matter mural, as it is authorized to do. *See* D.C. Code § 1-325.101 (establishing and the Department of Public Works mural program).

Second, plaintiffs contend that the mural should be removed because public art is only allowed "between the sidewalk and the property line," Christopher PI at 30, but this argument is based on a misinterpretation of a local regulation. The regulation plaintiffs cite states that "[s]ubject to approval by the Public Space Committee and with the recommendation of the Committee, an applicant may install public art in the public space between the sidewalk and the property line." *Id.*; *see* 24 D.C.M.R. § 1108.10. A plain reading of the regulation shows that its application only extends to questions of whether certain public art is permitted in an area which does *not* include the city streets (where the Black Lives Matter mural is painted), and the statute does not *prohibit* public art in locations not addressed in this section. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("When the statutory language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd— is to enforce it according to its terms."). Moreover, this section of the District's municipal regulations merely provides the standards and guidance for the issuance of permits related to public spaces in the Downtown Streetscape Area; it does not provide a remedy for an individual seeking relief for a purported violation of the provisions. *See generally* 24 D.C.M.R. § 1101, *et seq*.

Third, plaintiffs contend that the District's system of naming streets precludes the renaming of a portion of 16th Street N.W. "Black Lives Matter Plaza," Christopher PI at 30, but this argument rests on a faulty premise. The renaming of Black Lives Matter is a symbolic renaming of the street, not an official name. The statute plaintiffs cite restricts the *official* names of the streets

35

to a naming convention requiring, among other things, that "streets running north and south be designated with numbers." D.C. Code § 9-204.02. The official name of the street is still 16th Street. District law permits the Council to "designate a symbolic name for any alley or street, or portion thereof, or other public space." D.C. Code § 9-204.03a. That is precisely what the Council did when it designated a portion of 16th Street N.W. "Black Lives Matter Plaza" after Mayor Bowser submitted a resolution proposing the change. *see* PR 23-428, Coronavirus Support Clarification Emergency Declaration Resolution of 2020, § 2(e), *available at* https://lims.dccouncil.us/Legislation/PR23-0827; D.C. Code § 9-204.01 ("The Mayor may submit a resolution to the Council proposing a designation, change of name, or commemorative work for the Council's approval."). The symbolic designation therefore complies with District law and, even if it did not, nothing in the statute cited by plaintiffs provides a remedy or private right of action for them to seek relief.

**B.     Plaintiffs Will Not Suffer Irreparable Harm Absent Relief Because They Have Not Suffered an Injury.**

"[T]he deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely." *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018). *Cf. Proctor v. District of Columbia*, 310 F.Supp.3d 107, 116 (D.D.C. 2018) (McFadden, J.) ("But the Plaintiffs have not established that such losses are imminent and certain without preliminary relief."). Plaintiffs here have not shown that any injury is likely to occur as a result of the challenged displays, and cannot show irreparable harm.

Plaintiffs rely predominately on a decades-old Supreme Court three-Justice plurality opinion in *Elrod v. Burns*, 427 U.S. 347 (1976), to support their stance that irreparable harm "should be presumed," but plaintiffs misinterpret *Elrod* and fail to take into account more recent and controlling precedent. Christopher PI at 39. As plaintiffs note, the *Elrod* plurality found that a

"loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," but it did not hold that irreparable harm should be found *per se* based solely on the allegation of a First Amendment violation.[17] *Id.*; *Elrod*, 427 U.S. at 373 (plurality). In other words, even under *Elrod*, plaintiffs still have to demonstrate that *some* immediate harm would occur to satisfy the irreparable harm prong.

Plaintiffs cannot demonstrate irreparable harm on the basis of allegations alone. In *Winter*, the Supreme Court rejected the Ninth Circuit's standard that the "possibility" of irreparable harm was sufficient to satisfy the plaintiffs' burden of showing that irreparable harm would occur absent a preliminary injunction as "too lenient" and held that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 21-22 (emphasis added).

Here, plaintiffs fail to identify any harm that results from the existence of the challenged displays or the absence of their requested relief, let alone a harm that is likely to occur. Plaintiffs cite a host of hyperbolized maladies that would result from the denial of their requested relief, from "fear of threatened arrest, prosecution and fines," Sevier PI at 25, to "social marginalization and the violent oppression of non-observers," Christopher PI at 41. But plaintiffs offer no evidence that these harms are *likely* to occur absent injunctive relief. Instead, they rely purely on

---

[17]     The D.C. Circuit later found such a *per se* rule existed for irreparable harm in Establishment Clause cases, but the holding has since been abrogated by the Supreme Court's decision in *Winter* that requires courts to find irreparable harm is *likely* absent an injunction. *See Comp. Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006) ("[H]old[ing] that a party alleging a violation of the Establishment Clause per se satisfies the irreparable injury requirement of the preliminary injunction calculus[.]"); *but see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21-22 (2008) (requiring that plaintiffs "demonstrate that irreparable injury is *likely* in the absence of an injunction");  *Seeger v. United States Dep't of Def.*, 306 F. Supp. 3d 265, 278-79 (D.D.C. 2018) (finding that "*Chaplaincy of Full Gospel Churches v. England* is abrogated to the extent it adopted a lesser injury threshold than *Winter*" and noting that "*Winter* emphasizes that the basis for injunctive relief must be demonstrated irreparable harm").

unsupported and speculative allegations throughout their motions and in the many affidavits they filed bearing little if any relevance to this case. *See generally* Christopher PI; Penkoski PI; Sevier PI. Courts have denied claims for emergency relief where a party fails to "provide[] [ ] evidentiary support or even specific factual allegations that would support [its] assertions." *Brodie v. U.S. Dep't Health and Human Servs.*, 715 F. Supp. 2d 74, 85 (D.D.C. 2010); *see also Reinhard v. Johnson*, 209 F. Supp. 3d 207, 220 (D.D.C. 2016) (finding that "claim is speculative and not supported by any facts"); *Ctr. for Auto Safety v. Dole*, 582 F. Supp. 1444, 1450 (D.D.C. 1984) (plaintiff "should have brought forward concrete facts to support its claim of irreparable injury if such existed, yet it has not done so"). As a result, plaintiffs fail to meet their burden of demonstrating irreparable harm.

### C. The Balance of the Equities and the Public Interest Weigh Against Removing the Displays.

Even if a movant demonstrates a likelihood of success *and* irreparable injury, the court still "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987). The last two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. "Equitable relief is not granted as a matter of course, and a court should be particularly cautious when contemplating relief that implicates public interests." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).

Indeed, plaintiffs' request for far-reaching relief would run roughshod over the District's broad authority to maintain its public spaces and welcome peaceful protesters, and would instead injure the District. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J.) (finding that when "a State [or local government] is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury") (internal quotations omitted);

*City of Los Angeles v. Lyons,* 461 U.S. 95, 112, (1983) ("In exercising their equitable powers federal courts must recognize '[the] special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'") (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)). As relief for the constitutional and local violations they allege, plaintiffs request that the Court order the District to "temporarily modify" the Black Lives Matter mural to say "ALL LIVES MATTER" in red, white and blue paint and then permanently remove the painting. Sevier PI at 2. Plaintiffs further request that 16th Street "be renamed to '16th Street' once again." *Id.*

Here, the District and the public share a compelling interest in maintaining the displays that honor peaceful protestors and recognize the humanity of African Americans in a time of crisis. Falcicchio Decl. ¶ 6. And as the Supreme Court recognized in *American Legion*, the removal of monuments—even ones that are religious in nature—is not necessarily a "neutral act," and it could be seen as "profoundly disrespectful." 139 S. Ct. at 2086. Such is the case here. Removing the mural or replacing it with the politically-fraught "All Lives Matter" phrase would be counterproductive and contradict the messages of calm and respect that the District sought to convey to the public. This would be detrimental to the public interest.

Moreover, plaintiffs' requested relief would be especially burdensome for the District because it is overbroad and not sufficiently tailored to remedy the alleged harm. Plaintiffs explicitly state that the goal of their requested relief is to "deter and punish" Mayor Bowser for the displays, and they even characterize removing the displays as being a "slap … on the wrist." Sevier PI at 34. The D.C. Circuit has "long held that '[a]n injunction must be narrowly tailored to remedy the specific harm shown.'" *Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (quoting *Aviation Consumer Action Project v.*

*Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)); *see also District of Columbia v. U.S. Dep't of Agric.*, Civil Action No. 20-00119, 2020 WL 1236657, at \*12 (D.D.C. March 13, 2020) (observing that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979))). Here, plaintiffs' requests are inappropriate and unduly burdensome. The painting of a new mural that reflects a message many find offensive, for the sole purpose of "punish[ing]" the District, is unwarranted and disproportionate to the alleged harm.

## II.    The District Is Entitled to Judgment As a Matter of Law on All Claims.

For the reasons discussed above, plaintiffs' claims are meritless and they are not entitled to any relief. Plaintiffs' claims not only fail to satisfy the standard for obtaining an injunction, the claims fail as a matter of law. The material facts in this case are not in dispute, and plaintiffs fail to establish any reasonable basis on which judgment could be granted in their favor.[18] *See* Fed. R. Civ. P. 56(a). Even if the Court views the evidence in the light most favorable to plaintiffs and draws all reasonable inferences in their favor, plaintiffs have failed to demonstrate any basis for relief. *See Anderson*, 477 U.S. at 252 (a "mere existence of a scintilla of evidence in support of" the nonmovant is "insufficient" to stave off summary judgment.).

Although plaintiffs submitted hundreds of pages of arguments and exhibits in support of their Establishment Clause claim, they failed to offer any plausible evidence that a reasonable person would determine that Black Lives Matter is a religion or that the challenged displays are "reasonably understood to be religious in character." *Sevier*, 302 F. Supp. 3d at 320 (dismissing plaintiff's Establishment Clause claim) (citation omitted); *see Van Orden*, 545 U.S. 682-83 (a

---

[18]    During the June 18, 2020 TRO hearing, the Parties agreed that the case could be decided on the merits without discovery.

reasonable observer is "mindful of the history, purpose and context" of the challenged display); Section I.A.2 above. Instead, in support of their claims, plaintiffs rely on their personal opinions and those of so-called religious experts, none of which are relevant or sufficient for a reasonable juror to find a violation of the Establishment Clause.

Similarly, plaintiffs base their Equal Protection Clause claim on the theory that the displays are underinclusive, do not represent their own personal views, and "convey that black people are the favored race" of the District, but fail to provide evidence of a constitutional violation. *See* Section I.A.3 above. Plaintiffs fail to identify any benefit or burden based on race or religion that arises from the displays, and plaintiffs' claim under the Equal Protection Clause fails because the mere existence of the displays cannot deny plaintiffs equal protection of the laws. *See BEG Invs., LLC*, 85 F. Supp. 3d at 34 (finding that to state a claim under the Equal Protection Clause, "a plaintiff must assert facts that support the allegation that the government intentionally treated [him or her] differently from others who were similarly situated") (citation omitted).

Because plaintiffs would bear the burden of proof on a dispositive issue at trial, they bear the burden of production at this stage to show that there exists a genuine dispute requiring trial. *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 49 (D.D.C. 2012) (citing *Ricci v. DeStefano*, 557 U.S. 557, 129 (2009)). "Otherwise, [plaintiffs] could effectively defeat the 'central purpose' of the summary judgment device—namely, 'to weed out those cases insufficiently meritorious to warrant … trial'—simply by way of offering conclusory allegations, speculation, and argument." *Id.* (citing *Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999)). Plaintiffs have failed to meet their burden, and the District is entitled to judgment as a matter of law on all claims in the Complaint.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' Motions for a Preliminary and

Permanent Injunction and grant defendant's Cross-Motion for Summary Judgment.

Dated:  July 13, 2020.                    Respectfully submitted,

                                          KARL A. RACINE
                                          Attorney General for the District of Columbia

                                          TONI MICHELLE JACKSON
                                          Deputy Attorney General
                                          Public Interest Division

                                          /s/ Fernando Amarillas
                                          FERNANDO AMARILLAS [974858]
                                          Chief, Equity Section

                                          /s/ Pamela A. Disney
                                          PAMELA A. DISNEY [1601225]
                                          GAVIN N. PALMER [1619264]
                                          Assistant Attorneys General
                                          441 Fourth Street, N.W., Suite 630 South
                                          Washington, D.C. 20001
                                          (202) 807-0371
                                          (202) 730-1470 (fax)
                                          pamela.disney@dc.gov

                                          *Counsel for Defendant*