# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RICH PENKOSKI,** *et al*., | |
| Plaintiffs, | |
| v. | Case No. 20-cv-01519 (TNM) |
| **MURIEL BOWSER**, | |
| Defendant. | |

## MEMORANDUM OPINION

Rorschach tests are non-descript inkblots scrawled on notecards. People looking at the same inkblot identify entirely different images, based on their background, personality, and state of mind.

Just outside the White House, stretching two blocks down 16th Street, D.C. Mayor Muriel Bowser has painted her own sort of inkblot. Large yellow letters spanning the width of the street proclaim, "BLACK LIVES MATTER." The Mayor views this display ("the Mural"), as something that commemorates demonstrators who lined the streets this summer protesting police brutality. The D.C. chapter of Black Lives Matter ("BLM"), on the other hand, regards it as a "performative distraction from real policy changes."[1]

And Plaintiffs—non-black Christians—perceive it as a sign that they are not welcome in the District. Pointing to statements from BLM's website and leaders declaring that it is "unapologetically Black in [its] positioning" and embraces policies that "disrupt the Western-prescribed nuclear family structure" and "foster a queer-affirming network," Plaintiffs see the

---

[1] *See* Black Lives Matter D.C. (@DMVBlackLives), Twitter (June 5, 2020), https://twitter.com/DMVBlackLives/ status/1268903712581464066.

Mural as something that declares the District's preference for black citizens who adhere to Secular Humanism.  This favoritism, they claim, violates both the Establishment Clause and Equal Protection Clause.

Plaintiffs raise non-trivial objections to the Mural.  But federal courts are not in the business of correcting all constitutional errors wherever they appear.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,* 454 U.S. 464, 489 (1982).  No matter the importance of the issues presented, federal courts may adjudicate a "case" or "controversy."  *Id*.  Since Plaintiffs fail to show that they have standing to raise these constitutional challenges, the Court must dismiss their claims.

## I.

Early this summer, Black Lives Matter protests swept across the country.  According to Plaintiffs, tens of thousands of protestors in Washington, D.C., gathered for weeks outside the White House in Lafayette Square, chanting and kneeling together.  Christopher Mot. for Inj. ("Christopher Mot.") at 39, ECF No. 18; Penkoski Mot. for Inj. ("Penkoski Mot.") at 19, ECF No. 20.[2]  By late May, though, the protests turned violent, as rioters clashed with police officers and set American flags, parked cars, and historical landmarks—like St. John's Church—on fire.  *See id.*; *see also* Pls.' Statement of Undisputed Material Facts ("Pls.' Statement") ¶¶ 29, 35, 36, ECF Nos. 42-1, 44-1, 46-1 (identical).

In a press conference after a particularly destructive night, the President threatened to deploy the U.S. military to crack down on the violence.  *See* Falcicchio Decl. ¶ 5, ECF No. 29-3.  Later that day, federal law enforcement officers cleared Lafayette Square shortly before the President made an appearance at St. John's Church.  *Id*. ¶ 4; Pls.' Statement, ¶ 29.

---

[2]  All page citations are to the page numbers generated by the Court's CM/ECF system.

Allegedly in response to the President's statements and federal law enforcement's actions, Mayor Bowser directed the D.C. Department of Public Works to create a mural on 16th Street N.W., near the White House, to "honor the peaceful protesters from June 1, 2020 and send a message that District streets are a safe space for peaceful protestors."  Falcicchio Decl. ¶ 6 (cleaned up).[3]  The Mural, painted in bright yellow lettering that spans the width of the street and stretches the length of two city blocks, reads "BLACK LIVES MATTER."  Compl. ¶ 2, ECF No. 1; Sevier Mot. for Inj. ("Sevier Mot.") at 15, ECF No. 22; Falcicchio Decl. ¶ 7.  The Mayor also proposed renaming several blocks of 16th Street "Black Lives Matter Plaza," which the Council for the District of Columbia ("the Council") later approved.  Falcicchio Decl. ¶ 10; Compl. ¶ 2.

Five days after the District painted the Mural, Pastor Rich Penkoski and lobbyists Chris Sevier and Tex Christopher sued *pro se* challenging its constitutionality.  *See* Compl.  They claim that the Mural violates the Equal Protection Clause and the Establishment Clause because it labels them—non-black Christians—"second class citizens."  *Id*. ¶ 44.

The "Black Lives Matter cult," they allege, "is a denominational sect of the religion of Secular Humanism."  *Id*. ¶ 2.  This is evidenced both by the BLM protestors' behavior, *see* Penkoski Mot. at 19 ("The fact that there is a whole lot of kneeling, washing of feet, and corporate chanting of incantations makes it difficult to argue that Black Lives Matter Global Network is not a religious organization."), and the "scriptures lifted from the Black Lives Matter's marxist liturgical creed," *id*. (citing *What We Believe*, Black Lives Matter,

---

[3] Perhaps D.C.'s streets were a "safe space" for protestors, but the Mayor had previously suggested such massive gatherings were not safe for D.C.'s community.  Nor were they legal.  Only four days before these events, the Mayor had issued a COVID-19 order requiring "all individuals . . . to maintain a distance of at least six (6) feet from persons not in their household" and prohibiting "large gatherings of more than ten (10) individuals" to prevent the spread of the deadly virus.  *See* D.C. Mayor's Order 2020-079 (May 27, 2020), https://coronavirus.dc.gov/sites/default/ files/dc/sites/coronavirus/page_content/attachments/MO2020-067.pdf.  The Mayor claimed the community had a "shared responsibility to maintain our vigilance, in order to avoid a rapid increase in the occurrence of new cases and a spike in the number of fatalities, and to protect the public health, safety, and welfare of our fellow District residents and visitors."  *Id*.

https://blacklivesmatter.com/what-we-believe/ (last accessed Aug. 21, 2020) ("BLM

Statement")).  BLM's "What We Believe" statement announces, among other things, that BLM

"is unapologetically Black in [its] positioning," "foster[s] a queer-affirming network," and

"disrupt[s] the Western-prescribed nuclear family structure[.]"  *Id.* (quoting BLM Statement).

The Mural, Plaintiffs claim, signals the District's preference both for black citizens and for those

that adhere to the BLM denomination.  Compl. ¶¶ 2, 6.

Plaintiffs filed an Emergency Motion for a Temporary Restraining Order, *see* Pls.' Mot.

for TRO, ECF No. 9, asking the Court to enjoin the Mayor from constructing more BLM

displays and to order her to remove the Mural and return the Plaza's name to 16th Street, *see*

Pls.' TRO Proposed Order, ECF No. 9-1.

In a hearing later that week, the Court denied Plaintiffs' motion, but set an expedited

preliminary injunction briefing schedule in recognition of Plaintiffs' assertion that "time is of the

essence."  TRO Hr'g Tr. ("Hr'g Tr.") at 34–35 (June 18, 2020).  The parties agreed both to

expedited briefing for Plaintiffs' Motions for a Preliminary Injunction and to consolidate this

briefing with a trial on the merits under Rule 65(a)(2) of the Federal Rules of Civil Procedure.

*Id.* at 33, 36.

Each Plaintiff moved separately for a preliminary and permanent injunction.[4]  *See*

Christopher Mot.; Penkoski Mot.; Sevier Mot.  The Mayor cross-moved for summary judgment

and opposed Plaintiffs' motions.  Def.'s Mot. for Summ. J. & Opp'n to Pls.' Mot. ("Def.'s

Opp'n"), ECF No. 29-1.  And Plaintiffs filed replies and opposition briefs to the Mayor's cross-

---

[4] Sevier also sought to "support" Penkoski and Christopher's motions.  *See* Penkoski Mot. at 1; Christopher Mot. at
1.  But a *pro se* litigant can only argue on behalf of himself.  *See Stoller v. Ocwen Fin. Corp.*, 140 F. Supp. 3d 80,
81–82 (D.D.C. 2015) ("A litigant may proceed in federal court on behalf of himself or by properly admitted counsel,
but a layman cannot represent another person in a court proceeding[.]" (citing *Georgiades v. Martin-Trigona*, 729
F.2d 831, 834 (D.C. Cir. 1984))).  "A *pro se* co-plaintiff, cannot represent" other plaintiffs.  *Id.* at 82.

motion.  Christopher Reply, ECF No. 32; Penkoski Reply, ECF No. 33; Sevier Reply, ECF No.

34.  The Court later permitted Plaintiffs to supplement their replies with additional evidence.  *See*

Order (Aug. 4, 2020); Penkoski Suppl. Mem., ECF No. 39; Christopher Suppl. Mem., ECF No.

40.  And Plaintiffs re-filed their preliminary injunction motions as Motions for Summary

Judgment.[5]  Penkoski Mot. Summ. J., ECF No. 43; Christopher Mot. Summ. J., ECF No. 45;

Sevier Mot. Summ. J., ECF No. 47.

This matter is ripe for decision.

## II.

Having granted consolidation under Rule 65(a)(2), the Court "treats the parties' briefing

as cross-motions for summary judgment."  *Trump v. Comm. on Oversight & Reform of the U.S.*

*House of Representatives*, 380 F. Supp. 3d 76, 90 (D.D.C. 2019).  Summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When deciding a

motion for summary judgment, the Court "must assume the truth of all statements proffered by

the non-movant except for conclusory allegations lacking any factual basis in the record."  *Dist.*

*Intown Props. Ltd. P'ship. v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999).  The

Court's function at the summary judgment stage is not to "weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

For the Court to reach the merits, Plaintiffs must first carry their burden of establishing

the Court's jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  At the

---

[5]  Plaintiffs also filed a separate Motion to Take Judicial Notice, ECF No. 41.  But it does not appear that Plaintiffs
have consulted with the Mayor on this nondispositive motion, as required by Local Civil Rule 7(m).  So the Court
will deny this motion.  Further, none of the facts presented in this motion support Plaintiffs' standing, so the Court
would deny this motion as moot given the ultimate disposition of this matter.

summary judgment stage, they cannot rest on "mere allegations," but must produce evidence of "specific facts" that establish jurisdiction. *Id.* If a court determines that it lacks jurisdiction for any claim, it must dismiss it. Fed. R. Civ. P. 12(h)(3).

### III.

Though Plaintiffs assert that the Mayor's conduct here is "so egregious that a standing analysis is not necessary," Christopher Reply at 8 (cleaned up), the Court cannot dispense with standing so easily. This Court's jurisdiction under the Constitution is limited to deciding "cases" and "controversies." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 597–98 (2007). And "one of the controlling elements in the definition of a case or controversy under Article III is standing." *Id.* So even if the Mayor had not challenged Plaintiffs' standing, the Court would need to consider it sua sponte. *See Lee's Summit v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000).

Here, the Mayor urges that Plaintiffs lack standing to bring both their Establishment Clause, Def.'s Opp'n at 19–26, and Equal Protection Clause claims, *id*. at 24. To satisfy their burden to prove standing, Plaintiffs must offer evidence showing that they have suffered an "injury in fact" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). This injury must be "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." *Id*. (cleaned up). And, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 561 (cleaned up). At the summary judgment stage, Plaintiffs must do more than just allege that they meet these elements. *Id*. "[E]ach element must be supported in the same way as any other matter on which

the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

Because Plaintiffs fail to prove that they have suffered a cognizable injury-in-fact caused by the Mayor's action, the Court will dismiss their claims for lack of standing.

**A.**

Consider first Plaintiffs' standing to assert their claim under the Equal Protection Clause.

Plaintiffs argue that the creation of the Mural is an "under inclusive government action that violates the equal protection rights of the Plaintiffs and serve[s] to undermine a culture of rights and sacred civil liberties." Compl. ¶ 64. Perhaps, but what injury have they suffered?

Though Plaintiffs do not directly address their standing for this claim, their Complaint and motions suggest one type of injury. The Mural offends them and makes them feel like "second class citizens," Penkoski Mot. at 32; Compl. ¶ 36, because it "gives the impression that the favored race of the District of Columbia are liberal citizens with black skin pigmentation," Sevier Mot. at 21. In other words, Plaintiffs feel that the District's "Black Lives Matter" message stigmatizes them because they are not black.

The Court does not doubt the sincerity of Plaintiffs' feelings of ostracization nor quibble with their claims about the divisiveness of the Mayor's actions. *See* Compl. ¶ 36; Sevier Mot. at 21; Penkoski Mot. at 32. But these feelings alone cannot justify standing. Indeed, in *Allen v. Wright*, the Supreme Court expressly rejected the idea that litigants could base standing for an equal protection challenge on the "stigmatizing injury often caused by racial discrimination." 468 U.S. 737, 755 (1984).

In *Allen*, parents of black school children alleged that the Internal Revenue Service had "not adopted sufficient standards and procedures to fulfill its obligation to deny tax-exempt

status to racially discriminatory private schools." *Id.* at 739.  The IRS's action caused the parents and their children to suffer a "stigmatic injury, or denigration, suffered by all members of a racial group when the Government discriminates on the basis of race."[6]  *Id.* at 753–54.  Though the Court acknowledged that stigmatization is the "sort of noneconomic injury [that] is one of the most serious consequences of discriminatory government action," it determined that such an "abstract stigmatic injury," standing alone, was not cognizable.  *Id.* at 755.  Such a theory of standing would "transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'"  *Id.* at 756 (quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973)).

Standing, the Court held, requires plaintiffs to show that they have been "personally denied equal *treatment* by the challenged discriminatory conduct," not just that they *feel* stigmatized.  *Id.* at 755 (cleaned up) (emphasis added).  For instance, plaintiffs could assert a stigmatic injury if accompanied by "some concrete interest" subject to discriminatory action such as when plaintiffs were "denied monetary benefits allegedly on a discriminatory basis."  *Id.* at 757 n.22.

Relying on *Allen*, other courts have rejected plaintiffs' attempts to challenge discriminatory displays under the Equal Protection Clause.  *See, e.g.*, *Moore v. Bryant*, 853 F.3d 245, 249–51 (5th Cir. 2017); *see also Doe v. Cong. of the U.S.*, 891 F.3d 578, 594–95 (6th Cir. 2018) (holding atheists lacked standing to challenge the "In God We Trust" motto under the Equal Protection Clause when they claimed that the motto "stigmatiz[ed] those whose religious beliefs [did] not include trust in God").

---

[6]  The Court also recognized that plaintiffs may have been trying to assert an injury based on the Government not complying with the Constitution.  *Allen*, 468 U.S. at 753–54.  This injury was also not cognizable, since the Court has "repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."  *Id.* at 754.

In *Moore v. Bryant*, the Fifth Circuit dismissed on standing grounds an equal protection challenge to the Mississippi state flag—which incorporated the cross of the Confederate battle flag.[7] 853 F.3d at 249. The plaintiff—an African-American lawyer—argued that he was "unavoidably exposed to the state flag" through his work as a prosecutor. *Id.* And he found the flag's incorporation of the Stars and Bars "'painful, threatening, and offensive' to him, mak[ing] him 'feel like a second-class citizen,' and caus[ing] him both physical and emotional injuries." *Id.* The court recognized that the plaintiff's argument, at its core, was that "the Mississippi state flag stigmatize[d] him." *Id.*

That was the only injury the plaintiff asserted. The flag subjected him to discriminatory *messaging*, but the plaintiff did not allege that he was "personally subjected to discriminatory *treatment*." *Id.* (emphasis added). Relying on *Allen*, the court determined that he failed to plead a cognizable injury. *Id.*

So too here. As in *Moore*, Plaintiffs—at most—allege that the Mural is "painful, threatening, and offensive' to [them]," and makes them feel like second-class citizens.[8] *Moore*, 853 F.3d at 249. They may, indeed, be subject to a discriminatory message every time they see the Mural. But they have made no showing that the Mayor or the District have subjected them to any discriminatory *treatment* because of their race.[9] "*Allen* and its progeny make clear that . . . exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case." *Moore*, 853 F.3d at 250.

---

[7] The Mississippi legislature recently voted to change its flag. *See* H.B. 1796, 2020 Reg. Sess. (Miss. 2020).

[8] Recall that Plaintiffs never explain how they have standing to assert their Equal Protection Clause claim.

[9] To be sure, Plaintiffs may *fear* discriminatory treatment. But they have presented "no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental actions." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013). This cannot establish a concrete injury-in-fact, especially at the summary judgment stage. *Id.*; *see Lujan*, 504 U.S. at 561.

Because Plaintiffs allege no cognizable injury-in-fact, the Court will dismiss Plaintiffs'
equal protection claim.

## B.

Plaintiffs' "primary cause of action in this case arises under the Establishment Clause."
*See* Sevier Mot. at 18.  But the Mayor believes Plaintiffs lack standing for that claim as well.
First, she asserts, Plaintiffs cannot establish taxpayer standing under the Supreme Court's
decision in *Flast v. Cohen*, 392 U.S. 83 (1968).  *See* Def.'s Opp'n at 20–21.  Second, Plaintiffs'
"'offended observer' theory of standing has no basis in law."  *Id*. at 24 (quoting *Am. Legion v.
Am. Humanist Ass'n*, 139 S. Ct. 2067, 2098 (2019) (Gorsuch, J., concurring)).  And third, any
concrete injury Plaintiffs suffered—such as being "threatened, victimized, and persecuted by the
Black Lives Matter cult," Penkoski Mot. at 25—is not "fairly traceable to the District's conduct,"
Def.'s Opp'n at 25.  The Court takes each argument in turn.

## 1.

Plaintiffs' only asserted basis for standing in their Complaint and, largely, their briefing
is that they have "taxpayer standing."  Compl. ¶¶ 34, 53.  They "pay a variety of taxes in the
District of Columbia, including sale taxes and all other forms of taxes," *id*. ¶ 34, and claim they
have a "logical nexus to seek accountability," *id*. ¶ 43.  So, in their view, they satisfy the
Supreme Court's test in *Flast v. Cohen* for taxpayer standing to raise Establishment Clause
claims.  *Id*. ¶ 53.  Yet, as the Mayor notes, Plaintiffs have provided no evidence showing that
they satisfy the *Flast* test.  Def.'s Opp'n at 20–21.

Taxpayer status grants litigants standing in "extremely limited" circumstances.  *See In re
Navy Chaplaincy*, 534 F.3d 756, 762 (D.C. Cir. 2008).  Indeed, a century ago, the Supreme Court

rejected the idea that a plaintiff's status as a federal taxpayer could support standing to challenge a government action.  *See Frothingham v. Mellon*, 262 U.S. 447, 487–88 (1923).

Forty-five years later, the Court fashioned a narrow exception to *Frothingham*'s rule.  In *Flast*, it permitted federal taxpayers to raise an Establishment Clause challenge to congressional appropriations to religious schools.  392 U.S. at 101–03.  Still, these taxpayers had standing only if they met two conditions.  *First*, plaintiffs must challenge only the unconstitutionality of "exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution."  *Id*. at 102.  Taxpayers lack standing to challenge "incidental expenditure of tax funds in the administration of an essentially regulatory statute."  *Id*.  And *second*, the taxpayers must "establish a nexus between that [taxpayer] status and the precise nature of the constitutional infringement alleged."  *Id*.

Though this provides *some* taxpayers standing, the Court has "made clear that *Flast* is a very narrow exception," *Navy Chaplaincy*, 534 F.3d at 762, which "has largely been confined to its facts," *see Hein*, 551 U.S. at 609–10 (declining to expand *Flast* to cover executive expenditures even though "almost all Executive Branch activity is ultimately funded by some congressional appropriation").  That is, federal taxpayers only have standing to challenge a "legislative enactment [that] *expressly* authorizes or appropriates funds" violating the Establishment Clause.  *See Navy Chaplaincy*, 534 F.3d at 762 (emphasis added).

Penkoski and Christopher's briefing mainly focuses on the nexus prong of the *Flast* test.[10]  *See* Penkoski Mot. at 25; Christopher Reply at 14–17.  But they skip over *Flast*'s threshold requirement:  that they challenge a specific *congressional* appropriation or expenditure made under Congress's Article I, § 8 powers.  *See Flast*, 392 U.S. at 102.  Though they

---

[10]  Though Plaintiffs filed a joint Complaint in which they summarily alleged taxpayer standing, Compl. ¶ 34, neither of Sevier's briefs address standing, *see generally* Sevier Mot.; Sevier Reply.

acknowledge this requirement, *see* Penkoski Mot. at 25 n.13; Christopher Reply at 10, they never try to explain how the *D.C. Mayor's directive* to paint the Mural qualifies as such an expenditure.

And, as the Mayor observes, they cannot satisfy this prerequisite.  First, any funds expended on the Mural were municipal, not federal funds.[11]  Def.'s Opp'n at 20–21.  Second, the Mayor—not Congress—directed the Department of Public Works to create the Mural.  *Id*. at 20.  And consequently, third, Plaintiffs have presented no evidence that funds expended were "expressly authorized or mandated" under Article I, § 8, to create the Mural.  *Navy Chaplaincy*, 534 F.3d at 762.  If anything, it seems likely that any money spent on the Mural was an "incidental expenditure of tax funds in the administration" of the Department of Public Works.  *See Flast*, 392 U.S. at 102.

Since Plaintiffs have failed to show that they satisfy *Flast*'s test, they lack taxpayer standing.

---

[11] Plaintiffs never invoke the municipal taxpayer standing doctrine, so they have forfeited this argument.  *Cf. Scenic Am., Inc. v. U.S. Dep't of Transp*., 836 F.3d 42, 53 n.4 (D.C. Cir. 2016) ("Although a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction.").  Yet even if they had raised it, they fall short of its requirements.

   Under the municipal taxpayer standing doctrine, a "taxpayer's challenge to a state expenditure establishes a case or controversy 'when it is a good-faith pocketbook action.'"  *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 4 (D.C. Cir. 1988) (quoting *Doremus v. Bd. of Educ.*, 342 U.S. 429, 434 (1952)).  Plaintiffs must show a "'measurable appropriation' of tax funds."  *Id*. (quoting *Frothingham*, 262 U.S. at 488); *see Am. Humanist Ass'n v. Douglas Cnty. Sch. Dist. Re-1*, 859 F.3d 1243, 1260 (10th Cir. 2017) (rejecting municipal taxpayer standing because "plaintiffs have not shown evidence of a specific, measurable municipal expenditure on the challenged conduct").  And, as with *Flast*, "municipal taxpayers lack standing when they challenge a regulatory program that only incidentally involves expenditures of public funds."  *D.C. Common Cause*, 858 F.2d at 4.  Here, Plaintiffs have offered no evidence that the District expended any funds on the Mural, that their sales taxes financed that project, or that, even if the District appropriated funds for the Mural, these expenses were not "incidental."  *See ACLU-NJ ex rel. Miller v. Twp. of Wall*, 246 F.3d 258, 263 (3d Cir. 2001) (finding that though plaintiffs had "provided uncontradicted testimony that they pay property taxes to the Township," they "failed to establish that the Township has spent any money, much less money obtained through property taxes," on a nativity display).  And recall that at this trial-on-the-merits stage, mere allegations are insufficient.  *Lujan*, 504 U.S. at 561.

**2.**

Christopher, in his reply brief, hints that Plaintiffs may also be able to assert an injury-in-fact because they take offense at the Mural.[12]  *See* Christopher Reply at 12–13.  Even if Plaintiffs argue this as an alternative basis for standing, the Court agrees with the Mayor that Plaintiffs' "'offended observer' theory of standing has no basis in law."  *See* Def.'s Opp'n at 24 (quoting *Am. Legion*, 139 S. Ct. at 2098 (Gorsuch, J., concurring)).

According to their Complaint, Plaintiffs "all walk past and are exposed to the unavoidable Black Lives Matter display[.]"[13]  Compl. ¶ 39.  "The threat of unwelcomed and continued contact" with the Mural, Christopher suggests, is "sufficient" for Plaintiffs "to meet the 'injury in fact' requirement for standing."  Christopher Reply at 12 (citing *Staley v. Harris Cnty.*, 332 F. Supp. 2d 1030, 1031 (S.D. Tex. 2004); *N.C. C.L. Union v. Constangy*, 751 F. Supp. 552, 553 (W.D.N.C. 1990), *aff'd,* 947 F.2d 1145 (4th Cir. 1991)).

Why?  Because, as Plaintiffs see it, they "will be subjected to repeated exposure to the offensive non-secular display[] that is paid for and maintained by their tax dollars."  *Id*. at 13.  Plaintiffs suggest that the Mural offends them and makes them "actually feel like second class citizens," Compl. ¶ 44, because it signals to a "reasonable person . . . that the favored religion of the District and the Nation is the religion of Secular Humanism as advocated by the violent BLM cult," Christopher Reply at 12.  In other words, as with their equal protection claim, Plaintiffs assert a psychological, stigmatic injury for their Establishment Clause claim.

---

[12]  He still ties this argument to taxpayer standing, *see* Christopher Reply at 12 ("As taxpayers, the Plaintiffs do not want to have to keep coming into contact with the offensive displays[.]"), so it is unclear whether he tries to assert this as a separate basis for standing.

[13]  Christopher never filed an affidavit or other evidence attesting to this fact in support of his motion or in response to the Mayor's cross-motion.  But a verified complaint can replace a *pro se* plaintiff's affidavit.  *See Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992).

This injury, though, cannot be squared with the Supreme Court's holding in the landmark Establishment Clause standing case, *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982). An overview of that case is in order.

**a.**

Under the Federal Property and Administrative Services Act, the Secretary of Education had authorization to transfer land that had "outlived its usefulness to the Federal Government" to public or private entities, such as schools. *See Valley Forge*, 454 U.S. at 466. Following the closure of a military hospital, the Secretary conveyed land to Valley Forge Christian College. *Id.* at 468. A month later, a nonprofit organization, Americans United for Separation of Church and State ("Americans United"), learned about the conveyance through a press release. *Id.* at 469. It promptly sued, arguing that the conveyance violated the Establishment Clause. *Id.*

Americans United claimed that it had standing to challenge the transfer because it was "composed of 90,000 'taxpayer members.'" *Id.* The complaint asserted that each member "would be deprived of the fair and constitutional use of his (her) tax dollar for constitutional purposes in violation of his (her) rights under the First Amendment of the United States Constitution." *Id.*

The district court dismissed the case, concluding that Americans United lacked taxpayer standing under *Flast* and that it failed to allege that its members had suffered an "actual or concrete injury." *Id.* The Third Circuit reversed. *Id.* at 470. Americans United, it said, "had standing merely as 'citizens' claiming 'injury in fact' to their shared individuated right to a government that 'shall make no law respecting the establishment of religion.'" *Id.* One judge wrote separately emphasizing that finding "standing was necessary to satisfy the need for an

available plaintiff, without whom the Establishment Clause would be rendered virtually unenforceable by the judiciary." *Id*. (internal quotations omitted).

Upon review, the Supreme Court rejected the Third Circuit's standing theory. The Court had long recognized that "Art. III requirements of standing are not satisfied by the abstract injury in nonobservance of the Constitution asserted by citizens." *Id*. at 482 (cleaned up). "Such claims amount to little more than attempts 'to employ a federal court as a forum in which to air . . . generalized grievances about the conduct of government.'" *Id*. at 483 (quoting *Flast*, 392 U.S. at 106).

And that was the type of claim that Americans United brought. It made no difference, as the court of appeals thought, that Americans United alleged an Establishment Clause violation rather than some other constitutional grievance. *Id*. at 483–84. Other clauses of the Constitution are not "in some way less 'fundamental' than the Establishment Clause." *Id*. at 484. And there is "no principled basis on which to create a hierarchy of constitutional values or a complementary 'sliding scale' of standing which might permit respondents to invoke the judicial power of the United States." *Id*.

Americans United "claimed that the Constitution had been violated, [but] they claimed nothing else." *Id*. at 485 (cleaned up). The only injury Americans United members had personally suffered was "the psychological consequence presumably produced by observation of conduct with which one disagrees." *Id*. Such an injury, the Court held, had never been enough to confer standing and was not now "even though the disagreement [was] phrased in constitutional terms." *Id.* at 485–86.

The Court, finally, rejected the suggestion in the circuit's concurring opinion that Americans United must have standing "to satisfy 'the need for an available plaintiff'" to

challenge Establishment Clause violations. *Id*. at 488–89. Such a suggestion implied that "the business of the federal courts is correcting constitutional errors, and that 'cases and controversies' are at best merely convenient vehicles for doing so and at worst nuisances that may be dispensed with when they become obstacles to that transcendent endeavor." *Id*. at 489. That idea strays from our constitutional scheme and does "not become more palatable when the underlying merits concern the Establishment Clause." *Id*.

In sum, *Valley Forge* establishes three key principles for this case. First, the psychological consequences "produced by observation of conduct with which one disagrees" or conduct at odds with the Constitution are *not* cognizable injuries. *Id*. at 482, 485. Second, there is no "'sliding scale' of standing." *Id*. at 484. That is, a plaintiff may not be held to a lower threshold for injury for Establishment Clause claims than other constitutional violations. And third, courts may not manufacture standing to find an "available plaintiff" to challenge the Government's action. *Id*. at 488–89.

So what does this mean for Penkoski, Sevier, and Christopher? Their Establishment Clause claim must be dismissed.

Plaintiffs here, like Americans United, only allege a "psychological" harm, brought on by observance of the Mayor's action with which they disagree. Plaintiffs repeatedly assert that they are "deeply offended" by the Mural. Compl. ¶¶ 36, 45 n.13, 46, 47. They do not believe they should be "made to *feel* like second class citizens" because of their disagreement with the "Black Lives Matter" message. Penkoski Mot. at 32 (emphasis added); *see* Christopher Mot. at 51 ("Plaintiffs *feel* unwelcome in their own Nation's Capital" and "*feel* like second class citizens for believing that Jesus Christ was who He said He was" (emphasis added)); Sevier Decl. ¶ 10, ECF No. 11 ("[The Mural] make[s] me feel coerced and like a second class citizen[.]"); Penkoski

Decl. ¶ 10, ECF No. 13 (same).  They claim no other injuries caused directly by the Mayor's action.[14]

As with Americans United in *Valley Forge*, "[i]t is evident that [Plaintiffs] are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy."  454 U.S. at 486.  It is measured by the demonstration of an actual and concrete injury.  Plaintiffs' abstract psychological injuries do not meet that requirement.

Finding that Plaintiffs' feelings of offense and stigmatization are sufficient injuries for an Establishment Clause claim would also conflict with the second key principle from *Valley Forge*.  The Court cannot elevate the Establishment Clause over other constitutional rights and apply a "'sliding scale' of standing."  *Valley Forge*, 454 U.S. at 484.

Plaintiffs assert the same injuries for both their Equal Protection and Establishment Clause claims.  *See supra* III.A.  The only difference is that, for the Equal Protection Clause, Plaintiffs allege that they feel like "second class citizens" because black citizens are "the favored race of the District of Columbia," Sevier Mot. at 21, while under the Establishment Clause, it is because Secular Humanism is the "favored religion of the city [] and of the Nation," Compl. ¶ 40.  Same injury—just invoking two different constitutional terms.

To find that Plaintiffs have standing for their Establishment Clause claim where it is lacking for their Equal Protection Clause claim would lead to the "utterly unjustifiable result" recently contemplated by Justice Gorsuch:  "An African-American offended by a Confederate flag atop a state capitol would lack standing to sue under the Equal Protection Clause, but an

---

[14] Penkoski separately claims that he cannot preach on 16th Street because of the display.  Penkoski Decl. ¶ 4.  As we will see, *see infra* at III.B.3., these injuries are not fairly traceable to the Mayor but to third parties not before this Court.

atheist who is offended by the cross on the same flag could sue under the Establishment Clause."
*Am. Legion*, 139 S. Ct. at 2099 (Gorsuch, J., concurring).  Or here, a white Christian offended by
the Mural's racially discriminatory message lacks standing to sue under the Equal Protection
Clause, but that same plaintiff offended by the same Mural's religiously discriminatory message
could sue under the Establishment Clause.  In Justice Gorsuch's words, "Who really thinks *that*
could be the law?"  *Id.*

Finally, though Plaintiffs believe that "in some circumstances, individuals may seek to
challenge governmental actions for which neither those individuals nor any other individuals
could meet standing requirements," Penkoski Mot. at 25 n.13, *Valley Forge* directly forecloses
that result, 454 U.S. at 489.  Standing is not a suggestion.  Its requirements are "essential to
preserving the separation of powers and limited judicial role mandated by the Constitution."
*Navy Chaplaincy*, 534 F.3d at 765.  The "assumption that if [plaintiffs] have no standing to sue,
no one would have standing, is not a reason to find standing."  *Valley Forge*, 454 U.S. at 489
(quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)).

**b.**

To be sure, as Christopher observes, other courts have adopted some form of offended
observer standing.  *See* Christopher Reply at 12–13 (citing *Staley*, 332 F. Supp. 2d at 1031; *N.C.
C.L. Union*, 751 F. Supp. at 553); *see also, e.g.*, *ACLU v. Rabun Cnty. Chamber of Com., Inc*.,
698 F.2d 1098 (11th Cir. 1983); *Washegesic v. Bloomingdale Pub. Sch*., 33 F.3d 679, 683 (6th
Cir. 1994).  This theory has been frequently advanced to require removal of Christian displays
around the Nation.  But this Court is unpersuaded.

The Supreme Court, as the Mayor correctly observes, has never embraced this theory.
Def.'s Opp'n at 24.  While it has considered Establishment Clause challenges to religious

displays without addressing standing, "it is a well-established rule that 'cases in which jurisdiction is assumed *sub silentio* are not binding authority for the proposition that jurisdiction exists.'" *Navy Chaplaincy*, 534 F.3d at 764 (quoting *John Doe, Inc. v. DEA*, 484 F.3d 561, 569 n.5 (D.C. Cir. 2007)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by jurisdictional rulings . . . have no precedential effect."). And when it comes to the Supreme Court's standing requirements, inferior courts must do as it says, not as it does.

Nor has the D.C. Circuit recognized offended observer standing. To the contrary, in another Establishment Clause case, then-Judge Kavanaugh, writing for the panel, relied on the Supreme Court's decision in *Allen* to hold that "mere personal offense to government action does not give rise to standing to sue."[15]  *See Navy Chaplaincy*, 534 F.3d at 763.

In that case, a group of Protestant Navy chaplains sued, alleging that the Navy's retirement system discriminated in favor of Catholic chaplains. *Id*. at 758. The chaplains had not suffered from the alleged discrimination, but asserted an "injury-in-fact from their being subjected to the 'message' of religious preference conveyed by the Navy's allegedly preferential retirement program[.]" *Id*. at 763. The program made them "feel like second-class citizens within the Navy Chaplaincy." *Id*. Pointing to religious display and prayer cases in which other courts had found or assumed standing, the chaplains asserted that such an injury was sufficient. *Id*.

The court first noted that those cases were not binding on it (nor are they on this Court). *Id*. at 764. Then it went on to find that even "accepting those cases as precedents on standing," there were "significant differences between plaintiffs' case and the religious display and prayer

---

[15] Fifty years ago, the D.C. Circuit flirted with offended observer standing in *Allen v. Hickel*, 424 F.2d 944 (D.C. Cir. 1970). But *Valley Forge* later cast doubt on that decision, and the D.C. Circuit has not relied on that holding since *Valley Forge* was decided in 1982. No party cites it in the briefing.

cases." *Id*.  Namely, the chaplains were not even offended by a government message, but by a government *action* "re-characterized as a governmental *message* promoting religion."  *Id*. (emphasis in original).

Pointing to *Valley Forge*, the court noted that the chaplains' only alleged injury was the "psychological consequence . . . produced by observation of conduct with which one disagrees." *Id*. (quoting *Valley Forge*, 454 U.S. at 485–86).  Since the chaplains were "not themselves affected by a government *action* except through their abstract offense at the *message* allegedly conveyed by that action," the court determined that they had not shown injury-in-fact to bring an Establishment Clause claim.  *Id.* at 764–65.

The D.C. Circuit, then, has rejected the opportunity to apply offender observer standing in other Establishment Clause contexts.  *Id*.  And it has only assumed but never held that this theory suffices for religious display cases.  *Id*. at 764.  This Court declines to so hold now.

Though other courts of appeals have adopted this theory, this remains an unsettled area of law.  Even among those courts, cases invoking offended observer theory "are in some conflict and the doctrine is somewhat confused."  *Washegesic*, 33 F.3d at 682.

Some courts, for instance, base standing, in part, on the frequency of the plaintiffs' contact with the display.  *See, e.g.*, *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1250 (9th Cir. 2007) ("Whether *frequent regular* contact with an allegedly offensive religious symbol . . . can give rise to a legally cognizable injury is an open question in this circuit." (emphasis added)).  Others consider whether the plaintiffs are members of the community where the display is located.  *See, e.g.*, *id*. at 1251 ("[Plaintiff] has held himself out as a member of the community where the seal is located, as someone forced into frequent regular contact with the seal[.]"); *Washegesic*, 33 F.3d at 683 ("The practices of our own community may create a larger psychological wound than

someplace we are just passing through.").  And, in the past, some courts have considered whether the plaintiffs altered their behavior because of the display.  *See, e.g.*, *Freedom from Religion Found. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988) (denying standing where plaintiffs said they were "offended by [the display's] presence" but admitted they had "not altered their behavior as a result of the monument").  *But see, e.g.*, *Doe v. Cnty. of Montgomery*, 41 F.3d 1156, 1160 (7th Cir. 1994) (rejecting the argument that "unless a plaintiff assumes a 'special burden' or alters his behavior because of the religious message" he lacks standing).

    But why not follow these circuits precedents—in one form or another—here?

    *First*, for the reasons already explained, the Court believes *Valley Forge* forecloses this result.  *See supra* at III.B.2.a.; *see also Am. Legion*, 139 S. Ct. at 2100 (Gorsuch, J., concurring) ("[T]his Court has already expressly rejected 'offended observer' standing under the Establishment Clause itself." (citing *Valley Forge*, 454 U.S. at 464)).

    *Second*, many of those courts adopting this theory "invented offended observer standing for Establishment Clause cases in the 1970s in response to [the Supreme] Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602 (1971)."  *Am. Legion*, 139 S. Ct. at 2101 (Gorsuch, J., concurring).  The *Lemon* test, as it has evolved, "prohibit[s] the government from doing anything that a 'reasonable observer' might perceive as 'endorsing' religion."  *Id*.  So other courts crafted offended observer standing to allow such a reasonable observer to have standing to sue.  *See, e.g.*, *Moore*, 853 F.3d at 250 ("The Establishment Clause prohibits the Government from endorsing a religion . . . [a]ccordingly, Establishment Clause injury can occur when a person encounters the Government's endorsement of religion."); *Suhre v. Haywood Cnty.*, 131 F.3d 1083, 1086 (4th Cir. 1997) ("[T]he standing inquiry in Establishment Clause cases has been tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer.").

These courts adopted offended observer standing when *Lemon* reached its zenith of influence.  They are now wedded to that precedent.  *See Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1323 (11th Cir. 2020) ("If we were writing on a clean slate, we might well agree with the City's contention that plaintiffs lack standing here.  But we are not—and so we cannot.").

This case arises in a new Establishment Clause era.  Since the 1970s, the Supreme Court has gradually shifted away from *Lemon*, often ignoring the test altogether.  *See Am. Legion*, 139 S. Ct. at 2080 (plurality opinion) (collecting cases).  And just last year, a plurality of the Supreme Court announced that the "daunting problems" that the *Lemon* test has presented in religious display cases "counsel against efforts to evaluate such cases under *Lemon*."[16]  *Id*. at 2081–82.  With *Lemon* eroded, so too has the justification for accommodating a plaintiff merely standing in the role of the "reasonable observer."

*Third*, the standing doctrine has tightened significantly since courts decided many of the foundational offended observer cases.  The Eleventh Circuit, for instance, adopted offended observer standing in 1983.  *See Rabun*, 698 F.2d at 1105.  And many courts have relied on that case in creating their own doctrines.  *See, e.g.*, *Hawley v. Cleveland*, 773 F.2d 736, 740 (6th Cir. 1985).  But since then, the Supreme Court has raised the bar for "injury-in-fact" for standing.  In 1992, the Court explained that the injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560.  And just a few years ago, the Court clarified that a cognizable injury must be not only "particularized"—in that it affects

---

[16] Only Chief Justice Roberts and Justices Breyer and Kavanaugh joined this section of Justice Alito's opinion in *American Legion*.  *See Am. Legion*, 139 S. Ct. at 2074.  But Justice Gorsuch's concurring opinion emphasized that the "plurality rightly indicate[d]" that "*Lemon* was a misadventure" and that the test is "now shelved."  *Id*. at 2101–02 (Gorsuch, J., concurring).  Justice Thomas also agreed in his concurrence:  "As to the long-discredited test set forth in *Lemon v. Kurtzman* . . . the plurality rightly rejects its relevance to claims, like this one, involving 'religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies.' I agree with that aspect of its opinion. I would take the logical next step and overrule the *Lemon* test in all contexts."  *Id*. at 2097 (Thomas, J., concurring).  At least six justices, then, support the holding that *Lemon* no longer applies to religious display cases. *See Kondrat'yev*, 949 F.3d at 1326.

the plaintiff in an individual way—but also "concrete."  *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540,

1548 (2016) (quotations omitted).  It must "actually exist" and be "real and not abstract."  *Id.*

(cleaned up).

Under these heightened injury-in-fact requirements, the Court has rejected stigmatization,

*see Allen*, 468 U.S. at 755, disagreement, *Diamond v. Charles*, 476 U.S. 54, 62 (1986), fear,

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), and other abstract or purely

psychological harms as sufficient injuries-in-fact.  These cases have built upon *Valley Forge*'s

foundation, making it much harder to adopt an offended observer theory now, on a clean slate.

Indeed, some courts are questioning their adoption of offended observer theory and are

calling on the Supreme Court to address it directly.  Judge Newsom recently argued that *Rabun*

was "wrong the day it was decided—utterly irreconcilable with the Supreme Court's then-hot-

off-the-presses decision in *Valley Forge*."  *Kondrat'Yev*, 949 F.3d at 1336 (Newsom, J.,

concurring).  And Judge Hardiman, while declining to abrogate Third Circuit precedent, noted

that it was up to "the Supreme Court—or this Court sitting *en banc*—to determine whether to

discard" offended observer standing.  *Freedom from Religion Found., Inc. v. Cnty. of Lehigh*,

933 F.3d 275, 280 (3d Cir. 2019); *see also id.* at 280 n.3.

In sum, the development of the Establishment Clause and standing doctrines over the past

fifty years counsels against adopting offended observer standing here and now, when no contrary

precedent binds this Court.  The Court, thus, declines to find that Penkoski, Sevier, and

Christopher have standing just because they have been "expose[d]" to a display that offends

them.  Christopher Reply at 13.

**c.**

But even if the Court were to adopt offended observer standing, it is not clear that Plaintiffs have offered enough evidence that they have suffered such an injury.

Plaintiffs' Complaint, filed only five days after the Mural was created, jointly alleges that Plaintiffs "all walk past and are exposed to the unavoidable Black Lives Matter display" and that Sevier and Christopher "are required to walk past the challenged display as they carry out official business" for their lobbying work.  Compl. ¶¶ 39, 42.

But Plaintiffs offer no evidence in support of this.  Indeed, their later declarations never mention this allegation.  *See generally* Sevier Decl.; Penkoski Decl.; Pls.' Req. for Judicial Notice, ECF No. 41.  When did they walk past the Mural?  How often?  Did they pass it in their day-to-day business, or did they intentionally walk past it?  Indeed, Penkoski's declaration casts doubt on whether he has ever walked past the Mural since he testified that he "feel[s] like [he] is prohibited from going to the spot where the challenged displays are."  *See* Penkoski Decl. ¶ 4. And of course, it is Plaintiffs' burden to establish standing.  *Lujan*, 504 U.S. at 561.

More, as observed above, several circuits give weight to the fact that litigants are challenging displays in their own community, finding that they may have a more concrete and particularized injury than those "complaining about the unlawful establishment of a religion . . . [in] such an establishment elsewhere[.]"  *ACLU v. St. Charles*, 794 F.2d 265, 268 (7th Cir. 1986); *Washegesic*, 33 F.3d at 683 ("The practices of our own community may create a larger psychological wound than someplace we are just passing through.").

Yet Plaintiffs do not appear to be members of the District's community, only visitors whose lobbying activities or other business occasionally bring them here.  All three Plaintiffs'

listed mailing addresses in their Complaint are in Nashville, Tennessee.[17]  In later filings, Sevier

and Penkoski provided D.C. mailing addresses, but still no residential address.  *See, e.g.*,

Penkoski Mot. at 56.  Christopher's Reply suggests that Sevier rents an apartment in the

District—though Sevier's filings never reference this.  Christopher Reply at 14.  There is no

mention of how often Sevier stays in the District, nor is there any allegation that Penkoski or

Christopher currently reside here.

Plaintiffs' ties to the D.C. community, at least on this evidence, are tenuous at best.  And

Plaintiffs' "claim that the Government has violated the Establishment Clause does not provide a

special license to roam the country in search of governmental wrongdoing and to reveal their

discoveries in federal court."  *Valley Forge*, 454 U.S. at 487.

### 3.

Finally, even when Plaintiffs do allege concrete and particularized injuries, those injuries

are caused by third parties—not the Mayor.  Plaintiffs thus fail to offer proof of traceability and

redressability for these injuries.

Penkoski, for example, alleges that he has received a "barrage of threats . . . from the

phony tolerant Black Lives Matter cult members."  Penkoski Decl. ¶ 4.  He worries that he

"could be physically harmed if [he] preach[es]" on 16th Street, *id.*, so he has canceled events that

"take place on or around" that area, *see* Christopher Reply at 17.  Sevier and Christopher, too,

claim that BLM members have threatened them.  *See* Sevier Decl. ¶ 3; Christopher Reply at 16–

17.

---

[17]  Indeed, in violation of Local Rule 5.1(c)(1), Plaintiffs have failed to provide their full residential addresses.  The
Court has the authority to dismiss this case on that basis alone.  *See* LCvR 5.1(c)(1) ("The first filing by or on behalf
of a party shall have in the caption the name and full residence address of the party. . . . Failure to provide the
address information within 30 days of filing may result in the dismissal of the case against the defendant.").  The
Court declines to do so, but it also will not assume Plaintiffs are D.C. residents when their pleadings suggest
otherwise.

But all these claims focus on the BLM members, not the Mayor herself.  Plaintiffs have provided no evidence that the Mayor has threatened them, physically harmed them, or prevented them from preaching on 16th Street.

And even if the Court were to order the Mayor to remove the Mural, Plaintiffs provide no evidence that this remedy would *likely* stop BLM members from threatening them.  *Lujan*, 504 U.S. at 561 ("It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (cleaned up)).  Recall that the protests and violence near the White House preceded the erection of the Mural, not vice versa.

Plaintiffs' failure to produce evidence of traceability and redressability stands as one final roadblock in their pursuit of standing.  *Id.* (requiring injuries to be "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court" (cleaned up)).  The Court will thus dismiss Plaintiffs' Establishment Clause claim.

## IV.

Plaintiffs' Complaint includes only two counts, both challenging the Mural:  a "First Amendment Establishment Clause Violation" and a "Violation of the Equal Protection Clause of the Fourteenth Amendment."  Compl. at 20–23.  Though the crux of their motions is still the Establishment Clause claim, *see* Sevier Mot. at 18, their motions for preliminary and permanent injunctions pile on several additional constitutional and statutory claims challenging the Mural and a claim challenging one of the Mayor's COVID-19 orders.

The Court must "consider a *pro se* litigant's complaint 'in light of' all filings," *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015), but "[t]his benefit is not . . . a license to ignore the Federal Rules of Civil Procedure," *Sturdza v. U.A.E.*, 658 F. Supp. 2d 135,

137 (D.D.C. 2009); *see also Sanchez-Mercedes v. Bureau of Prisons*, --- F. Supp. 3d ---, No.
1:19-cv-00054 (TNM), 2020 WL 1821131, at *18 n.21 (D.D.C. Apr. 10, 2020).  More, when a
*pro se* plaintiff is an attorney—as Sevier claims to be, *see* Compl. ¶ 35; Sevier Decl. ¶ 2—he "is
not automatically subject to the very liberal standards afforded to a non-attorney *pro se* plaintiff
because an attorney is presumed to have a knowledge of the legal system and need less
protections from the court," *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 234 (D.D.C. 2007);
*see also Robinson v. Howard Univ., Inc.*, 335 F. Supp. 3d 13, 22 (D.D.C. 2018), *aff'd sub nom.
Robinson v. Wutoh*, 788 F. App'x 738 (D.C. Cir. 2019).

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to contain "a short
and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.
8(a).  This rule ensures plaintiffs "give fair notice to defendants of the claim being asserted,
sufficient to prepare a responsive answer, to prepare an adequate defense and to determine
whether the doctrine of *res judicata* applies."  *Sturdza*, 658 F. Supp. 2d at 137.

Here, Plaintiffs' briefs raise five new claims that appear nowhere in the Complaint.
Some of these claims, like Plaintiffs' arguments that the District violated its own code and
regulations, are unlikely to survive a motion to dismiss under Rule 12(b)(6) since these rules do
not appear to provide a private right of action.  Def.'s Opp'n at 45.

Others claims require further pleading, argument, and, possibly, factual development—
which neither side has presented here.  For instance, Plaintiffs' claim that the Mayor violated
their free speech rights hinges, in part, on whether the Mural is private or government speech.
*See* Def.'s Opp'n at 40.  But the parties have provided little-to-no argument or factual support to
aid the Court in answering this fact-intensive question.  *See Walker v. Tex. Div., Sons of
Confederate Veterans, Inc.*, 576 U.S. 200 (2015).

More, Plaintiffs' suggestion that the Mayor violated the Free Exercise Clause may indeed have merit, given that Plaintiffs allege that her COVID-19 restrictions have been selectively enforced—prohibiting churches from gathering in groups of more than ten people while tolerating protestors gathering by the thousands. *See Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (finding COVID-related restriction on in-person worship services likely violated the Free Exercise Clause because the governor permitted "law firms, laundromats, liquor stores, gun shops, airlines, mining operations, funeral homes, and landscaping businesses to continue to operate" while prohibiting worship services); *see also Calvary Chapel Dayton Valley v. Sisolak*, --- U.S. ---, No. 19A1070, 2020 WL 4251360, at *2 (U.S. July 24, 2020) (Alito, J., dissenting from denial of application for injunctive relief); *On Fire Christian Ctr., Inc. v. Fischer*, --- F. Supp. 3d ---, No. 3:20-cv-264-JRW, 2020 WL 1820249, at *2 (W.D. Ky. Apr. 11, 2020) (granting TRO to prevent enforcement of prohibition against drive-in Easter services).

But their Complaint failed to give the Mayor and this Court fair notice of these allegations. No matter how broadly the Court construes the Complaint, it simply does not have any free speech, statutory, or regulatory challenges to the Mural or a free exercise challenge to the Mayor's order on church attendance. The entire Complaint focuses on whether the Mural violates the Establishment Clause or Equal Protection Clause. *See generally* Compl. Indeed, this Complaint—unlike many *pro se* pleadings—contains clear and explicit statements about the claims that the Plaintiffs do allege. *See* Compl. at 20–22. The claims are not among them. *See id*.

This is particularly problematic here, as the parties have briefed and the Court has reviewed this case on an expedited schedule because of Plaintiffs' representations that "time is of the essence." Hr'g Tr. at 33–34. The Court has consistently accommodated Plaintiffs' timeline.

*See, e.g.*, Min. Order (July 3, 2020) (denying Defendant's Motion for Extension of Time).  But it cannot, on this expedited timeline, be asked to weigh in on these matters without full briefing and an opportunity for both sides to develop and present evidence.  *See Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011) ("[P]laintiffs cannot use their summary judgment briefing to press claims not raised in their [] complaint.").  Nor is it appropriate to expect the Mayor to properly address claims on this expedited schedule for which she had no notice in the Complaint.

Plaintiffs may seek leave to file an Amended Complaint to make these claims under Rule 15(a)(2) of the Federal Rules of Civil Procedure.

## V.

The Mayor's decision to emblazon a city street by the White House with the name of an organization that allegedly espouses a racial and religious preference may have been divisive and offensive to many people, including Plaintiffs.  But this Court is not a forum in which to air generalized grievances about the conduct of the government.  *See Valley Forge*, 454 U.S. at 483. And since Plaintiffs have not shown standing to challenge the Mural, the Court cannot entertain their Complaint.

The Court will thus dismiss the Complaint for lack of standing.  Plaintiffs' Motion for a Preliminary and Permanent Injunction and Motions for Summary Judgment and Defendant's Cross-Motion for Summary Judgment will be denied as moot.  A separate order will issue.


Dated:  August 21, 2020                                       TREVOR N. McFADDEN, U.S.D.J.