**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RICH PENKOSKI**, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 20-cv-01519 (TNM) |
| **MURIEL BOWSER**, | |
| Defendant. | |

## MEMORANDUM OPINION

When the parties were last before the Court, it determined that Plaintiffs failed to show

that they had standing to sue the Mayor over the "BLACK LIVES MATTER" display ("the

Mural") near the White House. *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 224 (D.D.C. 2020).

The Court dismissed their claims without prejudice, permitting them to replead. They did so,

and they each have filed motions for a permanent injunction and summary judgment to boot.

But in the amended complaint and nine later briefs, Plaintiffs have still failed to show that they

have viable legal claims. The Court will grant the Mayor's cross-motion for summary judgment.

## I.

The Court recounted the facts in its prior opinion, *see id.* at 224–26, but it now draws

from the undisputed facts advanced at the summary judgment stage to supplement that

background.

As in many cities across the country, protestors descended upon downtown Washington,

D.C., last summer as part of sweeping protests associated with the Black Lives Matter

movement. *See* Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF") ¶ 35, ECF No.

72-2.[1] Demonstrations coalesced around Lafayette Square near the White House, where protestors clashed with law enforcement personnel for days and engaged of acts of violence and property destruction. *Id.* ¶¶ 35–37; Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF") ¶¶ 31–32, 40, ECF Nos. 63-1, 66-1, 68-2 (identical).[2]

In the wake of ongoing unrest, President Trump threatened to deploy the military to quell violence and restore order. Def.'s SUMF ¶ 39. Meanwhile, Mayor Muriel Bowser announced a citywide curfew effective June 1, 2020, "to protect the safety of persons and property in the District."[3] Tensions came to a head later that day, though, when federal law enforcement officers forcibly cleared Lafayette Square shortly before President Trump appeared at St. John's Church across the street. *Id.* ¶¶ 37–38; *see also* Pls.' SUMF ¶¶ 31–32.

Reportedly in response to the President's statements and the actions of federal law enforcement, Bowser directed the D.C. Department of Public Works to create a mural on the asphalt of 16th Street N.W., steps away from the White House, to "honor the peaceful protesters from June 1, 2020, and send a message that District streets are a safe space for peaceful

---

[1] Plaintiffs submitted three identical statements of material facts in support of their motions for summary judgment, all of which complied with Local Rule 7(h). *See* ECF Nos. 63-1, 66-1, 68-2. But Plaintiffs submitted no statement of facts disputing the Mayor's statement, as required when opposing a motion for summary judgment. *See* LCvR 7(h)(1); *accord* Standing Order ¶ 14(B)(i), ECF No. 3. So the Court can and does "assume that facts identified by the moving party"—here, the Mayor—"in [her] statement of material facts are admitted" as true. LCvR 7(h)(1).

[2] Allegations by politicians and the media that police cleared Lafayette Square for the President's visit to St. John's Church have been undermined by a recent Inspector General's report finding that the U.S. Park Police had independently planned the operation to better secure the White House grounds. *See* Off. Of Inspector Gen., *Review of U.S. Park Police Actions at Lafayette* Park (2021), https://www.doioig.gov/reports/review-us-park-police-actions-lafayette-park.

[3] *See* D.C. Mayor's Order 2020-069 (June 1, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-069.pdf

protestors."  Decl. of John Falcicchio ("Falcicchio Decl.") ¶ 6, ECF No. 71-5 (cleaned up); *see* Def.'s SUMF ¶¶ 40–46.  MuralsDC, a program within the D.C. Department of Public Works, commissioned 13 artists for the project, but dozens of volunteers and District employees helped paint.  *Id.* ¶¶ 42–46.  Stretching the length of two city blocks, the finished mural spells out "BLACK LIVES MATTER" followed by the District's flag, all in bright yellow lettering.  Pls.' SUMF ¶ 9; Def.'s SUMF ¶¶ 40–46.

Along with the Mural, the Mayor directed District employees to install traffic signs bearing the name "Black Lives Matter Plaza" at each corner of 16th Street where it intersects with H, K, and I Streets.  Falcicchio Decl. ¶ 7.  The D.C. Council later approved the Mayor's proposal to "symbolically name" that portion of 16th Street "Black Lives Matter Plaza."  Def.'s SUMF ¶¶ 49–51.

Several days after the Mural's appearance, vandals painted over the three stars that appear at the top of the District's flag and added the phrase "Defund the Police" in the same color and font.  *Id.* ¶ 56.  The resulting image appeared to state: "Black Lives Matter = Defund the Police."  *Id.*  District employees repainted the three stars in the D.C. flag the next day.  *Id.* ¶ 57.  The phrase "Defund the Police" remained for several months until District personnel painted over it too, returning the Mural to its original condition.  *Id.* ¶ 58.[4]

---

[4]  In May 2021, after the parties completed briefing, the District undertook underground electrical work on 16th Street that required paving over the Mural.  *See* Marissa J. Lang, *D.C.'s Black Lives Matter mural will be repainted after brief disappearance amid construction*, Wash. Post (May 11, 2021), https://www.washingtonpost.com/local/blm-plaza-repaved/2021/05/11/57012372-b268-11eb-9059-d8176b9e3798_story.html.  District personnel repainted the Mural a few days later.  *See* FOX 5 DC Digital Team*, Black Lives Matter Plaza mural repainted after paved over*, FOX 5 DC, May 13, 2021, https://www.fox5dc.com/news/black-lives-matter-16th-street-mural-repainted-after-paved-over.

Last summer, Pastor Rich Penkoski and lobbyists Chris Sevier and Tex Christopher (collectively, "Plaintiffs") sued the Mayor, challenging the constitutionality of the Mural. *See* Compl., ECF No. 1. They contended that it violates the Establishment Clause and the Equal Protection Clause because the "Black Lives Matter cult is a denominational sect of the religion of Secular Humanism," *id*. ¶ 2, and the street display labels them—non-black Christians—as "second class citizens," *id*. ¶ 44. The Mural, Plaintiffs claim, announces the District's preference both for black citizens and adherents to the Black Lives Matter movement. Compl. ¶¶ 2, 6.

Plaintiffs filed an Emergency Motion for a Temporary Restraining Order, *see* Pls.' Mot. for TRO, ECF No. 9, asking the Court to enjoin the Mayor from commissioning more "BLM" displays and to order her to remove the Mural and return the Plaza's name to "16th Street," *see* Pls.' TRO Proposed Order, ECF No. 9-1. After the Court denied the motion, each Plaintiff moved separately for a preliminary and permanent injunction. *See* Christopher Mot. for Inj., ECF No. 17; Penkoski Mot. for Inj., ECF No. 19; Sevier Mot. for Inj., ECF No. 21. The Mayor opposed each filing and cross-moved for summary judgment. Def.'s Cross Mot. for Sum. J., ECF No. 29. Plaintiffs refiled their preliminary injunction motions as motions for summary judgment, and the Court consolidated the briefing with a trial on the merits. *Penkoski*, 486 F. Supp. 3d at 226; *see* Fed. R. Civ. P. 65(a)(2).

The Court dismissed Plaintiffs' challenges for lack of standing. *Penkoski*, 486 F. Supp. 3d at 227–38. It declined to consider five new First Amendment claims that did not appear in the Complaint, but it invited Plaintiffs to file an amended complaint adding those claims. *Id.* at 238–40.

According to Plaintiffs, they then considered "taking self-help measures." Pls.' SUMF ¶ 36. They allege that they bought paint cans, loaded them in a car, and planned to drive to the

Mural and blot it out with paint. *Id.* They turned back after calling the D.C. police "while en route to carry out this criminal agenda" and learning that they would face arrest for defacing public property in violation of D.C. Code § 22-3312.01. *Id.* ¶ 36 (cleaned up). Plaintiffs "assured District police that if" they did not secure the judicial relief, "they would have no choice but to revive their unlawful self-help agenda"—including a promise to "make an epic display and pin the blame on the judicial branch." *Id.* ¶ 37.[5]

So Plaintiffs again sought legal remedies. They filed an Amended Complaint that reasserts their Establishment Clause claim as well as advances a claim of viewpoint discrimination under the First Amendment. Am. Compl. ¶¶ 91–100, ECF No. 51.[6] They ask the Court to "declare that Secular Humanism is [a] religion that the Black Lives Matter organization is inseparably linked to"; require the Mayor to remove the Mural and permit Plaintiffs to paint their own murals; "enjoin the Mayor from creating any more non-secular Black Lives Matter displays"; and order the renaming of 16th Street. *Id.* at 38–39.[7] Plaintiffs followed up with three

---

[5] Plaintiffs allege that they also sent several unanswered letters to the Mayor and the D.C. Attorney General requesting permission to paint their own messages on a District street. *See* Pls.' SUMF ¶¶ 70–74, 76–77. The Mayor disputes these facts, *see* Def.'s Opp'n Ex. 2 at 23–27, and the Court agrees that Plaintiffs have produced no evidence of the correspondence, as required by Fed. R. Civ. P. 56(c)(1)(A). So the Court will not consider this evidence, although the existence of any such letters would not change the Court's analysis.

[6] Plaintiffs added three constitutional claims challenging the Mayor's restrictions on mass gatherings in response to the COVID-19 pandemic. *See* Am. Compl. ¶¶ 101–31. But Plaintiffs later withdrew those claims. *See* Pl. Christopher's Opp'n at 7–8 n.3, ECF No. 76. More, these claims only sought declaratory and injunctive relief—not damages—and they now appear moot. *See* D.C. Mayor's Order 2021-069 (May 17, 2021), https://coronavirus.dc.gov/page/mayors-order-mayor%E2%80%99s-order-2021-069-modified-measures-springsummer-2021-washington-dc-reopening.

[7] All page citations refer to the page numbers generated by this Court's CM/ECF system, and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

motions for a preliminary and permanent injunction, *see* ECF Nos. 52, 54, and 56, and three motions for summary judgment seeking similar relief, *see* ECF Nos. 63, 65, and 67.  The Mayor opposes all Plaintiffs' claims and cross-moves to dismiss the complaint or, in the alternative, for summary judgment.  *See* ECF Nos. 71, 72.  This matter is ripe.[8]

## II.

The parties have submitted cross-motions for summary judgment, and the Court addresses Plaintiffs' claims under that standard.  *See Hedgeye Risk Mgmt., LLC v. Heldman*, 196 F. Supp. 3d 40, 46–47 (D.D.C. 2016); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015) (noting that courts should evaluate standing arguments under the summary judgment standard when resolving motions for preliminary injunction).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court's role at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Plaintiffs are proceedings *pro se*, so the Court generally subjects their pleadings to "less stringent standards than formal pleadings drafted by lawyers."  *Gray v. Poole*, 275 F.3d 1113, 1115 (D.C. Cir. 2002) (cleaned up).  But when a *pro se* plaintiff is an attorney—as Sevier identifies himself, *see* Am. Compl. ¶ 1—courts do not "automatically" apply "the very liberal standards afforded to a non-attorney *pro se* plaintiff."  *See Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 234 (D.D.C. 2007); *Robinson v. Howard Univ., Inc.*, 335 F. Supp. 3d 13, 22 (D.D.C.

---

[8]  This Court has subject matter jurisdiction under the federal question statute.  28 U.S.C. § 1331. Oral argument would not aid the Court, so it denies the various requests for a hearing.  *See* LCvR 78.1.

2018), *aff'd sub nom. Robinson v. Wutoh*, 788 F. App'x 738 (D.C. Cir. 2019). Any leeway does

not extend to the *evidence* required at summary judgment, as courts hold *pro se* plaintiffs to the

same evidentiary burdens and presumptions as represented plaintiffs. *See Prunte v. Univ'l Music

Grp., Inc.*, 699 F. Supp. 2d 15, 21–22 (D.D.C. 2010), *aff'd*, 425 F. App'x 1 (D.C. Cir. 2011).

## III. [9]

Plaintiffs advance two claims: (1) the Mural violates the First Amendment's

Establishment Clause by promoting the religion of Secular Humanism, and (2) the Mural is a

public forum for community speech but Plaintiffs have been denied the opportunity to add their

own messages based on the content of their proposed messages. They cannot proceed down

either path. The Court will consider them in reverse order.

## A.

Take first Plaintiffs' allegations of viewpoint discrimination. They contend that the

Mayor violated the First Amendment by giving special privileges to one viewpoint—Black Lives

Matter—while denying Plaintiffs an equal chance to paint their own expressive messages on

District streets. *See* Am. Compl. ¶¶ 98–100; Sevier Inj. Mem. at 34–37.

---

[9] Plaintiffs have again failed to provide their residential addresses, in violation of Local Rule 5.1(c)(1). The Court pointed out this fact in its last opinion, when it noted that it could dismiss the case on that basis alone. *See Penkoski*, 486 F. Supp. 3d at 238 (citing LCvR 5.1(c)(1)). Plaintiffs in several places assert that they rent property in the District, *see, e.g.*, Christopher Reply at 26, or maintain an office here, *see, e.g.*, Am. Compl. at 20 n.54. That does not suffice. The rule and the Court were clear on this point. *See* LCvR 5.1(c)(1). In the signature block of their briefs, Plaintiffs state, "DC residential address deleted for safety reasons." *See, e.g.*, Pl. Sevier's Mem. in Supp. of Mot. for Inj. ("Sevier Inj. Mem.") at 54, ECF No. 57. If Plaintiffs felt endangered by sharing their residential address, they could have moved to file documents under seal. *See* LCvR 5.1(h). While the Court again declines to dismiss the case on this basis, it notes Plaintiffs' repeated failure to heed the Court's directives and follow the local rules. Plaintiffs' *pro se* status is not "a license . . . to ignore the Federal Rules of Civil Procedure, a court's local rules, or a court's orders." *Nwaneri v. Quinn Emanuel Urquhart & Sullivan, LLP*, No. 19-cv-01540, 2020 WL 7773391, at *3 (D.D.C. Dec. 30, 2020) (cleaned up).

This claim is a new one for Plaintiffs, who did not advance it in the original complaint. That novelty is not a problem, but the claim fails based on the undisputed facts.

The First Amendment protects citizens' free speech rights in part by shielding them from discriminatory government regulation. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). If the government hosts a forum for public speech, it generally "must respect the open character of" that forum, so its ability to selectively restrict expressive activity there is limited. *Oberwetter v. Hilliard*, 639 F.3d 545, 551 (D.C. Cir. 2011). "Viewpoint discrimination is . . . an egregious form of content discrimination," in which the government favors or restricts certain speech based on the "motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829. Plaintiffs insist that the Mayor has done exactly that with the Mural. *See* Sevier Inj. Mem. at 38–39.

The First Amendment's Free Speech Clause, however, does not apply to the government's own speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009); *see also id.* at 464 ("the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause"). A government entity may "speak for itself," and "select the views that it wants to express." *Id.* at 467–68 (cleaned up). The government need not promote "pro-littering" campaigns aside its anti-littering campaigns, for example. Indeed, it is the government's duty to incorporate public opinion and act accordingly, including through speech. *See Nat'l Endow. for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view."). "Were the Free Speech Clause interpreted otherwise, government would not work." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

"Even political discrimination is allowed when the government chooses to sponsor speech." *Raven v. Sajet*, 334 F. Supp. 3d 22, 32 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019). So aside from a few limited exceptions, offensive speech by the government is cured at the ballot box, not in the courtroom.

But is the Mural government speech?[10] The Mayor maintains that it is, particularly given that she directed its creation, content, and location through her power as the District's chief executive. Def.'s Mem. of P. & A. in Opp'n and Cross-Mot. ("Def.'s Opp'n") at 32, ECF No. 71-1; *see* Def.'s SUMF ¶ 40. At times Plaintiffs concede as much; their briefing brims with attributions of the Mural to the Mayor. *See, e.g.*, Am. Compl. ¶ 24 ("The Mayor ordered the construction of the 'Black Lives Matter' mural on 16th Street"); Pls.' SUMF ¶ 21 (same); Sevier Inj. Mem. at 13 ("Mayor Bowser ordered the painting of a massive "BLACK LIVES MATTER" banner on 16th Street. . . . The DC flag was added at the end of the painted display to signify the government's stamp of approval."); Pl. Sevier Reply ("Sevier Reply") at 24 n.26, ECF No. 78 ("Clearly, it was the Mayor's decision to change part of 16th Street to 'Black Lives Matter Plaza,' making her the speaker of that display and not BLM.").

These occurrences are unsurprising given that Plaintiffs call their Establishment Clause claim their "primary cause of action." Sevier Inj. Mem. at 17. And to succeed on that claim requires that the speech be *government* speech if it is to be inappropriately promoting a religion. *See infra* at Section III.B. But Plaintiffs cannot have it both ways, as they recognize. *See* Sevier Reply at 9–10. Either (a) the Mural is government speech immune from a viewpoint

---

[10] Another Judge in this District concluded that the Mural was government speech. *See Frederick Douglass Found., Inc. v. District of Columbia*, No. CV 20-3346 (JEB), 2021 WL 1166841, at *9 (D.D.C. Mar. 26, 2021). But there, both parties conceded that the display was government speech. *Id.* So the Court considers this question anew.

discrimination claim but at risk of violating the Establishment Clause, or (b) it is private speech safe from the Establishment Clause but vulnerable to a viewpoint discrimination claim.

There is a firm basis to conclude the Mural is government speech.[11]  All parties agree that the Mayor "directed," *see* Def.'s SUMF ¶ 40, or "ordered" the painting of the Mural, *see* Pl.'s SUMF ¶ 21.  Although Plaintiffs contest the meaning of the Mural and the message it sends, they do not contest that the Mayor intended to send *a* message by commissioning the project.  *See, e.g.*, Am. Compl. ¶ 38 (referring to the "Mayor's over the top and lavish endorsement of the BLM religious organization"); *cf. Summum*, 555 U.S. at 470 ("When a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure.").  More, even private creations can constitute government speech; the government can, for example, communicate through its "editorial discretion" when it selects and presents certain third-party speech.  *See PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (finding government speech where city solicited decorated elephant and donkey statues from local artists and organizations for an art display).

Yet courts must "exercise great caution" when faced with apparent government speech. *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017).  The doctrine is "susceptible to dangerous misuse," furnishing governments a possible free pass to discriminate against certain viewpoints under the guise of speaking for themselves.  *Id.*  So despite the apparent governmental character of the Mural commissioned by the Mayor herself—and Plaintiffs' intermittent concessions on this point—the analysis does not end there.

---

[11]  In discussing their viewpoint-discrimination claim, Plaintiffs do not mention the street signs bearing the name "Black Lives Matter Plaza."  Am. Compl. ¶¶ 98–100.  The Court does not interpret Plaintiffs as alleging that the signs are a public forum.  In any event, they are clearly government speech.

When courts are unsure whether a government entity is speaking for itself or hosting a forum for private speech, they turn to the three factors set out in *Walker* and *Summum*: "(1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech." *Raven*, 334 F. Supp. 3d at 31 (cleaned up).

### 1.

First, the medium. While "not a prerequisite," courts "have recognized that a medium that has long communicated government messages is more likely to be government speech." *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017) (cleaned up).

A threshold question is the appropriate level of generality in defining the "medium." At the highest level, the Mayor is correct that the Government commonly speaks through artistic displays. *See Gittens*, 414 F.3d at 28; *Pulphus*, 249 F. Supp. 3d at 253–54 (choosing to remove private artist's painting from walls of the Capitol was government speech); *cf. Summum*, 555 U.S. at 470 ("Governments have long used monuments to speak to the public."). But that fact is so general as to be of little help; calling the medium here "an artistic display" does not distinguish it from private artistic displays, in a similar way that noting that the government often uses "written words" does not advance the analysis very far. "Art" may come in infinite media, and pegging art itself as the relevant medium sweeps in too much.

On the other hand, Plaintiffs stress that the Mayor has never before used colorful paint on the asphalt of 16th Street to convey political messages, *see* Sevier Reply at 37, a fact she does not contest. But focusing at this level of specificity also begs the question. *See Pulphus*, 249 F. Supp. 3d at 248. Such precision would shift the inquiry from "mediums . . . historically . . . used

to communicate messages" by the government to *locations* historically used. *Id.* at 247. And the government is free to speak in new places and at new times without courts reflexively labeling the *medium* as materially novel. The appropriate focus, then, is somewhere in the middle: painted messages on city streets.

The Mayor insists that streets all over the District contain messages from the government, specifically in the form of traffic directions. *See* Def.'s Reply in Supp. of Cross-Mot. to Dismiss ("Def.'s Reply") at 16, ECF No. 79. The occasional "STOP" or "KEEP CLEAR" directed at drivers and pedestrians come to mind. But the Mayor fails to explain how these examples extend to a message on the street—perpendicular to traffic on the road or the sidewalk—with letters so large that they span several blocks and which can be read as one message only from a distance, such as from a nearby building. More, regulatory roadway directives bear little resemblance to an artistic mural that is ring-fenced to obstruct vehicular traffic. When has the government communicated messages in this way? The Mayor offers no examples to justify the "historical" use of this medium. Her argument is like justifying the placement of a menorah in front of a government building because a mailbox also stands there.

Shifting her position slightly, the Mayor notes that she "and MuralsDC have a history of commissioning murals on public properties throughout the District," Def.'s Reply at 16, which Plaintiffs acknowledge, *see* Am. Compl. ¶¶ 57–58. True enough. But are any of the murals on a paved street or even on the ground? Or are the murals merely colorful displays on public property, such as on the side of buildings? The Mayor does not say. She did not submit adequate evidence on other purported government murals from which the Court could conclude much of anything. And here again, finding that the government sometimes sponsors large artistic displays is not enough to label the medium here as one historically used for government

speech.  Overall, this historical-use factor is at best inconclusive, but it more appropriately weighs against seeing the Mural as government speech.

**2.**

Next up is whether the public reasonably interprets the government to be the speaker. What matters is the reasonable perception of the public, so the Court notes but looks beyond the many times Plaintiffs have attributed the Mural to the Mayor.[12]  This factor weighs strongly for the Mural being government speech.

In *Walker*, the Supreme Court held that messages on specialty license plates issued by Texas counted as government speech.  576 U.S. at 210–14.  The Court explained that the association with the state was clear from the face of the plates:  They had "TEXAS in large letters at the top of every plate," the state "require[d] Texas vehicle owners to display license plates, and every Texas license plate is issued by the State."  *Id.* at 212.  More, each license plate was "a government article serving the governmental purposes of vehicle registration and identification."  *Id.*  This last point reflects the common-sense principle that it "is not common

---

[12]  The Court understands the Supreme Court's use of the word "reasonably" to invite this objective evaluation.  *See Walker*, 576 U.S. at 210 ("persons who observe donated monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf") (quoting *Summum*, 555 U.S. at 471); *cf. Pulphus*, 249 F. Supp. 3d at 249–50 (evaluating expectations of "the public" and unnamed "viewers" of art display).  But speaking of the wider public, even the D.C. chapter of BLM implicitly attributed the Mural to the Mayor when criticizing it as "a performative distraction from real policy changes."  *See* Black Lives Matter DC (@DMVBlackLives), Twitter (June 5, 2020), https://twitter.com/DMVBlackLives/status/1268903712581464066; *see also id.* ("[Mayor] Bowser has consistently been on the wrong side of BLMDC history.").  Similarly, when the District temporarily paved over the Mural in May 2021, BLM tweeted: "@MayorBowser's BLM performance has come to a close and set strike completed.  We now return to her regularly scheduled performances."  Black Lives Matter DC (@DMVBlackLives), Twitter (May 11, 2021), https://twitter.com/DMVBlackLives/status/1392119166195339266.

for property owners," including the government, "to open up their property [to messages] with which they do not wish to be associated." *Id.* at 210 (cleaned up).

So too here. Even if the government has not historically conveyed messages on the streets of the District in this way, the public would reasonably assume the government endorses messages that appear permanently painted on its streets. That is why courts have recognized that art selected for display on public property is "often treated as being endorsed by the government or representative of the government's views, and is therefore considered government speech." *Pulphus*, 249 F. Supp. 3d at 249 (collecting cases). More, the Mural includes the D.C. flag, which Plaintiffs concede "was added at the end of the painted display to signify the government's stamp of approval." Am. Compl. at 16 n.43.

The context of the Mural's creation is also critical. At the Mayor's direction, a division of the D.C. Department of Public Works planned and supervised the painting of the Mural. Def.'s SUMF ¶¶ 40–46. Unlike graffiti, it appeared with much fanfare, including press statements by the Mayor's office and the official renaming of the street by the city council. *Id.* ¶¶ 48–55. The public would reasonably take the District at its word that the Mural was part of a political message by the Mayor.

### 3.

Finally, the Court looks to whether the government maintains editorial control over the speech. "If the previous factor dealt with the degree to which the public perceives that the government exercises control over the content of the art displayed, this third factor deals with the degree of control the government actually exercises over the content of the works displayed." *Pulphus*, 249 F. Supp. 3d at 250. While mixed, this factor ultimately tilts toward finding government speech.

The District certainly had "control" over the Mural by commissioning its creation and determining what it would say. Def.'s SUMF ¶¶ 40–44. It matters not that members of the public apparently assisted with some of the initial painting. *Id.* ¶¶ 42–46. "The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Walker*, 576 U.S. at 217; *see also Gittens*, 414 F.3d at 28 ("compilation of the speech of third parties is a communicative act") (cleaned up).

The unsanctioned addition of "Defund the Police" complicates the matter. Recall that vandals painted over the stars in the part of the Mural that depicted the D.C. flag, and they added text next to the existing Mural. Def.'s SUMF ¶ 56. The resulting message proclaimed "Black Lives Matter = Defund the Police." *Id.* District employees repainted part of the Mural the next day, adding back the stars to the D.C. emblem. *Id.* ¶ 57. That temporary loss of control does not detract from the Mural as government speech; in fact, the District's quick movement to repaint the D.C. flag exhibits editorial control. *Cf. Walker*, 576 U.S. at 213 (noting that "the State has rejected at least a dozen proposed designs" for the license plate when judging degree of editorial control).

Unlike the D.C. flag alteration, though, the new "Defund the Police" message remained for several months. Def.'s SUMF ¶ 58. The Mayor tacitly suggests in her briefing that by not removing the new message she in essence adopted it, transforming it into government speech. Def.'s Reply at 18. She offers that the "District could have painted over the [Defund the Police] mural the following day, as it repainted the stars on the District flag, but it simply chose not to." *Id.* That cannot be enough. In fact, a government entity allowing members of the public to add their own messages to a public space, leaving up certain messages but removing others based on

their content, ably describes prohibited viewpoint discrimination at a public forum.  *See Rosenberger*, 515 U.S. at 829; *see also Matal*, 137 S. Ct. at 1758 ("If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints.").  Nor does the Mayor support this adopted-speech theory with evidence; for example, there is nothing in the record about a contemporaneous statement by the Mayor or the District endorsing the new message.  The Court doubts that the District endorsed that Black Lives Matter "equals" Defund the Police, as this litigation position suggests.

While the District's two-month delay in reasserting dominion over the content of the Mural gives the Court pause, it is not enough to extinguish the other indicia of control.  After all, District personnel eventually painted over the added message and returned the Mural to its original state.  Def.'s SUMF ¶ 58.  More, in May 2021 District personnel paved over the Mural to accommodate roadwork—leaving the street bare—before repainting the original "BLACK LIVES MATTER" message a few days later.  *See supra* n.4.  In short, the Mural appears as the Mayor wants it to appear, communicating a political message from the District.  In these circumstances, the District has exhibited enough editorial control over the Mural that this factor also tips in the Mayor's favor.  But the Court's analysis on this point would likely change should the Mayor selectively retain graffiti in the future.

*       *       *

The *Walker-Summum* factors favor finding government speech.  On the record here, the medium is not one historically used by the government to communicate.  But this fact is strongly outweighed by the public's expectation about the Mural appearing on government property and the circumstances of its creation; the Mayor explicitly took credit for the creation of the Mural,

which District personnel designed and painted, and which appeared along with the renaming of 16th Street.  Def.'s SUMF ¶¶ 40–55.  And since then, the District has exhibited imperfect but enough control over the Mural's content to preserve its governmental character.

The record simply does not support Plaintiffs' arguments that the Mayor created a public forum on 16th Street.  So after exercising "great caution," *Matal*, 137 S. Ct. at 1758, the Court finds that the government speech doctrine covers the Mural.  This determination forecloses Plaintiffs' viewpoint discrimination claim.  *See Summum*, 555 U.S. at 467.

Plaintiffs also resist this finding by asserting that the Mural's status as government speech is a question of fact that should be decided by a jury not the Court.  *See* Sevier Reply at 21–22, 29, 36, 40.  There are two problems with this argument.  *First*, for support Plaintiffs rely on *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988).  That case held that whether a sports stadium on government property served as a public forum was "inherently a factual" question that should not have been decided by the Court as a matter of law.  *Id.* at 1014.  The inquiry there—whether the government was hosting a public or nonpublic forum—is not the question here.  Because the Court determines that the Mural was government speech, "forum analysis does not apply."  *Pulphus*, 249 F. Supp. 3d at 247.  *Second*, the Court can and must prevent a question of fact from proceeding if the record lacks evidence from which a jury could find for Plaintiffs on that issue.  That is the point of summary judgment.  *See Anderson*, 477 U.S. at 249; Fed. R. Civ. P. 56(a).  Indeed, *Stewart* reversed the district court not just because a factual question was at issue but because the plaintiffs "ha[d] in their complaint alleged sufficient facts to withstand a motion to dismiss" so it "was error to dismiss [their] claims *at so early a*

*stage of the litigation*." *Stewart*, 863 F.2d at 1014 (emphasis added). Now is an appropriate time to adjudicate Plaintiffs' viewpoint discrimination claim, which cannot succeed on this record.[13]

## B.

In sidestepping the viewpoint discrimination claim, the Mural lands in the crosshairs of Plaintiffs' Establishment Clause claim.

Plaintiffs advanced this claim in their original complaint, Compl. at 20–22, and they identify it as their "primary cause of action," Sevier Inj. Memo at 17. In short, Plaintiffs allege that Black Lives Matter is a religion and the Mural conveys a message from the government that "Black Lives Matter Secular Humanism" is the favored religion of the District. Am. Compl. ¶¶ 91–97. As they did last year, Plaintiffs claim that the Mayor's conduct is "so egregious that a standing analysis is not necessary." Pl. Christopher's Reply Br. ("Christopher Reply") at 19, ECF No. 76 (cleaned up). The Court cannot agree.

A plaintiff must always assure the court that he has standing. *Scenic Am., Inc. v. U.S. Dep't of Trans.*, 836 F.3d 42, 48 (D.C. Cir. 2016). This showing requires an injury-in-fact to the plaintiff traceable to the defendant's challenged conduct and redressable by the court hearing the case. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The "manner and degree of evidence" demanded of the plaintiff depends on the stage of litigation. *Scenic Am., Inc.*, 836 F.3d at 48. And the burden "grows heavier at each stage," *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015), so by summary judgment a court must dismiss a claim if a plaintiff has not produced enough evidence "to at least raise a disputed

---

[13] Having determined that Plaintiffs' viewpoint discrimination claim cannot succeed, the Court need not address the Mayor's argument that Plaintiffs failed to properly plead a viable theory of municipal liability. *See* Def.'s Opp'n at 32–33 (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978)).

issue of fact as to each element of standing," *Scenic Am., Inc.*, 836 F.3d at 49; Fed. R. Civ. P. 12(h)(3). The Court may consider materials outside the pleadings in deciding whether it must dismiss a case for want of jurisdiction. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Plaintiffs largely double down on the same, unsuccessful standing arguments that they advanced before. To be sure, since the Court's last opinion Plaintiffs have filed an Amended Complaint and nine briefs.[14] But much of their material repeats past arguments, including one brief identical to a brief filed in support of the original complaint. *Compare* Christopher's Mem. in Supp. of Mot. for Inj., ECF No. 55, *with* Christopher's Mem. in Supp. of Mot. for Inj., ECF No. 18. The Court summarily reviews Plaintiffs' standing theories to confirm that they have not provided new evidence to cure them.[15]

---

[14] Although each side is entitled to file only one set of briefs, the Court permitted Plaintiffs to file individual briefs given their *pro se* status, despite the added burden it placed on the Court and the Mayor.

[15] The Court need not address Plaintiffs' arguments that the personal offense they take at the Mural is a sufficient injury-in-fact to confer standing. *See* Christopher Reply at 16 (the "offensive display cause[s] the Plaintiffs to feel like second class citizens/political outsiders"). The Court determined in its last opinion that this "'offended-observer' theory of standing has no basis in law." *Penkoski*, 486 F. Supp. 3d at 231; *see id.* at 231–38 (considering but rejecting theory). The Court incorporates by reference its analysis in that ruling, which Plaintiffs never appealed. So this legal determination is settled under the law-of-the-case doctrine. *See Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995). And there are no apparent factual developments that merit taking a second look. *See Nat'l Ass'n of Home Builders v. E.P.A.*, 786 F.3d 34, 41 (D.C. Cir. 2015) (explaining that once a competent court dismisses a claim on jurisdictional grounds, "a second complaint cannot command a second consideration of the same jurisdictional claims" unless circumstances have materially changed). More, in their new briefs Plaintiffs fail to engage with the Court's previous reasoning on this issue or address *Valley Forge*, the controlling case. 454 U.S. 464 (1982). So the Court also considers this theory waived.

**1.**

Plaintiffs again place nearly all their chips on their purported "taxpayer standing." *See* Am. Compl. ¶ 45 & n.59. But they again fail to meet the very narrow requirements set out in *Flast v. Cohen* and its progeny. 392 U.S. 83 (1968).

Taxpayer status confers standing in only "'extremely limited' circumstances." *Penkoski*, 486 F. Supp. 3d at 229 (quoting *In re Navy Chaplaincy*, 534 F.3d 756, 762 (D.C. Cir. 2008) (Kavanaugh, J.)). Federal taxpayers may challenge only a congressional appropriation "that expressly authorizes or appropriates funds violating the Establishment Clause." *Penkoski,* 486 F. Supp. 3d at 230 (cleaned up). The Court previously dismissed Plaintiffs' taxpayer-standing theory because they failed to show—or even allege—that the Mural expended *federal* funds or that Congress had any hand in its creation. *Id.* at 230–31; *cf. Valley Forge Christian Coll. v. Americans United for Separ'n of Church & State, Inc.,* 454 U.S. 464, 479–80 (1982) (rejecting taxpayer standing because "source" of plaintiffs' complaint was executive branch decision "not a congressional action" and because property transfer at issue "was not an exercise of authority conferred by the Taxing and Spending Clause" of Article I) (cleaned up).

Plaintiffs spill much ink discussing their tax payments, *see, e.g.*, Christopher Reply at 25, and the alleged nexus between their status as taxpayers and the purported constitutional violation, *see id.* at 25–29. But they yet again "skip over *Flast*'s threshold requirement" that they challenge a *congressional* expenditure made under Congress's taxing and spending power. *Penkoski*, 486 F. Supp. 3d at 230. Plaintiffs correctly cite this requirement in one of their briefs, *see* Christopher Reply at 21, but at no point do they submit evidence or arguments tying Congress to this dispute. This deficiency again dooms their taxpayer standing theory under *Flast.*

The Court acknowledged in its prior opinion that perhaps Plaintiffs could invoke *municipal* taxpayer standing, given that they sue the Mayor for commissioning the Mural in the District. *See Penkoski*, 486 F. Supp. 3d at 230 n.11. Plaintiffs declined that implicit invitation, as they do not mention the doctrine anywhere in their briefs.[16] So they forfeit this standing argument. *See Scenic Am., Inc.,* 836 F.3d at 53 n.4. While courts have a duty to raise jurisdictional deficiencies sua sponte, *see Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1125 n.2 (D.C. Cir. 1994), the burden of establishing standing always lies with plaintiffs, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Failing to meet the elements of federal taxpayer standing under *Flast*—and failing to attempt to meet them for municipal taxpayer standing—Plaintiffs lack taxpayer standing.

**2.**

Plaintiffs rehash another standing argument: they say the Mayor's "decision to authorize construction of" the Mural "directly injured" them by "entitl[ing] BLM members to harass, stalk, threaten, libel, and harm" them. Christopher's Reply at 9; *accord* Sevier Reply at 18 n.17. They add that they have "suffered financial injury because their plan to headquarter their healthcare

---

[16] At most, Plaintiffs stress that they pay sales tax in the District. *See* Christopher Reply at 25, 27. That takes them but one step on the steep climb of establishing municipal taxpayer standing. Plaintiffs, for example, have offered zero evidence that revenue from their sales taxes financed the Mural. *See D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 4 (D.C. Cir. 1988) (discussing elements of municipal taxpayer standing); *cf. ACLU-NJ ex rel. Miller v. Twp. of Wall*, 246 F.3d 258, 263 (3d Cir. 2001) (rejecting standing where despite "uncontradicted testimony that [plaintiffs paid] property taxes to the Township," they "failed to establish that the Township has spent any money, much less money obtained through property taxes," on challenged religious display). At summary judgment, more is required. *See Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 n.3 (D.D.C. 2019) (finding earlier determination that plaintiff "had proffered sufficient standing to overcome dismissal . . . not dispositive" at summary judgment).

business in offices on 16th Street have been thwarted because of the Mayor's endorsement of the Black Lives Matter religious organization."  Am. Compl. ¶ 96.

The Court has already explained that these alleged injuries stem from third-party "BLM Members"—not the Mayor, who is the only defendant here—so Plaintiffs failed to offer proof of traceability and redressability to establish standing.  *Penkoski*, 486 F. Supp. 3d at 238 (citing *Lujan*, 504 U.S. at 561); *see also Landrith v. Roberts*, 999 F. Supp. 2d 8, 17 (D.D.C. 2013) ("Causation is substantially more difficult to establish when a plaintiff's alleged injury is directly caused by a third party who is not before the court.") (cleaned up).

Plaintiffs failed to cure this deficiency.  They could have submitted evidence that the Mayor threatened or harmed them, or they could have shored up the connection between the Mayor and the alleged actions of anonymous BLM members.  They did neither.

Plaintiffs merely assert that "[a]ny reasonable observer can connect the dots and see that the Mayor's challenged policies are the superseding cause of the Plaintiffs' injuries, serving as the 'but-for' causation of the harm that followed."  Christopher Reply at 9.  *First*, even if true, "but-for" causation is neither necessary nor sufficient to sustain standing when a plaintiff's injuries stem from the conduct of a third party.  *See Landrith*, 999 F. Supp. 2d at 17.  *Second*, Plaintiffs' reliance on rhetoric that "any reasonable observer can connect the dots" only underscores the lack of evidence they have submitted in support of this theory.  *Third*, even if the Court accepted Plaintiffs' unsupported logic on causation, they have still failed to explain how removal of the Mural would likely redress any alleged harassment by BLM members.  *Lujan*, 504 U.S. at 561 ("It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (cleaned up).

Mere allegations do not suffice at the summary judgment stage. *Scenic Am., Inc.*, 836 F.3d at 48. Plaintiffs have again failed to support their third-party-incitement theory of standing.

**3.**

Plaintiffs do advance one new argument on standing. They assert that absent judicial relief they must resort to their "self-help plan" of blotting out the Mural with paint—conduct that would risk arrest and criminal prosecution. *See* Christopher Reply at 16–18; Sevier Reply at 18 n.16; *see also* Pls.' SUMF ¶ 36–37. Recall that Plaintiffs say they once drove toward the Mural with paint and turned back only after learning from the D.C. police that they would face arrest for defacing public property in violation of D.C. Code § 22-3312.01. Pls.' SUMF ¶ 36. So Plaintiffs contend that the "threat of arrest" is an imminent and concrete injury-in-fact traceable to the Mural and redressable by this Court. Sevier Reply at 18 n.16.

The Mayor shrugs at this theory. Def.'s Reply at 7. She accuses Plaintiffs of trying to "'manufacture standing' by 'inflicting harm on themselves.'" *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)).

The Mayor is too dismissive. Threatened enforcement can provide plaintiffs standing to challenge regulations or criminal laws, as long as enforcement is "sufficiently imminent." *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370 (D.C. Cir. 2020) (cleaned up). "[A]ctual threats of arrest made against a specific plaintiff are generally enough to support standing as long as circumstances haven't dramatically changed." *Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005). So "an actual arrest, prosecution, or other enforcement action is not a prerequisite." *Susan B. Anthony List (SBA) v. Driehaus*, 573 U.S. 149, 158 (2014). This so-called "pre-enforcement review" is "at its peak when claims are rooted in the First Amendment," as they are here. *Woodhull Freedom Found.*, 948 F.3d at 371 (cleaned up).

This standing theory, however, has its limits. A plaintiff "satisfies the injury-in-fact requirement" for pre-enforcement challenges where he "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible *threat of prosecution thereunder*." *SBA*, 573 U.S. at 159 (emphasis added). An essential part of the inquiry is whether a plaintiff's "intended future conduct is arguably proscribed by the statute they wish to challenge." *Id.* at 162 (cleaned up). So pre-enforcement challenges are limited to where the threat of enforcement stems from the challenged law itself. *See Kearns v. Cuomo*, 415 F. Supp. 3d 319, 329 (W.D.N.Y. 2019) (rejecting pre-enforcement standing "where the law Plaintiff [wa]s challenging [wa]s different than the law under which he allegedly fears criminal prosecution" and noting plaintiff was unable to cite any case law supporting such a theory), *aff'd*, 981 F.3d 200 (2d Cir. 2020).

Here Plaintiffs assert no quarrel with the District's graffiti statute, which furnishes the threat of prosecution. They do not, for example, advance a facial or as-applied challenge to D.C. Code § 22-3312.01. *Cf. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists *a credible threat of prosecution thereunder*, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") (emphasis added); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding standing where plaintiff challenged "specific provisions of state law which have provided the basis for threats of criminal prosecution against him"). Plaintiffs instead seek a backdoor to challenge non-legislative conduct by the Mayor. Pre-enforcement review does not permit this.

Plaintiffs cite only one case, *see* Sevier Reply at 18 n.16, and it does not help them. In *Younger v. Harris*, the plaintiff (Harris) had been indicted for distributing leaflets in violation of the California Criminal Syndicalism Act. 401 U.S. 37, 38–39 (1971). When he challenged the law's constitutionality in federal court, several other plaintiffs intervened, arguing that Harris's prosecution chilled their speech too. *Id.* at 39. The Court determined that only Harris had standing because the intervenors "d[id] not claim that they ha[d] ever been threatened with prosecution, that a prosecution [wa]s likely, or even that a prosecution [wa]s remotely possible." *Id.* at 42. Harris, meanwhile, had "an acute, live controversy with the State and its prosecutor," given his criminal indictment under the statute he challenged. *Id.* at 41. Not so with Plaintiffs here, who face no known prosecutions and do not challenge the constitutionality of the D.C. statute that allegedly threatens them.

At bottom, Plaintiffs' standing argument amounts to a threat: accept judicial consideration of their grievances or else they will break the law. The Court will not indulge this standing-by-coercion tactic.

Because Plaintiffs fail to prove that they have any viable theories of standing, the Court will again dismiss their Establishment Clause claim.

## IV.

As this Court emphasized last year, Plaintiffs' cri de coeur over the Mural does not fall on deaf ears. The Court takes seriously passionate appeals for judicial intervention to stop discriminatory government conduct. But to succeed in federal court, Plaintiffs must have standing under the Constitution and assert viable legal claims that address legal wrongs. Despite multiple chances, Plaintiffs have failed to meet their burden on any claim.

The Court will thus deny Plaintiffs' motions for summary judgment and for a preliminary or permanent injunction and grant summary judgment to the Mayor.  A separate order will issue.

Dated:  July 12, 2021

_____
TREVOR N. McFADDEN, U.S.D.J.